IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO.: 02-CV-2902** |
| | : | |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2002, upon consideration of Plaintiff's

Motion for a Preliminary and Permanent Injunction and Defendants' Opposition to Plaintiff's

Motion for a Preliminary and a Permanent Injunction and Defendants' Motion to Dismiss

Plaintiff's Complaint Under Fed. R. Civ. P. 12(b)(6) and Plaintiff's response thereto,

IT IS HEREBY ORDERED that Plaintiff's foregoing Motion is denied;

IT IS FURTHER ORDERED that Defendants' foregoing Motion is GRANTED

and Plaintiff's Complaint is dismissed with prejudice.

_____
D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO.:  02-CV-2902** |
| | : | |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY AND A PERMANENT INJUNCTION AND DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)**

Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann"), by and through their undersigned counsel, Pepper Hamilton LLP, hereby request that this Court deny Plaintiff Amer Industrial Technologies, Inc.'s ("AIT") Motion for a Preliminary and a Permanent Injunction, and for the reasons set forth below, Defendants move the Court for an Order dismissing Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

I.    STATEMENT OF FACTS

A.    Introduction

AIT sued MLEA and Wiedemann, because AIT lost to MLEA in a three company competitive bid process for engineering design work at the Savannah River Project.  AIT claims that it lost that work because Wiedemann disclosed AIT's pricing data for that project to MLEA. The facts, however, show that (1) Wiedemann never disclosed that data or any other AIT proprietary information to MLEA, (2) MLEA proposed and submitted its own independently

developed bid proposal for that project, and (3) the company that evaluated the three bids,

Accurate Machine Product Corporation ("Accurate Machine"), ranked AIT last among the three

bidders, even though the runner-up, MECA, submitted a bid price that was <u>higher</u> than AIT's

price.  AIT also makes claims that Wiedemann might disclose AIT proprietary information to

MLEA regarding three other projects, one for Kumsung and two for CTCI.  The Affidavit of

Wiedemann and MLEA, however, establish that (1) Wiedemann has never disclosed any AIT

proprietary information about those projects to MLEA, and (2) MLEA has no intention of

bidding on those three projects and had never heard of them before being sued by AIT.

      B.    <u>The Savannah River Project</u>

      Wiedemann was hired by AIT on or about October 20, 2001, and worked there

until January 22, 2002, when AIT terminated his employment.  <u>See</u> Wiedemann Affidavit,

attached hereto as Exhibit A, ¶¶ 1 & 9.  Wiedemann was an employee at will and did not sign,

nor was he ever asked to sign, an employment contract or a covenant not to compete.  <u>Id.</u> ¶ 2.

One of the projects Wiedemann undertook for AIT was to prepare a bid to be submitted to

Accurate Machine for the design and fabrication of certain equipment at the Westinghouse

Savannah River Site.  <u>Id.</u> ¶ 4.  In preparing that bid, Wiedemann had conversations in November

2001 with Paul Manzon of MLEA about the Savannah River Project.  <u>Id.</u> ¶ 6.  Those

conversations, however, were about MLEA subcontracting with AIT for design work for certain

equipment at the Savannah River Project, and on November 20, 2001, MLEA did submit a bid to

AIT for part of the design work for the Savannah River Project.  <u>Id.</u> ¶¶ 6 & 7.  AIT ultimately

submitted a subcontractor bid to Accurate Machine on December 26, 2001 for the design and

fabrication of certain equipment for the Savannah River Project.  <u>Id.</u> ¶ 8.  On January 15, 2002,

Accurate Machine submitted a bid for design and fabrication of the Savannah River Project to

the Westinghouse Savannah River Company, which bid incorporated the bid submitted to Accurate Machine by AIT.  See Gough Affidavit, attached hereto as Exhibit B, ¶¶ 3 & 4.

Shortly thereafter, still in mid-January 2001,Westinghouse told Accurate Machine that, for budgetary reasons, it had decided to split the Savannah River Project into two separate phases, design and fabrication -- entailing two separate contracts.  Id. ¶ 5.  Westinghouse then asked Accurate Machine to submit a bid for the design-only phase of the Project.  Id.

