## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : | **JUDGE MARY A. MCLAUGHLIN** |
|  | : |  |
| **Plaintiff,** | : | **CASE NO.:  02-CV-2902** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | : |  |
|  | : |  |
| **Defendants.** | : |  |

### ORDER

AND NOW, on this _____ day of _____, 2002, upon consideration of Defendants' Motion to Dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6) and Plaintiff's response thereto,

IT IS HEREBY ORDERED that Defendants' foregoing motion is denied.

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | JUDGE MARY A. MCLAUGHLIN |
| Plaintiff, | CASE NO.: 02-CV-2902 |
| v. | |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)

### I.    INTRODUCTION

On May 15, 2002, Plaintiff, Amer Industrial Technologies, Inc. ("Plaintiff" or "AIT"),

filed a complaint and motion for a preliminary and permanent injunction against Defendants,

John Wiedemann ("Wiedemann"), a former AIT employee, and MLEA, Inc. ("MLEA"), AIT's

direct competitor, (collectively referred to as "Defendants"), for misappropriation of trade

secrets, tortious interference with contractual and prospective business relations, and civil

conspiracy, and for breach of fiduciary duty or duty of loyalty against Wiedemann only.  In

response, on June 18, 2002, Defendants filed a motion for summary judgment under Fed. R. Civ.

P. 56.[1]  On that same date, Defendants also filed a memorandum of law in opposition to

Plaintiff's motion for preliminary and permanent injunction.

---

[1]    Although styled as a motion to dismiss under Fed.R.Civ.P. 12(b)(6), Defendants readily admit that, because the motion is supported by affidavits, the motion should be treated as a motion for summary judgment under Rule 56.  Fed.R.Civ.P. 12(b)(6).

Defendants' motion for summary judgment should be denied because genuine issues of material fact exist and the parties have just commenced discovery. Plaintiff's complaint is based on Wiedemann's unlawful misappropriation of AIT's pricing and design information for the Savannah Project for his own and MLEA's benefit. Further, based on this past unlawful conduct, it is likely that Defendants have, are, or will engage in similar conduct using AIT's pricing and design information to obtain work on other projects on which Wiedemann formerly worked during his employment with AIT. Once discovery is completed, Plaintiff will be able to identify these other projects and the full extent to which Defendants acted unlawfully with respect to the Savannah Project. For now, and for the reasons stated below, Defendants motion for summary judgment should be denied as, at least at this juncture, genuine issues of material fact remain in dispute.[2]

## II.    STATEMENT OF THE FACTS

Wiedemann served as AIT's Program Project Manager from on or about October 20, 2001, his date of hire, until he was discharged from his employment on January 22, 2002. (Wiedemann Aff. at ¶¶ 1 and 9; Amer Aff. at ¶¶ 3 and 9[3]). During his employment with AIT, Wiedemann was privy to trade secret information including, but not limited to, proprietary and confidential information regarding pricing, designs, data, devices, methods, techniques,

---

[2]    Pursuant to this Court's Order entered May 31, 2002, Plaintiff's reply, if any, to Defendants' opposition to Plaintiff's motion for preliminary and permanent injunction is due on June 21, 2002; expedited discovery must be completed by July 27, 2002; and an injunction hearing is scheduled for August 14, 2002. In compliance with this Court's Order, the parties have already exchanged document requests and responses thereto; inspections of Defendants' computers have been completed by Plaintiff's computer expert and Plaintiff is awaiting the experts analysis thereof; and the parties are in the process of scheduling depositions. Instead of replying to Defendants' opposition to the request for preliminary and permanent injunction at this time, Plaintiff will present its full position at the scheduled hearing after all discovery is completed.

[3]    Ahmad Amer's affidavit, dated June 28, 2002, is attached as Exhibit A.

