## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 02-CV-2902 |
| v. | : : | AMENDED COMPLAINT |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | : : : : : | |
| Defendants. | : : | |

Plaintiff, Amer Industrial Technologies, Inc. ("AIT"), by its undersigned attorneys,

brings this Amended Complaint against Defendants, MLEA, Inc. ("MLEA") and John K.

Wiedemann ("Wiedemann"), and avers as follows:

### PARTIES

1.      AIT is a Delaware corporation with its principal place of business at 100 Amer

Road, Building 200, Wilmington, Delaware.  AIT is a citizen of the State of Delaware.

2.      MLEA is a Pennsylvania corporation with its principal place of business located

at 211 Welsh Pool Road, Suite 120, Exton, Pennsylvania.  MLEA is a citizen of the

Commonwealth of Pennsylvania.

3.      Wiedemann is an individual residing at P. O. Box 207, 2891 St. Peters Road, St.

Peters, Pennsylvania.  Wiedemann is a former employee of AIT and a current consultant to

MLEA.  Wiedemann, on information and belief, is a citizen of the Commonwealth of

Pennsylvania.

## JURISDICTION AND VENUE

4.    This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds $75,000.

5.    Venue is proper within this judicial district because Defendants are located within the district and the acts set forth herein principally occurred in this district.

## BACKGROUND

6.    AIT is engaged in the business of:

    a.    Designing, engineering, manufacturing, and testing nuclear and non-nuclear heat exchangers, heavy walled vessels, tanks, filters, dampeners, orifices, venturis, and coolers and providing nuclear upgraded items.

    b.    Providing process equipment and prototype product under the guidance of its own staff of metallurgical, quality assurance, and professional engineers; and

    c.    Servicing the electrical power utilities (both nuclear and fossel), petrochemical industry, U.S. Air Force, and the Department of Navy.

7.    Defendant Wiedemann served as AIT's Program Project Manager from October 29, 2001, his date of hire, until he was discharged from his employment on January 22, 2002.

8.    Contemporaneous with his hiring, Wiedemann executed Employee Inventions and Secrecy Agreements which, inter alia, provided that he would not at any time disclose proprietary information including data, specifications, methods and processes or sales information.

9.    During his employment with AIT, Defendant Wiedemann was privy to trade secret information including, but not limited to, proprietary and confidential information

2

regarding pricing, designs, data, devices, methods, techniques, drawings, and processes.

10.    In particular during his employment with AIT, Defendant Wiedemann led AIT's subcontractor bid proposal to Accurate Machine Products Corporation ("Accurate Machine") for the design and fabrication of preheaters, aftercoolers, and process coilers for cleaning contaminated areas at the Savannah River Nuclear Plant ("Savannah Project").

11.    The development of AIT's proposal for the design and fabrication of the Savannah Project cost in excess of $25,000 and required approximately three (3) months to complete. Wiedemann performed much, if not most, of his work on the Savannah Project on his personal laptop computer and had stored on that computer material relating to AIT's Savannah Project proposal as well as preliminary design material relating to the Savannah Project.

12.    In addition to the Savannah Project, Wiedemann was also privy to AIT's proprietary and confidential information concerning other open projects for which AIT has submitted proposals but for which no award has yet been made, including, but not limited to, Kumsung Engineering, CTCI (fuel tanks), CTCI (N2 bottles).

13.    On December 26, 2001, AIT submitted its proposal to Accurate Machine for the design and fabrication of the Savannah Project.

14.    On January 22, 2002, AIT terminated Defendant Wiedemann's employment. Upon his termination, Wiedemann took his personal laptop computer with him.

15.    On January 25, 2002, Accurate Machine requested that AIT submit a proposal for the design portion only of the Savannah Project. At that time, Accurate Machine reminded AIT that it was in competition for the design portion with another, undisclosed competitor from Tennessee. Also at that time, Accurate Machine advised AIT that both its and the competitor's prior proposals for both design and fabrication were "acceptable" based on price.

16.    On that same day, AIT submitted to Accurate Machine its proposal for the design portion only of the Savannah Project in the amount of $127,000.

17.    Shortly thereafter, MLEA engaged Defendant Wiedemann as a consultant.

18.    Sometime after January 23, 2002, Wiedemann told Ken Gouge ("Gouge"), the Contracting Officer for Accurate Machine, that he might have a lead on another company who could bid on the design work for the Savannah Project.

19.    On or about February 1, 2002, a representative of MLEA phoned Gouge to express interest in bidding on the Savannah Project.

20.    On or about February 5, 2002, Gouge sent to MLEA the design specifications necessary to prepare a proposal for the Savannah Project.