As a result, Accurate Machine immediately sought new competitive, fixed-price bid proposals for the design-only phase of the Project.  Id. ¶ 6.  In soliciting the new bids for the design-only work, Accurate Machine provided each prospective bidder with the same technical information upon which to base any bid proposals.  Id. ¶ 9.  In response to this solicitation, Accurate Machine received bids from three companies.  Id. ¶ 7.  On January 18, 2002, Accurate Machine received a bid from AIT for $127,000.  Id. ¶ 8.  On February 8, 2002, Accurate Machine received a bid from MLEA for $91,000.  Id.  On February 18, 2002, Accurate Machine received a bid from MECA for $129,498.  Id.  The three bidders were unaware of each other's identities, but they knew that the project was being competitively bid.  Id. ¶ 9.  Wiedemann was terminated by AIT on January 22, 2002, seven days after Accurate Machine submitted its bid for the design and fabrication of the Savannah River Project, and four days after AIT had submitted the second bid to Accurate Machine for the design-only contract.  See Exhibit A, ¶ 9; see Exhibit B, ¶¶ 3 & 8.

On March 4, 2002, after evaluating each of the bid proposals, Accurate Machine awarded the purchase order for the design-only phase of the Savannah River Project to MLEA.  See Exhibit B, ¶ 10.  Accurate Machine awarded the subcontract to MLEA on the combined basis of MLEA's technical merit and pricing.  Id. ¶ 11.  Of particular value to Accurate Machine

was that one of the key MLEA engineers, Paul Manzon, had previously worked at the Savannah
River Site and was, therefore, familiar with the very stringent operating environment at the plant,
which requires specialized design considerations.  Id.  Accurate Machine ranked MLEA as first
among the three competitive bidders "based on price, delivery, technical capabilities and

Id.  MECA was ranked second.  Id.  As to AIT, Accurate Machine
concluded that "there seems to be no compelling reason for preference."  Id.  In short, AIT was a
distant third – if that.  AIT had no special "contractual relation" or other business relationship of
any kind with Accurate Machine.  Rather, AIT was simply one project bidder competing for the
Savannah River Project subcontract.  AIT never had any more chance of being awarded the
design-only contract than any other bidder, including MLEA.  In fact, Mr. Amer told
Wiedemann not to spend too much time on the bid proposal to Accurate Machine because
Mr. Amer thought AIT stood less than a 10% chance of winning the job.  See Exhibit A, ¶ 5.

　　　　While employed by AIT, Wiedemann met the President and General Manager of
Accurate Machine, Kenneth Gough ("Gough"), when Gough toured the AIT facility in early
January 2002, before the Savannah River Project had been split into design and fabrication
phases.  See Exhibit B, ¶ 12.  At that time, AIT told Gough that Wiedemann would be
responsible for AIT's overall engineering and design work on the Savannah River Project.  Id.
¶ 13; Exhibit A, ¶ 11.  While Wiedemann was employed at AIT, Wiedemann never once
mentioned MLEA to Gough or to Accurate Machine.  See Exhibit A, ¶ 12; Exhibit B, ¶ 15.
After Wiedemann was terminated by AIT, he informed Gough, as a professional courtesy, that
he had been terminated from AIT, and that he would no longer be responsible for the AIT bid
proposal for the Savannah River Project.  See Exhibit A, ¶ 11; Exhibit B, ¶ 16.