2

drawings, and processes. (Amer Aff. at ¶ 4). In particular during his employment with AIT, Wiedemann supervised preparation of AIT's subcontractor bid proposal to Accurate Machine Products Corporation ("Accurate Machine") for the design and fabrication of preheaters, aftercoolers, and process coilers for cleaning contaminated areas at the Savannah River Nuclear Plant ("Savannah Project"). (Amer Aff. at ¶ 5; Wiedemann Aff. at ¶ 4). In addition to the Savannah Project, Wiedemann was also privy to AIT's proprietary and confidential information concerning other open projects for which AIT has submitted proposals but have not yet been awarded. (Amer Aff. at ¶ 6; Wiedemann Aff. at ¶ 17).

On or around October 18, 2001, Accurate Machine originally requested a bid from AIT concerning the Savannah Project. (Amer Aff. at ¶ 7). AIT submitted its original proposal on December 26, 2001, over two (2) months later. (Wiedemann Aff. at ¶ 8; Amer Aff. at ¶ 8). On January 15, 2002, Accurate Machine submitted its bid to the Westinghouse Savannah River Company ("Westinghouse") for the Savannah Project, and in submitting that bid, "Accurate Machine incorporated a bid submitted to Accurate Machine by Amer Industrial Technologies, Inc. ("AIT")." (Gough Aff. at ¶ 4). On January 25, 2002, based on Westinghouse's response, Accurate Machine requested a revised proposal from AIT for design only and at that time assured AIT its pricing was satisfactory. (Amer. Aff. at ¶ 10). Also, at that time, Accurate Machine advised AIT that only *one* competitor existed, which now turns out was MECA. (Amer. Aff. at ¶ 11). That same day, AIT submitted its design only proposal to Accurate Machine. (Amer. Aff. at ¶ 12). In total, the development of AIT's proposal for the Savannah Project cost in excess of $22,000 and required approximately three (3) months to complete. (Amer Aff. at ¶ 13).

On or about February 18, 2002, Accurate Machine advised AIT that AIT's proposal for

3

the Savannah Project was rejected and that Accurate Machine had decided to award the job to another undisclosed entity because of price only. (Amer Aff. at ¶ 14). At the time, Accurate Machine refused to disclose the identity of the entity which was awarded the bid. (Amer Aff. at ¶ 15). Subsequently, on April 12, 2002, Accurate Machine advised AIT that the Savannah Project had been awarded to MLEA. (Amer. Aff. at ¶ 16).

As it turns out, contemporaneously with the communications and developments between Accurate Machine and AIT, MLEA and Wiedemann were engaging in their unlawful scheme to steal the Savannah Project from AIT. On January 22, 2002, AIT terminated Wiedemann's employment. (Wiedemann Aff. at ¶ 9; Amer. Aff. at ¶ 9). Prior to his termination of employment, Wiedemann frequently telephoned MLEA. (Wiedemann Aff. at ¶ 6; Amer. Aff. at ¶ 17). Notwithstanding Defendants' representations to the contrary, those contacts did not end in December 2001. (Wiedemann Aff. at ¶¶ 6-8). Rather, as AIT's telephone records demonstrate, those contacts continued throughout the month of January, 2002, the month of Wiedeman's termination of employment. (Amer Aff. at ¶ 17).

Shortly after his termination of employment from AIT, MLEA, on January 28, 2002, engaged Wiedemann as a consultant and then later as an employee. (Wiedemann Aff. at ¶ 13). Around that same time, the date of which is still unknown, Wiedemann had a conversation with Kenneth Gough ("Gough") of Accurate Machine, during which Wiedemann advised Gough that "he might have a lead on another company for the design work, or words to that effect." (Gough Aff. at ¶ 17). On February 5, 2002, Accurate Machine requested a bid from MLEA. (*See* MLEA 0005 produced by Defendants, attached as Exhibit B). Even though Gough states that he solicited a bid proposal *from* MLEA, it is yet unknown how Accurate Machine learned of MLEA's identity, as the affidavits of both Wiedemann and Gough are silent on this fact. (Gough

4

Aff. at ¶ 17; Wiedemann Aff. at ¶¶ 12 and 18; DelGaizo Aff. at ¶ 8). Instead, it appears that Wiedemann steered Accurate Machine away from AIT, told Accurate Machine that he had another company to do the project, and then had MLEA solicit Accurate Machine about the project. (Gough Aff. at ¶ 17; Wiedemann Aff. at ¶ 18). Miraculously, *three (3) days* after Accurate Machine requested the bid from MLEA, MLEA submitted, on February 8, 2002, a *complete* proposal to Accurate Machine. (Gough Aff. at ¶ 8; DelGaizo Aff. at ¶ 8).