21.    By Gouge's own estimation, he expected a proposal on this job to take "two to three weeks. This is quite complex", and at a minimum, it would take a full week of twelve to sixteen hour days to prepare a proposal responsive to his request for bids for the Savannah Project. Further Gouge opined that the bidder would have to prepare a preliminary design in order to make its proposal.

22.    Notwithstanding the extent and complexity of the work required to prepare a proposal, on February 8, 2002 MLEA, through its Engineered Gas Systems ("EGS") unit, submitted a full detailed proposal for the Savannah Project to Accurate Machine.

23.    Thereafter, in response to modification of the requirements on the job by the prime contractor, Westinghouse, on February 13, 2002, MLEA sent a revised inquiry to AIT, MLEA and also to a third bidder, Mechanical Electrical Consulting Associates ("MECA").

24.    Defendant, MLEA sent an amended proposal responding to the revised inquiry from Accurate Machine on the very next day, February 14, 2002.

4

25.    On or about February 18, 2002, Accurate Machine advised AIT that AIT's proposal for the Savannah Project was rejected and that Accurate Machine had decided to award the job to another undisclosed entity because of price only.  At the time, Accurate Machine refused to disclose the identity of the entity which was awarded the bid.

26.    Accurate Machine actually awarded the purchase order to MLEA on or about March 4, 2002.

27.    Subsequently, on April 2, 2002, Accurate Machine conceded to AIT that the Savannah Project had been awarded to MLEA.

28.    Based on information and belief, MLEA submitted a lower priced proposal to Accurate Machine for the Savannah Project based exclusively on proprietary and confidential information developed by Wiedemann and other AIT employees for AIT.  MLEA did not have to incur the costs normally required to develop such information.

29.    Defendants' wrongful activities, including Wiedemann's wrongful misappropriation of AIT's trade secrets and MLEA's unlawful use of AIT's developmental work, are causing AIT to suffer irreparable harm as set forth below.

**COUNT I**

**(MISAPPROPRIATION OF TRADE SECRETS -- ALL DEFENDANTS)**

30.    AIT hereby incorporates by reference its allegations contained in Paragraphs 1 through 29 of the Complaint as if fully set forth herein.

31.    AIT expended a large sum of money and a great deal of effort in developing the Savannah Project proposal as well as its other proposals.

32.    Bid awards based on AIT's proposals are crucial to AIT's success and ability to compete in the marketplace.

33.    AIT is entitled to the use and enjoyment of its proprietary and confidential

5

business information.

34.     AIT's proprietary and confidential proposal information was communicated to Wiedemann while he was employed in a position of trust and confidence.

35.     As a high-level employee of AIT entrusted with AIT's proprietary and confidential information concerning proposals, Wiedemann had a fiduciary obligation not to misappropriate or disclose to competitors such proprietary and confidential information learned in the course of his employment with AIT.  Wiedemann's common law obligation to refrain from misappropriating, disclosing, or using confidential trade secret information continues even after his separation from employment with AIT.

36.     Based on information and belief, Wiedemann improperly used AIT's trade secret information, specifically, but not necessarily limited to, pricing data, to his own and MLEA's benefit and to the detriment of AIT by disclosing and using such information concerning the Savannah Project to enable MLEA to underbid AIT on the basis of price alone.

37.     MLEA knew Wiedemann developed this information for the benefit of AIT and used it for its benefit without the necessary investment of money and time to develop such information.

38.     Wiedemann's and MLEA's actions with respect to the Savannah Project demonstrate that there is a substantial likelihood that AIT's trade secrets concerning other project proposals will either be disclosed or used for the personal benefit of Wiedemann and MLEA and to the detriment of AIT.

39.     The actions of Wiedemann and MLEA set forth herein constitute theft of trade secrets in violation of Pennsylvania law, and AIT is entitled to damages and injunctive relief with respect to such unlawful conduct.

6

## COUNT II

### (BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY—DEFENDANT WIEDEMANN)

40.     AIT hereby incorporates by reference its allegations contained in Paragraphs 1 through 39 of the Complaint as if fully set forth herein.

41.     As a high-level employee of AIT, Defendant Wiedemann had a fiduciary obligation to work for the benefit of AIT and not to compete with AIT while still employed by AIT.

42.     Wiedemann's fiduciary duty or duty of loyalty to AIT extends beyond the term of his employment relationship with AIT.

43.     Wiedemann's fiduciary duty or duty of loyalty imposes a duty on Wiedemann not to use or disclose AIT's trade secrets.

44.     Based on information and belief, Wiedemann contacted Defendant MLEA concerning the Savannah Project while still employed by AIT.