C.    Wiedemann's Post-Termination Employment

Between January 28, 2002 and February 22, 2002, Wiedemann performed some contractual consulting work for MLEA.  See Exhibit A, ¶ 13; see also DelGaizo Affidavit, attached hereto as Exhibit C, ¶ 6.  This consulting work concerned the BOC Edwards Ammonia Project in Taiwan and was completely unrelated to the Savannah River Project or to AIT.  See Exhibit A, ¶ 13.  When Accurate Machine awarded the design-only Savannah River Project contract to MLEA on March 4, 2002, Wiedemann was out of the country on vacation.  See Exhibit A, ¶ 14; Exhibit B, ¶ 10.  When Wiedemann returned from vacation, he again performed some contract consulting work for MLEA between March 11, 2002 and March 22, 2002.  See Exhibit A, ¶ 15.  Again, this consulting work had nothing to do with the Savannah River Project or with AIT.  Id.  Rather, his work concerned the BOC $NF_3$ Project in South Africa.  Id.  On March 25, 2002, Wiedemann was hired by MLEA as a full-time employee.  Id., ¶ 16; Exhibit C, ¶ 5.

After he was terminated by AIT, Wiedemann informed MLEA that Accurate Machine was seeking bid proposals for the Savannah River Project, but he did not tell MLEA about AIT's pricing or other proprietary information.  See Exhibit A, ¶¶ 17 & 18; Exhibit C, ¶ 7.  Even after he began doing contract consulting work for MLEA between the end of January 2002 and the end of March 2002, Wiedemann's work for MLEA was unrelated to the Savannah River Project and had nothing to do with AIT.  See Exhibit A, ¶¶ 13 & 15.  After becoming a full-time employee of MLEA, Wiedemann has not worked on any projects that would compete with AIT.

Although during the brief time he was employed by AIT, Wiedemann may have worked on the projects referred to in the Complaint as the Kumsung Engineering Project ("Kumsung"), the CTCI fuel tanks ("CTCI fuel"), and the CTCI nitrogen bottles ("CTCI $N_2$"), he never provided any information about those projects to MLEA.  Id. ¶ 17; Exhibit C, ¶ 7.  Nor

has MLEA ever prepared competing bid proposals for any of those projects.  See Exhibit C, ¶ 4.

The first time MLEA heard of the Kumsung and CTCI Projects was when it was served with

AIT's Complaint on May 16, 2002.  Id. ¶ 3.

       D.    Conclusion

      Wiedemann did not misappropriate or disclose any AIT trade secrets and, he

breached no fiduciary or other duty of loyalty to AIT.  See Exhibit A, ¶¶ 17 & 18; Exhibit C,

¶¶ 7 & 8.  MLEA has not tortiously interfered with any existing or potential contractual relation

of AIT.  See Exhibit C, ¶¶ 7 & 8.  Wiedemann and MLEA have never tortiously conspired to

intentionally harm AIT, and AIT has suffered no actionable harm.  See Exhibit A, ¶¶ 17 & 18.

Other than the Savannah River Project (the contract which was awarded in March 2002), AIT

has not alleged – nor can it – that there are any other projects for which MLEA and AIT have

subsequently competed.  See Exhibit A, ¶ 17; Exhibit C, ¶¶ 3 & 4.

      AIT cannot meet any of the requirements for a preliminary or a permanent

injunction.  MLEA and Wiedemann are entitled to have AIT's suit dismissed.

II.    ARGUMENT

       A.    Plaintiff's Motion For An Injunction Should Be Denied.

      An injunction is an extraordinary form of relief, and Plaintiff cannot meet the

burden of proving its entitlement to that relief.  Under Pennsylvania law, in considering a motion

for a preliminary injunction, a court must weigh four factors:  1) whether the movant has shown

a reasonable probability of success on the merits; 2) whether the movant will be irreparably

injured by the denial of such relief; 3) whether granting preliminary injunctive relief will result

in even greater harm to the non-moving party; and 4) whether granting preliminary injunctive

relief will be in the public interest.  <u>SI Handling Systems v. Heisley</u>, 753 F.2d 1244, 1254 (3d

Cir. 1985).  Plaintiff cannot establish those factors in its favor.