MLEA submitted the lowest priced proposal to Accurate Machine for the Savannah Project. Indeed, MLEA submitted a bid for $91,000, more than $36,000 less than its competitors, AIT ($127, 000) and MECA ($129,498). (Gough Aff. at ¶ 8; Amer Aff. at ¶ 12). Despite the self-serving statements contained in Wiedemann's and DelGaizo's affidavits that Wiedemann never shared AIT's proprietary information with MLEA (Wiedemann Aff. at ¶ 17; DelGaizo Aff. at ¶¶ 7 and 8), the inference clearly exists to the contrary -- that MLEA was able to submit such a low proposal in comparison to AIT and MECA because it was able to avoid the costs of preparing the bid by relying on proprietary and confidential information developed by Wiedemann for AIT. Thus, MLEA did not have to incur the costs normally required to develop such information, which at least for AIT cost $22,000 and required three (3) *months*, not three (3) days, to complete. Accurate Machine's concealing of MLEA's identity for two (2) months only strengthens the hypothesis that MLEA prepared its bid using AIT's data.

In addition to the strong inference that Defendants misappropriated AIT's trade secrets for the Savannah Project, AIT is conducting expedited discovery to determine what other information Wiedemann misappropriated. To that end, AIT's computer expert has inspected Wiedemann's personal laptop and the personal computers used by Wiedemann and Paul Manzon at MLEA. Once the computer expert examines the information obtained during those

inspections, AIT will be able to identify, with specific names and details, the nature of Defendants' unlawful conduct concerning not only the Savannah Project but other projects on which Wiedemann worked during his employment with AIT.

## III.    LAW AND ARGUMENT

### A.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that when considering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold*, 369 U.S. 654, 655 (1962).

The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Celotex Corp. v. Caterett*, 477 U.S. 317, 323 (1986). Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.* 477 U.S. 574, 586 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless it provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the instant matter, the facts set forth in the respective affidavits, taken together with the

relevant case law, clearly demonstrate that summary judgment, especially at this early juncture

before any meaningful discovery has been completed, should be denied.

**B.**    **SUMMARY JUDGMENT IS PREMATURE BECAUSE THE PARTIES
ARE CURRENTLY CONDUCTING DISCOVERY AND GENUINE
ISSUES OF MATERIAL FACT ALREADY EXIST CONCERNING EACH
AND EVERY CLAIM IN THE COMPLAINT**

1.    **Trade Secrets**

Under Pennsylvania law, an employer has a common law right to protect its legitimate

interests in trade secrets and proprietary information from misappropriation by third parties. *See*

*Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965).

In order to prove a cause of action for misappropriation of trade secrets, AIT must prove: (1) the

information constitutes a trade secret; (2) the information is of value to AIT and important in the

conduct of its business; (3) by reason of discovery and ownership, AIT had the right to use of the

secret; and (4) the secret was communicated to Wiedemann while he was employed by AIT in a

position of trust and confidence, under such circumstances as to make it inequitable and unjust

for him to disclose it to others, or to make use of it himself to the prejudice of AIT.  *See,*

*Prudential Ins. Co. of Am. v. Stella*, 994 F.Supp. 318, 323 (E.D.Pa. 1998); *Tyson Metal Products,*

*Inc. v. McCann*, 376 Pa. Super. 119, 122, 546 A.2d 119, 121 (1988); *Felmlee v. Lockett*, 466 Pa.

1, 8, 351 A.2d 271, 277 (1976).