45.     Based on information and belief, Wiedemann contracted with and assisted MLEA to formulate a proposal in response to the Savannah Project proposal in direct competition with AIT, using AIT's proprietary and confidential information, all while still employed by AIT.

46.     In the alternative, after his employment with AIT, Wiedemann contracted with and assisted MLEA to formulate a proposal in response to the Savannah Project in direct competition with AIT, using AIT's proprietary and confidential information.

47.     Defendant Wiedemann breached his common law fiduciary duty or duty of loyalty.

48.     As a result of Wiedemann's unlawful actions, AIT is entitled to compensatory and punitive damages.

7

## COUNT III

### (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS -- ALL DEFENDANTS)

49.     AIT hereby incorporates the allegations contained in paragraphs 1 through 48 of the Complaint as if fully set forth herein.

50.     AIT, at great expense and effort, developed a proposal to Accurate Machine for the design and engineering of the Savannah Project.

51.     AIT developed and had a business relationship with Accurate Machine.

52.     AIT had a legitimate expectation that its relationship with Accurate Machine would continue.

53.     Defendants Wiedemann and MLEA knew about AIT's relationship with Accurate Machine.

54.     Nonetheless, Wiedemann and MLEA, without privilege and in violation of Pennsylvania law, induced Accurate Machine to cease doing business with AIT and instead to do business with MLEA on the Savannah Project.

55.     Wiedemann and MLEA intentionally interfered with AIT's proposal on the Savannah Project.

56.     Wiedemann's and MLEA's interference with AIT's proposal on the Savannah Project was intentional, without justification, purposely and with malice and intent to injure.

57.     But for the wrongful interference of Wiedemann and MLEA, AIT reasonably expected to be granted work by Accurate Machine on the Savannah Project.

58.     As a result of Wiedemann's and MLEA's unlawful conduct, AIT has suffered damages, including the loss of the Savannah Project.

8

## COUNT IV

## (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS -- ALL DEFENDANTS)

59.    AIT hereby incorporates the allegations contained in paragraphs 1 through 58 of the Complaint as if fully set forth herein.

60.    AIT, at great expense and effort, developed proposals for Kumsung Engineering, CTCI (fuel tanks), CTCI (N2 bottles), and other projects.

61.    AIT has a legitimate expectation that it will be awarded contracts based on its proposals for Kumsung Engineering, CTCI (fuel tanks), CTCI (N2 bottles), and other projects.

62.    Wiedemann was significantly involved with and has knowledge of AIT's proposals, including, but not limited to, Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles).

63.    Defendant MLEA is aware of Wiedemann's knowledge concerning AIT's proposals to, including, but not limited to, Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles), and MLEA nonetheless continues to engage Wiedemann's services.

64.    As a result of Wiedemann's contractual relationship with MLEA, it is likely that Wiedemann, using AIT's proprietary and confidential trade secret information, will divert AIT's opportunities, including, but not limited to, Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles), to MLEA.

65.    Based on Defendants' past conduct, Defendants are likely to interfere with AIT's bids to obtain these additional projects.

66.    Wiedemann's and MLEA's interference with AIT's proposals on these projects would, if not already is, intentional, without justification, purposely and with malice and intent to injure.

9

67.    But for the wrongful interference of Wiedemann and MLEA, AIT reasonably expects to be granted work on these projects.

68.    As a result of Wiedemann's and MLEA's unlawful conduct, AIT has suffered or will suffer damages, including the loss of the projects.


## COUNT V

### (CONVERSION AND UNJUST ENRICHMENT-DEFENDANT MLEA)

69.    AIT hereby incorporates by reference its allegations contained in paragraphs 1 through 68 of the Complaint as are fully set forth herein.

70.    At all times material to this Amended Complaint, Plaintiff, AIT owned and lawfully possessed the preliminary design material it had prepared for the Savannah Project as well as the proposal which it prepared and submitted for the Savannah Project, all of which had a developmental cost in excess of $25,000.

71.    On or about January 22, 2002, Defendant Wiedemann unlawfully and wrongfully took and carried away the aforesaid design and proposal material which was contained in his laptop computer.

72.    Unbeknownst to AIT, upon being engaged by MLEA as a consultant and/or hired by MLEA as an employee, Wiedemann wrongfully transferred to Defendant MLEA the aforesaid preliminary designs and proposal, thereby enabling Defendant MLEA to submit a Savannah Project bid to Accurate Machine within three (3) days of receiving from Accurate Machine the design specifications, a task that could not have been completed in that timeframe except for making use and incorporating AIT's preliminary designs and proposal information.

73.    Defendant MLEA has thereby unlawfully converted the design, developmental and other work entailed in composing AIT's proposal on the Savannah Project to its own use in

10

order to submit its own bid, to substantially underbid both AIT and MECA, having not incurred any developmental expense, which in turn enabled MLEA to obtain the award.