           1.      Plaintiff has not demonstrated a reasonable probability of success on the
<u>                 merits.                                                                          </u>

Beyond alleging the misappropriation of AIT's "pricing data" on its Savannah

River bid proposal, AIT is repeatedly vague in its Complaint and never specifically identifies the

other "trade secret information" that was supposedly misappropriated by Defendants.  What that

other "trade secret information" is – if, indeed, it constitutes trade secrets – can only be identified

by Plaintiff, which it has not done.   Such vague allegations cannot support injunctive relief of

the kind sought by Plaintiff, and Plaintiff bears the burden of showing that the supposedly

misappropriated information is proprietary.  <u>Air Products and Chemicals, Inc. v. Johnson</u>, 442

A.2d 1114, 1120 (Pa. Super. Ct. 1982).  <u>See also</u> <u>Somat Corp. v. Combs</u>, 40 Pa. D. & C.2d 107,

117 (C.C.P. Chester 1966) (defendant's knowledge of plaintiff's prices or amount of its bids

already submitted upon particular projects is not misappropriation of trade secrets).

Putting aside those vague allegations, the nub of AIT's Complaint is that (1)

because Wiedemann was employed by AIT he came to know AIT's price submitted to Accurate

Machine for the Savannah River Project and (2) he disclosed that price to MLEA either before or

after he was terminated by AIT, thereby resulting in MLEA being awarded the purchase order by

Accurate Machine, and (3) Wiedemann has AIT proprietary information about other AIT

business opportunities, i.e. Kumsung and CTCI, which allegedly makes it "likely" that

Defendants will interfere with those opportunities.

Thus, the common and key element of AIT's claims is Wiedemann's disclosure to

MLEA, either before or after his termination by AIT, of AIT's Savannah River/Accurate

Machine pricing data, and his disclosure to MLEA of AIT information related to the Kumsung

and CTCI projects.  AIT's claims fail as a matter of proof.  Mr. Wiedemann's Affidavit

establishes that he never – neither before nor after his termination by AIT – disclosed to MLEA

the AIT bid price or other AIT information used in AIT's bid to Accurate Machine.  See Exhibit

A, ¶¶ 17 & 18.  The only conversations Wiedemann had with MLEA while employed by AIT

were with Mr. Manzon in November 2001 about MLEA possibly being a subcontractor for AIT

on certain design work for the Savannah River Project.  See Exhibit A, ¶ 6.  It was only after he

was terminated by AIT on January 22, 2002 that Wiedemann said anything to MLEA about the

Savannah River Project, and at that time he told MLEA only that there might be an opportunity

to bid on design work.  See Exhibit A, ¶ 18.  See also Spring Steels, Inc. v. Molloy, 162 A.2d

370, 374 (Pa. 1960) (after termination of his agency, in absence of restrictive agreement, agent

can properly compete with his principal as to matters for which he has been employed).  Of

course, this conversation disclosed nothing new to MLEA, since while at AIT in November

2001, Wiedemann had previously talked to MLEA about using MLEA as an AIT subcontractor

for part of that project.  Id. ¶ 6.  Mr. Wiedemann's Affidavit also shows that he never, at any

time, disclosed any AIT information related to its opportunities for Kumsung or CTCI.  Id. ¶ 17.

In fact, MLEA's President and CEO, Theodore J. DelGaizo, in his Affidavit states that MLEA

has not bid on any of those Kumsung or CTCI projects, and indeed, he was not even aware of

those projects until MLEA was sued on May 16, 2002.  See Exhibit C, ¶¶ 3 & 4.  See also

Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 358 (3d Cir. 1980) (error to

grant injunctive relief where there was credible testimony that former employee did not intend to

disclose, and new employer did not intend to use, former employer's confidential information).

       MLEA's bid price on the Savannah River Project simply does not square with

AIT's allegations that MLEA used AIT's price in making the MLEA bid.  The MLEA fixed

price bid was $91,000, or 30% lower than AIT's bid of $127,000.  See Exhibit B, ¶ 8.

Particularly on a price-fixed contract such as this, if Wiedemann had divulged AIT's pricing

information to MLEA, one would expect the MLEA bid to be much closer to the $127,000 AIT

bid.  In other words, why did not MLEA make a bid that just barely undercut AIT's, thereby

increasing MLEA's profit margin?  The answer is simple – MLEA did not know AIT's bid price.