Trade secret protection clearly encompasses business information that is not generally

known in the industry. Indeed, in *Air Prods. & Chems. v. Johnson*, 296 Pa. Super. 405, 419, 442

A.2d 1114, 1121-22 (1982), the Court held that business knowledge that could enable a

competitor to thwart the plaintiff's plans or to compete without the burden of testing and market

analysis born by the plaintiff is protectable as a trade secret.  To that end, evidence that the

7

plaintiff has expended a large sum of money and a great deal of effort in developing the information supports a trade secret status. *Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. 1997); *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa. Super. 2000).

The second element of a trade secret claim is the requirement that the information is of value to the employer and important in the conduct of its business. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. AIT has established that its proposals are invaluable to the success of its business. Indeed, AIT has invested in direct salary expenses and other administrative costs more than $22,000 into preparing its proposals. Each proposal is the product of three (3) months of effort and expense. The confidentiality of these proposals is crucial to AIT's continued success and ability to compete in the marketplace.

The third element of a trade secret claim is that, by reason of discovery or ownership, the employer has the right to the use and enjoyment of the trade secret. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. There is no question that AIT has the right to use and enjoy its trade secrets, which resulted from an investment of many months of hard work and several thousand dollars.

The final element of a trade secret claim is that the trade secret be communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable to disclose it to others, or to make use of it himself, to the detriment of the employer. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. In this regard, it is well established that an employee, upon termination of employment, has a duty to refrain from disclosing or using any confidential information acquired in the course of his/her employment. *See Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960). Wiedemann was employed by AIT until January 22, 2002 as a high-level employee responsible for a number of proposals. By necessity,

8

Wiedemann had daily access to AIT's proposals and requests for bids.

In the instant case, Wiedemann apparently used AIT's trade secrets to his own benefit and to the detriment of AIT when, after his termination of employment, he immediately went to work for AIT's direct competitor, MLEA. One week Accurate Machine was informing AIT that its proposal was good and was even relying on it in its own bid to Westinghouse, and then the next week, after Wiedemann's termination of employment, Accurate Machine advised AIT that its proposal was rejected and awarded to MLEA. The only intervening events were Wiedemann's termination of employment from AIT and his consulting engagement and employment with MLEA. The fact that MLEA outbid its competitors by 30% and required only three (3) days to compile and submit its bid creates a strong inference, in and of itself, of unlawful misappropriation.

Defendants' actions with respect to the Savannah Project demonstrate that there is a substantial likelihood that AIT's trade secrets will either be disclosed or used for the personal benefit of Wiedemann and MLEA and to the detriment of AIT. *See Quaker City Engine Rebuilding v. Toscano*, 369 Pa. Super 573, 578, 535 A.2d 1083, 1085 (1987). Discovery will uncover the extent to which Wiedemann took with him AIT's proprietary and confidential information, and may also demonstrate, even though not necessary for AIT's claims, the unlawful use of such information. Accordingly, Defendants' request for summary judgment concerning Plaintiff's misappropriation of trade secrets should be denied.

## 2. Breach of Fiduciary Duty

It is well established that "an agent owes a duty of loyalty to his/her principal, and in all matters affecting the subject of his agency, he/she must act with the utmost good faith in the furtherance and advancement of the interests of his/her principal." *Sylvester v. Beck*, 406 Pa. 607, 610, 178 A.2d 755, 757 (1962). An agent is a fiduciary with respect to matters within the

9

scope of his/her agency and is required to act solely for the benefit of his/her principal. *See Onorato v. Wissahickon Park, Inc.*, 430 Pa. 416, 423, 244 A.2d 22, 26 (1968). The courts recognize that an employee's fiduciary duty or duty of loyalty to the employer *extends beyond the life of the employment relationship. See Air Products and Chemicals, Inc. v. Johnson*, 296 Pa. Super. 405, 415-16, 442 A.2d 1114, 1119 (1982).