74.    Without regard to whether AIT would otherwise have been awarded the project, Defendant MLEA is indebted to AIT for the full developmental expense incurred in preparing the preliminary designs and proposals which it converted to its unjust enrichment.

## COUNT VI

### (CIVIL CONSPIRACY--ALL DEFENDANTS)

75.    AIT hereby incorporates by reference its allegations contained in Paragraphs 1 through 74 of the Complaint as if fully set forth herein.

76.    MLEA and Wiedemann, acting in concert, conspired with one another to substantially destroy AIT's design and engineering business through (a) Wiedemann's unlawful misappropriation of AIT's proprietary and confidential trade secrets; (b) Wiedemann's unlawful disclosure of AIT's proprietary and confidential trade secrets to MLEA;  (c) Wiedemann's and MLEA's unlawful use of AIT's proprietary and confidential trade secrets in order to formulate a proposal on behalf of MLEA in response to the Savannah Project bid; and (d) based on information and belief,  Wiedemann's and MLEA's unlawful use of AIT's proprietary and confidential trade secrets in order to formulate proposals in response to bids for other projects.

77.    Defendants acted with malice towards AIT and manifested an intent to injure AIT by willfully and knowingly ignoring Defendant Wiedemann's common law duty of loyalty and fiduciary duty.

78.    In pursuing their common plan, scheme, and design to injure AIT, Defendants have unlawfully interfered with AIT's ability to bid on present and future design and engineering projects.

11

79. Defendants' actions were without justification.

80. Unless Defendants are immediately enjoined from using AIT's proprietary and confidential trade secrets and from interfering with AIT's present and prospective contractual relationships with customers, AIT will suffer immediate, substantial, and irreparable harm, the amount of which cannot be definitely ascertained in that:

      a.    AIT has suffered and will continue to suffer a temporary and permanent loss of contracts and revenue in its design and engineering business;

      b.    AIT has suffered and will continue to suffer a temporary and permanent loss of its competitive position in the engineering marketplace as a result of Defendants' misappropriation of trade secrets; and

      c.    AIT will suffer a total loss of certain design and engineering proposals developed using its proprietary and confidential trade secret information which it so painstakingly developed at great cost over the past months.

81. AIT will suffer greater harm by the denial of injunctive relief than would Defendants by the granting thereof.

82. AIT has no adequate remedy at law.

83. The relief requested will properly restore the parties to their respective status that existed immediately prior to Defendants' wrongful conduct.

84. The public interest would be served by granting the injunctive relief requested.

WHEREFORE, AIT respectfully requests that this Court:

1. Issue a Preliminary and Permanent Injunction restraining and enjoining Defendants and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf as follows:

a.    Defendants shall hold all AIT trade secrets, including, but not limited to, the proprietary and confidential information used for design and engineering contracts, in the strictest of confidence and shall not at any time divulge, disclose, or reveal said trade secrets to any third party nor use any such trade secrets for any purpose, including but not limited to, any business in which Defendants have an interest or by which he is employed or may become employed and specifically to perform any design or engineering type work for the Savannah Project, Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles);

b.    Defendants shall immediately cease and desist from tortiously interfering with AIT's existing and prospective relationships with, including, but not limited to, the Savannah Project, Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles);

c.    Defendants shall immediately cease work on and renounce any revenues involving or relating to the Savannah Project and/or withdraw any proposal to Kumsung Engineering, CTCI (fuel tanks), and CTCI (N2 bottles);

d.    Defendants shall immediately return any and all trade secrets belonging to AIT in whatever form such information resides, including, but not limited to, any and all documents and copies thereof which are currently in their possession; and

e.    Defendants shall immediately permit forensic examination by AIT and/or experts designated by AIT of all computers, servers, or electronic storage

devices of any kind, including personal digital assistants, maintained by any and all Defendants at any location, including residences.

2.     Grant monetary damages in an amount of at least $75,000.00 and such amount in excess thereof as may be ascertainable at trial, including an accounting of the profits for the Savannah Project and/or in the alternative, the fair market value of the preliminary design information and proposal wrongfully converted and used by MLEA in making its proposal, punitive, and exemplary damages as provided for by Pennsylvania law.

14

3.    Grant such further and additional relief as the Court deems just and proper.

BLANK ROME COMISKY & McCAULEY LLP


RICHARD S. MEYER
DONALD D. GAMBURG
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
(215) 569-5699 (fax)

Date:   July 18, 2002

Attorneys for Plaintiff,
AMER INDUSTRIAL TECHNOLOGIES, INC.

112300.00400/21045100v1