The irony here is that it appears that AIT was never really in the running for the

Savannah River Project work.  Mr. Gough, the President and General Manager of Accurate

Machine, in his Affidavit, ranked AIT third among the three bidders.  See Exhibit B, ¶ 11.  He

ranked MLEA first "based on price, delivery, technical capabilities and acceptable reference

Id.  And, he ranked MECA second, even though MECA's price was higher than AIT's

price.  Id.  Tellingly, Mr. Gough ranked AIT last, concluding that "there seems to be no

compelling reason for preference."[1]  AIT would not have been awarded the work even if MLEA

had never bid.  Id.

This is consistent with how AIT assessed its chances before bidding.  Plaintiff's

principal, Mr. Amer, admitted to Wiedemann, while Wiedemann was preparing AIT's bid, that

AIT had "less than a 10% chance of winning the Accurate Machine contract."  See Exhibit B,

¶ 5.  As a result, he directed Wiedemann not to spend too much time preparing the AIT bid

proposal to Accurate Machine.  Id.  Accurate Machine's evaluation of AIT's bid is dispositive as

to AIT's claims about the Savannah River Project.  Even if Wiedemann had disclosed AIT's

---

[1] Mr. Gough's Affidavit states that neither he nor his company ever received any inquiries from counsel for AIT about Accurate Machine's rationale for awarding the design work to MLEA.  Had such an inquiry been made, this suit could have – and should have – been avoided.  Defendants reserve the right to seek appropriate sanctions, if this failure to investigate is not satisfactorily explained.

price information to MLEA and MLEA had used it – both allegations being false – AIT still would <u>not</u> have been awarded the work.  <u>See</u> Exhibit B, ¶ 11.

All Wiedemann did was remind MLEA about the Accurate Machine bid opportunity after he was terminated by AIT.  <u>See</u> Exhibit A, ¶ 18.  That, however, occurred *after* Wiedemann was no longer employed by AIT.  <u>Id.</u>  AIT's supposed relationship with Accurate Machine, or the existence of the request for bid proposals, are not trade secrets.  <u>See</u> <u>SI Handling</u>, 753 F.2d at 1259 ("Plaintiff did not require covenants from its employees, and cannot now through the medium of trade secrets law prevent them from exploiting their contacts"); <u>see</u> Restatement (Second) of Torts § 757 cmt. B (trade secret is not simply information as to single or ephemeral events such as the amount or other terms of a secret bid for a contract).  And MLEA already knew about Accurate Machine and its relationship to the Savannah River Site, because AIT had solicited a bid from MLEA in November 2001, when the Project still combined design and fabrication.  Defendants breached no duty, and AIT has suffered no harm.  AIT just lost in fair competition, as Mr. Amer suspected it would.

AIT's claims as to the Kumsung and CTCI projects cited in the Complaint are meritless as well.  To begin with, AIT fails to identify what specific categories of "proprietary and confidential trade secret information" it believes Wiedemann took with him from AIT.  This is odd, since presumably AIT knows what information of a proprietary nature for those projects existed at AIT during Wiedemann's tenure there.  That is of no moment, however, for two reasons.  First, in his Affidavit, Wiedemann declares that he never told anyone at MLEA anything about AIT's price or other proprietary information relating to those projects.  <u>See</u> Exhibit A, ¶ 17.  Second, MLEA is not involved in those projects, and, in fact, had never even

heard of them until AIT filed suit.  <u>See</u> Exhibit C, ¶¶ 3 & 4.  AIT's request for injunctive relief is based on nothing but speculation.

In summary, AIT cannot establish that Wiedemann disclosed to MLEA any AIT pricing or other proprietary information as to the Savannah River Project.  More significantly, AIT never even had a shot at that work, as it finished a distant third among three bidders.  AIT's claims as to the Kunsung and CTCI projects are ephemeral.  AIT has no likelihood of success on the merits.