This duty of loyalty and non-disclosure arises from the confidential relationship which, of necessity, exists between an employer and an employee and exists independently of any contractual agreement not to disclose confidential information. *See Felmlee*, 466 Pa. at 8; 351 A.2d at 273 ("a pledge of secrecy is impliedly extracted from the employee, a pledge which carries with him even beyond the ties of his employment relationship").

The confidential nature of the employer-employee relationship that existed between AIT and Wiedemann imposed a duty upon Wiedemann not to use or disclose his former employer's trade secrets. Moreover, as a high level employee, Wiedemann was solely entrusted with the responsibility of supervising the Savannah Project proposal and other proposals. Wiedemann blatantly disregarded and neglected his duties when he conspired to harm and injure AIT by dissuading Accurate Machine from continuing to use AIT and pushing Accurate Machine towards using MLEA for the Savannah Project. Based on this already admitted conduct, it is likely that discovery will uncover additional breaches of Wiedemann's duty owed to AIT. Accordingly, Defendants' request for summary judgment concerning Plaintiff's breach of fiduciary duty or duty of loyalty claim against Wiedemann should be denied.

### 3.    Tortious Interference with Existing Contractual Relations

Pennsylvania courts have adopted the *Restatement (Second) of Torts* definition of intentional interference with existing contractual relations. *See Adler Barrish Daniels Levin Cresskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978). *Restatement (Second) of Torts* §766

10

provides:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third-party person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting from failure of the third person to perform the contract.

To state a cause of action for tortious interference with contractual relations, a plaintiff must establish:

    (1)    the existence of a contractual relationship;

    (2)    an intent on the part of the defendant to harm the plaintiff by interfering with that relationship;

    (3)    the absence of a privilege or justification for such interference; and

    (4)    damages resulting from the defendant's conduct.

*Triffin v. Janssen*, 426 Pa. Super. 57, 63, 626 A. 2d 571, 574 (1993). This tort has also been recognized where a third-party systematically and tortiously interferes with an existing employment relationship. *See Morgan's Home Equipment*, 390 Pa. at 623, 136 A.2d at 847.

Wiedemann and MLEA tortiously interfered with AIT's business relation with Accurate Machine. AIT had a business relationship with Accurate Machine and had the legitimate expectation that the relationship would continue. Wiedemann and MLEA knew of AIT's relationship with Accurate Machine. Wiedemann and MLEA induced Accurate Machine to cease doing business with AIT. But for the improper conduct of Wiedemann, AIT was reasonably certain to have continued its customer relationship with Accurate Machine. In fact, prior to Wiedemann's termination of employment, Accurate Machine had already used AIT's proposal for the Savannah Project and there is no evidence that it would not have continued to do so but for Defendants' unlawful interference. As a direct and proximate result of Defendants'

11

conduct, AIT has been harmed and suffered damages, including loss of the Savannah Project bid.

Thus, Defendants' request for summary judgment concerning Plaintiff's tortious interference

with contractual relations claim should be denied.

### 4.    Tortious Interference with Prospective Business Relations

As with existing contractual relations, the law prohibits third-parties from tortiously

interfering with prospective business relations. *See Thompson Coal Co. v. Pike Coal Co.*, 488

Pa. 198, 208, 412 A.2d 466, 471 (1980); *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895

(1971); *Restatement (Second) Torts*, §766B. The cornerstone of this tort is whether there exists a

reasonable probability that a plaintiff will contract with a third party. *See Glenn*, 441 Pa. at 480,

272 A.2d at 898.

On or about January 22, 2002, the day Wiedemann's employment was terminated, AIT

was in the process of creating proposals, other than the Savannah Project, concerning the design

and fabrication of materials for other projects. Just like with the Savannah Project, these

proposals involved large amounts of money and time to develop. AIT has a legitimate

expectation that it will have a business relationship with these entities. As a result of his

employment relationship with MLEA, it is likely that Wiedemann will divert these opportunities

to MLEA, if he has not already done so. Based on Wiedemann's past conduct concerning the

Savannah Project, Wiedemann and MLEA are likely to interfere with AIT's attempts to obtain

these additional projects.