       2.      Plaintiff will not be irreparably harmed by the denial of its motion for a preliminary injunction.

"To demonstrate irreparable harm, the Plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.   The preliminary injunction must be the *only* way of protecting the Plaintiff from harm."  <u>Campbell Soup Co. v. Conagra, Inc.</u>, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original).  Establishing only a <u>risk</u> of irreparable harm is not enough.   A Plaintiff has the burden of making a clear showing of immediate irreparable injury.  The requisite feared injury or harm must be irreparable--not merely serious or substantial -- and it must be of a peculiar nature, so that compensation in money alone cannot atone for it.  <u>Id.</u> at 91-92 (citations omitted.)

In <u>Campbell Soup</u>, where a former employee had revealed a trade secret to a new employer, the Third Circuit vacated the District Court's entry of a preliminary injunction because the plaintiff former employer had failed to show that it would be irreparably harmed.  <u>Id.</u> at 92. In reversing, the Court held that plaintiff did not meet its burden of proof because the new employer had no intent of using the trade secret any further, there was no evidence that the defendant was close to marketing a product based on the trade secret, and because the secret had already been revealed and, thus, could not be "further" revealed.  <u>Id.</u> at 91-92.

In this case, Plaintiff cannot establish irreparable harm.  Even assuming that Defendants had misappropriated AIT's bid price to Accurate Machine for the Savannah River – there is still no need for the extraordinary relief of an injunction. That work has already been awarded and, indeed, the work under the contract is nearly completed.  See Exhibit C, ¶ 9.  To suggest that AIT's confidential information related to the Savannah River Project can somehow be "further disclosed" is nonsense.  While a *threat* of disclosure may establish immediate irreparable harm, the threat of "further" disclosure of something already revealed cannot be irreparable harm.  Campbell Soup, 977 F.2d at 92.  Thus, with respect to Accurate Machine and the Savannah River Project, there is no threat of irreparable harm (if, in fact, there ever was such a threat to begin with).  If it ultimately turns out that Plaintiff is entitled to some form of relief as to the Accurate Machine bid, it is certainly not injunctive relief.  See id. at 91-92.  See also SI Handling, 753 F.2d at 1264 (relevant inquiry is whether movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued) (emphasis added).

As to AIT's  claim for injunctive relief as to the alleged "prospective" projects for Kumsung, CTCI fuel, and CTCI $N_2$, it bears repeating that "establishing a risk of irreparable harm is not enough."  Id. at 91 (emphasis added).  In Campbell Soup, the Court stated:

> [I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.  Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do.

Id. at 92.  See also Continental Group, 614 F.2d at 359 ("an injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights").  In this case, MLEA has no intention of bidding on, or competing with AIT for the Kumsung, CTCI fuel, and

CTCI N$_2$ projects.[2]  <u>See</u> Exhibit C, ¶ 4.  Plaintiff has the burden of proving that the Defendants

had a "purpose or intent to harm the Plaintiff by preventing the relationship from accruing."

<u>Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.</u>, 801 F. Supp. 1450, 1459 (E.D. Pa.

1992).  That will be an impossible burden to meet considering that, until Plaintiff filed its

Complaint, MLEA had never even heard of those projects.

In addition, Plaintiff would be hard-pressed to present evidence that it even has a

reasonable chance of being awarded those contracts in the first place so as to qualify those mere

business opportunities as a prospective contractual relationship between AIT and those

companies.  In <u>Advanced Power Systems</u>, the Court stated:

> [e]ven at the pleading stage, a Plaintiff may not rest a claim for
> tortious interference with prospective contractual relations on a
> mere hope that additional contracts or customers would have been
> forthcoming but for Defendant's interference.  The complaint must
> allege facts that, if true, would give rise to a reasonable probability
> that particular anticipated contracts would have been entered into.

<u>Id</u>. at 1459.  AIT has not alleged anything beyond "opportunities" as to those companies.  That

cannot be a basis for injunctive relief.

Plaintiff cannot demonstrate the irreparable harm necessary for injunctive relief.

For this reason alone, Plaintiff's request for a preliminary and permanent injunction should be

denied.

3.    <u>MLEA will be harmed if subjected to an injunction</u>.