Despite the assertions of Wiedemann and DelGaizo that they never heard of and were not

pursuing the projects for Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles),

Plaintiff's concerns are not so limited. Once discovery is completed, AIT anticipates that

evidence will exist that Wiedemann and MLEA are unlawfully pursuing other AIT projects

utilizing proprietary and confidential information obtained by Wiedemann during his

employment with AIT.  Until discovery is completed, AIT will not be in a possession to identify these other projects.  Thus, at this time, Defendants' request for summary judgment is premature and should be denied.

### 5.    Civil Conspiracy

Pennsylvania law recognizes a cause of action for civil conspiracy where two or more persons combine to do an unlawful act.  *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999).  More specifically, an action for damages exists for a conspiracy to misappropriate trade secrets or destroy the business of another.  *Somat Corp. v. Combs*, 40 Pa. D. & C.2d 107 (1966); *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 953 F.Supp. 617 (E.D.Pa. 1997).  To state a cause of action for conspiracy, a plaintiff must establish: (i) a combination of two or more persons acting with a common purpose to do an unlawful act, or to do a lawful act by unlawful means or for an unlawful purpose; (ii) an overt act done in pursuance of the common purpose; and (iii) actual legal damage. *McGuire v. Shubert*, 722 A.2d 1087 (Pa. Super. 1998).  In the instant matter, the strong inference exists that Wiedemann and MLEA unlawfully conspired to misappropriate AIT's proprietary and confidential trade secret information concerning the Savannah Project.  It is highly probable that such  conspiracy involves other AIT projects.  AIT clearly has suffered from this conspiracy.  Consequently, Defendants' request for summary judgment should be denied.

13

## IV.    **CONCLUSION**

For all of the foregoing reasons, AIT respectfully requests that Plaintiff's motion to dismiss Plaintiff's complaint under Fed. R. Civ. P. 56 be denied in its entirety.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

RICHARD S. MEYER
DONALD D. GAMBURG
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
(215) 569-5699 (fax)

Date:    July 2, 2002

Attorneys for Plaintiff,
AMER INDUSTRIAL TECHNOLOGIES, INC.

14

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(b) and proposed Order was served via hand delivery, this 2nd day of July, 2002 upon the following Attorney for Defendants:

> Philip J. Katauskas, Esquire
> Pepper Hamilton LLP
> 3000 Two Logan Square
> 18th and Arch Streets
> Philadelphia, PA 19103-2799

Attorney for Plaintiff

15

**EXHIBIT A**

COMMONWEALTH OF PENNSYLVANIA     )

                                     ) S.S.         **AFFIDAVIT**

COUNTY OF PHILADELPHIA             )

I, AHMAD AMER, being first duly sworn, depose and state as follows:

1.      The information in this Affidavit is based on personal knowledge.

2.      I am President of Amer Industrial Technologies, Inc. ("AIT") and have been in this position since the Company's creation in 1977.

3.      On or about October 20, 2001, AIT hired John Wiedemann ("Wiedemann") as AIT's Program Project Manager.

4.      During his employment with AIT, Wiedemann was privy to trade secret information including, but not limited to, proprietary and confidential information regarding pricing, designs, data, devices, methods, techniques, drawings, and processes.

5.      Wiedemann supervised preparation of AIT's subcontractor bid proposal to Accurate Machine Products Corporation ("Accurate Machine") for the design and fabrication of preheaters, aftercoolers, and process coilers for cleaning contaminated areas at the Savannah River Nuclear Plant ("Savannah Project").

6.      In addition to the Savannah Project, Wiedemann was also privy to AIT's proprietary and confidential information concerning other open projects for which AIT has submitted proposals but have not yet been awarded.

7.      On or around October 18, 2001, Accurate Machine originally requested a bid from AIT concerning the Savannah Project.