In ruling on a request for injunctive relief, the Court must also weigh the harm to

the non-moving party.  <u>Continental Group</u>, 614 F.2d at 356-57.  An injunction of the breadth

---

[2] Defendants should not be foreclosed from ever doing business in the future with those companies simply because Wiedemann may have learned something about those companies while employed by AIT.

sought against MLEA would severely restrict – or prevent-- MLEA from effectively competing for work in the field of engineering design that MLEA and AIT inhabit. It would give AIT an artificial and unwarranted competitive advantage. By contrast, AIT will not be harmed by the denial of an injunction. The Savannah River Project was awarded in March 2002, and the work is almost completed. See Exhibit C, ¶ 9. MLEA has not submitted any other bids that compete with AIT, and certainly none on which Wiedemann worked while employed at AIT. See id., ¶ 4.

        4.      <u>Granting injunctive relief in this case is contrary to the public interest</u>.

Wiedemann has a right to shape his professional career and to work in the field of his training. See <u>Springs Steels</u>, 162 A.2d at 373. If AIT was concerned about possible competition by former employees, it should have insisted that Wiedemann sign some form of non-compete agreement. There was no such agreement between Wiedemann and AIT. See Exhibit A, ¶ 2. Wiedemann is, thus, legally entitled to take his professional skills, knowledge and contacts to MLEA. See <u>SI Handling</u>, 753 F.2d at 1259 ("Plaintiff did not require covenants from its employees, and cannot now through the medium of trade secrets law prevent them from exploiting their contacts"). The <u>SI Handling</u> Court stated:

> It is not a phenomenal thing in American business life to see an employee, after a long period of service, leave his employment and start a business of his own or in association with others. And it is inevitable in such a situation, where the former employee has dealt with customers on a personal basis that some of those customers will want to continue to deal with him in his new association. This is so natural, logical and part of human fellowship, that an employer who fears this kind of future competition must protect himself by a preventive contract with his employee.

<u>Id</u>. at 1259 (quoting <u>Spring Steels</u>, 162 A.2d at 375).

Moreover, the law encourages a free and competitive market place contemplated by our Constitution. See <u>United Aircraft v. Boreen</u>, 284 F. Supp. 428, 449 (E.D. Pa. 1968) (denying injunctive relief against former employees at will without restrictive covenants who left

plaintiff to form a competitor, and citing a "strong policy of Pennsylvania favoring economic liberty, manifested in <u>Molloy</u> case and in the economic spirit of the Constitution"). It would be contrary to public policy to enjoin MLEA or Wiedemann, where there was no restrictive covenant, and where there is no evidence that any trade secrets had been misappropriated or misused.

      B.    <u>Plaintiff Has Failed To State A Claim For Which Relief Can Be Granted</u>.

Defendants hereby move this Court for an Order dismissing the Complaint under Federal Rule of Civil Procedure 12(b)(6). Because this motion is supported by affidavits, the Court will treat the motion as a motion for summary judgment under Rule 56. Fed.R.Civ.P. 12(b)(6).

Rule 56 of the Federal Rules of Civil Procedure provides that a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, the non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, summary judgment should be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

Counts I through IV of the Complaint stand or fall on one set of facts – that the Defendants' wrongfully came into possession of, and used, AIT's "pricing data" for the Savannah River Project and similarly came into unspecified AIT "proprietary" information and

"are likely to interfere" with AIT's current business "opportunities" with certain Kumsung and CTCI projects. The evidence, however, simply does not support that set of facts.

First, Wiedemann came to know AIT's pricing data for the bid to Accurate Machine for the Savannah River Project, because he was responsible for preparing AIT's bid. See Exhibit A, ¶ 4. Second, Wiedemann's Affidavit establishes that he never disclosed that AIT "pricing data" or other proprietary information to MLEA either before or after he left AIT. Id. ¶¶ 17 & 18. Third, the Affidavit of Mr. Gough at Accurate Machine establishes that AIT was never in the running for the design work at the Savannah River Project. See Exhibit B, ¶ 11. If MLEA had not bid or had not accepted the award, Accurate Machine would have awarded the work to MECA, which in fact submitted a higher priced bid than AIT submitted. Id. Finally, Wiedemann never disclosed to anyone any AIT information as to the Kumsung and CTCI Projects as alleged in the Complaint. Id., ¶ 17. In fact, MLEA did not even know about those projects until it was sued by AIT. See Exhibit C, ¶ 3.