8.      On December 26, 2001, AIT submitted its original proposal for the Savannah Project.

9.      On January 22, 2002, AIT terminated Wiedemann's employment.

10.    On January 25, 2002, based on Westinghouse's response, Accurate Machine requested a revised proposal from AIT for design only and at that time assured AIT its pricing was satisfactory.

11.    At that time, Accurate Machine also advised AIT that only *one* competitor existed, a Tennessee company.

12.    That same day, AIT submitted its design only proposal to Accurate Machine for the Savannah Project for $127,000.

13.    In total, the development of AIT's proposal for the Savannah Project cost in excess of $22,000 and required approximately three (3) months to complete.

14.    On or about February 18, 2002, Accurate Machine advised AIT that AIT's proposal for the Savannah Project was rejected and that Accurate Machine had decided to award the job to another undisclosed entity because of price only.

15.    At the time, Accurate Machine refused to disclose the identity of the entity which was awarded the bid.

16.    Subsequently, on April 12, 2002, Accurate Machine advised AIT that the Savannah Project had been awarded to MLEA.

17.    AIT's telephone records demonstrate that Wiedemann frequently telephoned MLEA during the period October, 2001 through January, 2002.

FURTHER AFFIANT SAYETH NAUGHT.

_____
AHMAD AMER

SWORN TO BEFORE ME this ___ day of June, 2002.

_____
Notary Public
EXP. 3/15/05

3

**EXHIBIT B**

# ACCURATE MACHINE PRODUCTS CORPORATION

P.O.BOX 998      JOHNSON CITY, TENNESSEE 37605-0998      710 W.WALNUT ST.
TELEPHONE 423-928-8134      FAX 423-928-1063

## INQUIRY - THIS IS NOT AN ORDER

DATE 02-05-2002                                    INQ.NO. 122C-001
   1001                                    THIS INQUIRY NUMBER MUST APPEAR ON YOUR QUOTATION

TO:  ENGINEERED GAS SYSTEMS                PHONE
     DIV. of MLEA INC

     ATTN: GEORGE TIMBERLAKE

## PLEASE ADVISE PRICE AND DELIVERY

| ITEM NO. | QTY | DESCRIPTION | UNIT PRICE |
|---|---|---|---|
| | NOTE: | 1. ALL MATERIALS AND SERVICES QUOTED ARE SUBJECT TO TERMS OF AMPCO FORM SI-1 REV.0, SUPPLIER INSTRUCTION FOR PURCHASED GOODS. 2. DO-E2 RATING APPLIES. | |
| ITEM 1 | 1 LOT | DESIGN ONLY OF FOUR EACH PREHEATERS, FOUR EACH AFTERCOOLERS AND TWO EACH PROCESS COOLERS PER WESTINGHOUSE SAVANNAH RIVER CO. SPECIFICATION M-SPP-H-00353 REV.1. MUST INCLUDE ALL CALCULATIONS, FINAL DESIGN DRAWINGS, ETC. IN ACCORDANCE WITH SPECIFICATION. DOES NOT INCLUDE THE FOUR EACH CATALYTIC REACTORS. VENDOR TO FURNISH COPY OF QA MANUAL AND EVIDENCE OF SIMILAR WORK DONE RECENTLY ALONG WITH A BRIEF COMPANY HISTORY AND DETAILS OF QUALIFICATIONS FOR DESIGN ENGINEERS INVOLVED. PLEASE NOTE THAT OUR CUSTOMER HAS ADVISED THAT THERE ARE A FEW CHANGES IN THE WORKS, WE DO NOT HAVE THE DETAILS OF CHANGES AS YET BUT WILL FORWARD THEM AS SOON AS WE RECEIVE. | |

## REPLY TO YVONNE ZDONOWICZ NO LATER THAN  RUSH! RUSH!

DELIVERY _____        ACCURATE MACHINE PRODUCTS CORP.

FOB _____        YVONNE ZDONOWICZ,PURCHASING MANAGER

TERMS _____

BY _____

DATE OF QUOTATION _____        FAX

MLEA 0005