The last Count of the Complaint, Count V, alleges a civil conspiracy between MLEA and Wiedemann. Like the other Counts, this one rests on allegations that Wiedemann has disclosed AIT's "proprietary and confidential trade secrets" (no further specificity is alleged) to MLEA as part of an agreement to harm AIT. There is simply no proof of any agreement or of any such disclosures by Wiedemann. See Thompson Coal Company v. Pike Coal Company, 412 A.2d 466, 472 (Pa. 1979) (intent to injure is essential in proof of a conspiracy; where defendant acted solely to advance his own legitimate business interests, and did not act solely to injure plaintiff, defendant would not be liable for conspiracy to interfere with prospective business relationships.) In fact, the facts are to the contrary. Wiedemann never disclosed AIT's "pricing data" or other AIT "proprietary" information to MLEA in connection with the Savannah River

Project.  See Exhibit A, ¶ 17.  MLEA and Wiedemann never interfered with AIT's opportunity to

win that award.  See Exhibit C, ¶ 7.  MLEA prepared and submitted its bid independent of AIT's

bid.  Id. ¶ 8.  More telling, Accurate Machine ranked AIT dead last in that bid process, even

though, of the three bidders, AIT submitted the second lowest price.  See Exhibit B, ¶ 11.  In

Accurate Machine's evaluation of the bids, it concluded that AIT's bid presented "no compelling

Id.  In short, there is no evidence of any conspiracy between the

Defendants that resulted in any harm to AIT.  MLEA simply won the Savannah River Project

work solely on the basis of merit.  Id.  Nor is there any evidence of any agreement between

Wiedemann and MLEA with respect to the Kumsung and CTCI projects.  See Exhibit A, ¶ 17;

Exhibit B, ¶ 7.

III.    CONCLUSION

This action is simply a suit by a sore loser in a fair competitive bid process for

design work at the Savannah River Project.  Accurate Machine's impartial assessment of AIT's

bid ranked AIT dead last, even behind MECA, whose bid price was higher than AIT's bid price.

Instead of reacting like a responsible corporate citizen and looking for the deficiencies in its bid,

AIT instead searched for scapegoats.  Its suit against MLEA and Wiedemann is the result of that

search.  AIT's claims rest on baseless allegations that Wiedemann disclosed AIT's bid price to

MLEA, an allegation flatly contradicted by Wiedemann and MLEA.  Significantly, according to

Accurate Machine's evaluation of the three bids, AIT would not have gotten the award even if

MLEA had never submitted a bid.  The work would have gone to MECA.

AIT's claims as to the Kumsung and CTCI projects are even flimsier.  MLEA

never even heard of those projects before it was sued.  And it has no intention of bidding on

them.  AIT's claims are pure speculation.

For the foregoing reasons, AIT's Motion for a Preliminary and Permanent Injunction should be denied, and the Court should grant Defendants' Motion to Dismiss the Complaint with prejudice.

Respectfully submitted,

/s/  Robert S. Nix
PEPPER HAMILTON LLP
Philip J. Katauskas
Robert S. Nix
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Defendants MLEA, Inc. and
John K. Wiedemann

Date:   June 18, 2002

## CERTIFICATE OF SERVICE

I, Robert S. Nix, certify that a true copy of the foregoing Defendants' Opposition to Plaintiff's Motion for a Preliminary and a Permanent Injunction and Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed. R. Civ. P. 12(b)(6) was served via hand delivery, this 18th day of June, 2002 upon the following Attorney for Plaintiff.

Donald D. Gamburg, Esquire
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA  19103-6998

/s/ Robert S. Nix_____
Robert S. Nix