IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| **Plaintiff,** | : | |
| v. | : | **CASE NO.: 02-CV-2902** |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| **Defendants.** | : | |

## ORDER

AND NOW, this ____ day of _____, 2002, upon consideration of Defendants' Motion to Dismiss Plaintiff's Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6), and Plaintiff's response thereto, if any,

IT IS HEREBY ORDERED that Defendants' Motion is GRANTED and Plaintiff's Amended Complaint is dismissed with prejudice. IT IS FURTHER ORDERED that Plaintiff's Motion for a Preliminary and a Permanent Injunction is DENIED.

_____
D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., <br><br>        **Plaintiff,** <br><br>        v. <br><br> MLEA, INC. and JOHN K. WIEDEMANN, <br><br>        **Defendants.** | JUDGE McLAUGHLIN <br><br> CASE NO.:  02-CV-2902 |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT UNDER
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

      Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann"), by and through their undersigned counsel, Pepper Hamilton LLP, hereby renew their June 18, 2002 request that this Court deny Plaintiff Amer Industrial Technologies, Inc.'s ("AIT") Motion for a Preliminary and a Permanent Injunction, and move the Court for an Order dismissing Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants incorporate by reference as if fully set forth below, the June 18, 2002 Defendants' Opposition to Plaintiff's Motion for a Preliminary and a Permanent Injunction and Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(6)(b) and, for the reasons stated therein and for the reasons set forth in the accompanying Memorandum of Law attached hereto, request that the Court deny Plaintiff's Motion and grant Defendants' Motion.

WHEREFORE Defendants MLEA, Inc. and John K. Wiedemann request that the Court enter an Order in the form appended hereto.

                              Respectfully Submitted,

                              /s/ Robert S. Nix
                            Philip J. Katauskas, Esquire
                            Robert S. Nix, Esquire
                            PEPPER HAMILTON LLP
                            3000 Two Logan Square
                            18th & Arch Streets
                            Philadelphia, PA  19103-2799
                            215.981.4000

                            Attorneys for Defendants MLEA, Inc. and
                            John K. Wiedemann

Dated:  August 7, 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| Plaintiff, | : | |
| v. | : | **CASE NO.: 02-CV-2902** |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT UNDER
<u>FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>**

**I.   <u>INTRODUCTION</u>**

Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann") (collectively, "Defendants"), submit this Memorandum of Law in support of their accompanying Motion to Dismiss Plaintiff's Amended Complaint Under Fed.R.Civ.P. 12(b)(6). Defendants also incorporate by reference their June 18, 2002 Opposition to Plaintiff's Motion for a Preliminary and a Permanent Injunction, and the July 12, 2002 Reply Brief in Support of Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(b)(6). Defendants also reiterate their request that this Court deny Plaintiff Amer Industrial Technologies, Inc.'s ("AIT's") Motion for a Preliminary and a Permanent Injunction.

**II.   <u>BACKGROUND</u>**

The factual background of this case is fully set forth in Defendants' June 18, 2002 Opposition to Plaintiff's Motion for a Preliminary and a Permanent Injunction and Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(b)(6), and will not be repeated

here. On July 18, 2002, Plaintiff filed an Amended Complaint, adding a count for conversion and unjust enrichment.

The Defendants have patiently endured the Plaintiff's overbroad, burdensome, and invasive discovery, including seven out of eight scheduled depositions (five of which were noticed by the Plaintiff), production of documents, and inspection of the Defendants' computer hard drives, all of which, as discussed below, has produced no evidence whatsoever of any impropriety by either Defendant.[1] Defendants grow weary of wasting time and money indulging Plaintiff's jumping from theory to theory in a desperate attempt to keep this baseless case alive. The instant Motion to Dismiss is filed in response to Plaintiff's Amended Complaint. For the following reasons, it should be granted.

## III. ARGUMENT

### A. Plaintiff Cannot Meet Its Burden Of Opposing Defendants' Motions To Dismiss.

Because Defendants' Motion to Dismiss is supported by Affidavits and Depositions, the Court treats them as motions for summary judgment under Rule 56. Fed.R.Civ.P. 12(b)(6). Rule 56 provides that a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, *the non-moving party must make a showing sufficient to establish the existence of each element*

---

[1] Plaintiff has deposed the following witnesses from MLEA: Theodore DelGaizo, President and CEO; Paul Manzon, Vice President and Chief Structural Engineer; George Timberlake, Senior Vice President of Business Development; and Keith Michael, Vice President of Sales and Marketing. Mr. Wiedemann's deposition has been postponed due a death in the family of Plaintiff's counsel.

*of his case on which he will bear the burden of proof at trial*. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (emphasis supplied). The evidence produced in this case to date proves that Plaintiff cannot ever meet that burden.

In its July 2, 2002 response to Defendants' June 18, 2002 Motion to Dismiss the Complaint, AIT argued that even if there were no evidence to support the claims in its Complaint, summary disposition was premature because no depositions had yet been taken. See Pl.'s Mem. of Law at 2. Now that seven out of eight scheduled depositions have been taken (four of the seven being noticed by AIT), Defendants' computer hard drives have been inspected, and numerous documents exchanged, there is still no evidence to support the claims in Plaintiff's amended complaint. Moreover, the evidence produced shows that there is no genuine issue of material fact as to whether the Defendants either: 1) caused AIT to lose the bid for the Savannah River Project; or 2) interfered in any way with its bids or prospective contracts with Kumsung, CTCI, or any other entity.

B.  The Kumsung and CTCI Projects

The Amer Affidavit[2] says absolutely nothing about either the Kumsung or CTCI projects alleged in the Complaint. Specifically, Mr. Amer, the President of AIT, failed to state facts to support his allegations that AIT had any reasonable expectation of being awarded any of this work, a prerequisite to claims for tortious interference with prospective contractual relations. See Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., 801 F. Supp. 1450, 1459 (E.D. Pa. 1992).

---

[2] The Affidavit of Ahmad Amer was attached to the July 2, 2002 Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(b)(6). Similarly, the Affidavits of John K. Wiedemann, Kenneth D. Gough, and Theodore J. DelGaizo were attached to the June 18, 2002 Defendants' Opposition to Plaintiff's Motion for Preliminary and a Permanent Injunction and Defendants' Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(6)(b).

Moreover, in his deposition, with respect to Kumsung, Amer admits that he does not have a contract with Kumsung and never has had a contract with Kumsung. See Amer Dep., at 231, attached hereto as Exhibit A. Regarding his allegations against Wiedemann with respect to Kumsung, Amer responded:

> Q: [As] you sit here today, is it your position that the reason your company hasn't got that contract is because of something Mr. Wiedemann or Main Line Engineering did?
> A: I have no proof of that -- yet.
> Q: I'm sorry.
> A: I have no proof of that yet.

Amer Dep., at 234.

In his Affidavit, Wiedemann avers that he "never told anyone at MLEA about the price or other proprietary information in AIT's bid proposal to Accurate Machine for the Savannah River Project, Kumsung Engineering, CTCI or any AIT business whatsoever." Wiedemann Aff., ¶ 17. In addition, Ted DelGaizo, MLEA's President and CEO, avers in his Affidavit that "[t]he first time [he] ever heard of the Kumsung, CTCI fuels, or CTCI $N_2$ projects identified in the Plaintiff's Complaint was when the Complaint was served on MLEA on May 16, 2002." DelGaizo Aff., ¶ 3. Moreover, Mr. DelGaizo avers that "MLEA has not bid on and has no intention of bidding on any one of those three projects." Id., ¶ 4. Asked about that statement from the DelGaizo Affidavit in his deposition, Amer stated, "[I]f that's his affidavit, I believe it." Amer Dep., at 235.

In his deposition by AIT, Mr. DelGaizo reaffirmed the truthfulness of his Affidavit. Referring to his Affidavit, counsel for AIT questioned Mr. DelGaizo about the Kumsung and CTCI projects:

> Q: And according to your statements in paragraph 4, MLEA has not bid on those three projects, correct?
> A: Correct.

> Q: And MLEA has no intention of bidding on these three projects, correct?
> A: Correct.
> Q: What Kumsung project are you referring to?
> A: I have no idea.
> Q: Are you referring to the project that's in the Complaint?
> A: Whatever your client is referring to is what I'm referring to. I don't know anything about these guys. This is absolute -- this is what I mean by frivolous.
> Q: And how about CTCI, other than seeing them in the Complaint, you don't know what project that's referring to?
> A: I don't even know what they are. They could be buildings, railroads for all I know. I have no idea and couldn't care less.

See DelGaizo Dep., at 69-70, attached hereto as Exhibit B.

Most telling, the deposition of Mr. Amer, President of AIT, reveals that he simply has no evidence of any wrongdoing at all by either Defendant. With respect to CTCI, Amer stated in his deposition:

> Q: Is it your position that your company has been unable to reach that contract with CTCI because of anything that Wiedemann did?
> A: We don't know the reasons yet until we either get rejected or – we're still negotiating the contract.
>         . . . .
> Q: Sitting here today, you don't have any proof, to use your word, that Mr. Wiedemann has contacted CTCI about this project, do you?
> A: No.
> Q: And you don't have any proof, sitting here today, that anybody at MLEA has contacted CTCI about these projects, right?
> A: I don't have any records.
> Q: You don't have any proof either, do you?
> A: I don't have any proof.
> Q: And all those problems you've listed that have gotten in the way, if you will, of your company reaching a contract with CTCI, that is, revised specifications, unhappy with prices, Taiwan Electric changing the specifications, none of those reasons are Mr. Wiedemann's fault are they?
> A: No.

-8-

> Q: In fact, none of those reasons are Main Line Engineering's fault, are they?
> A: No.
>
> . . . .
>
> Q: I really want an answer to my question which doesn't have anything to do with Accurate Machine. I want to know that sitting here today you have no proof that Mr. Wiedemann or MLEA did anything improper or against the rules, to use your term, with respect to your Kumsung negotiations or your CTCI negotiations?
> A: Not yet.

Amer Dep., at 238-45.

In addition to Mr. DelGaizo, the other MLEA witnesses each testified that they had never heard of Kumsung or CTCI. See Manzon Dep., at 124, attached hereto as Exhibit C; Timberlake Dep., at 93-94, attached hereto as Exhibit D; Michael Dep., at 90, attached hereto as Exhibit E.

"[E]stablishing a risk of irreparable harm is not enough." Campbell Soup Co. v. Conagra, Inc., 977 F.2d 86, 91 (3d Cir. 1992). See also Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3d Cir. 1980) ("an injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights"). Amer's deposition, DelGaizo's Affidavit and the MLEA witness depositions clearly prove that there is not even a risk of any harm as to those alleged prospective projects. Without evidence of the need for, and legal basis for, an injunction against the Defendants as to the Kumsung or CTCI prospective projects, Plaintiff's Amended Complaint as to those prospective projects should be dismissed, and the motion for injunctive relief denied.

C. The Savannah River Project

With respect to the Savannah River Project, it is undisputed that work has already been awarded and, indeed, the work under the contract is completed. See DelGaizo Dep., at 128. There is no threat to AIT – if there ever was a threat. SI Handling Systems, 753 F.2d 1244, 1264

(3d Cir. 1985) (relevant inquiry is whether movant is in danger of suffering irreparable harm <u>at the time the preliminary injunction is to be issued</u>) (emphasis added).

In his July 12, 2002 deposition, a non-party witness, Ken Gough, President of Accurate Machine, who accepted and evaluated the bids for the Savannah River Project testified:

> Q: Mr. Gough, is the project that we're talking about, that is, the design-only phase, completed?
> . . . .
> A: No, it is not finished. We expect to finish in the near future.
> Q: About how long do you expect it to take to finish it?
> A: It will possibly be finished next week. More likely, it will be the end of this month, the end of July [2002].

<u>See</u> Gough Dep., at 207, attached hereto as Exhibit F.[3]

Thus, the extraordinary relief of an injunction is not warranted, because the Plaintiff cannot, as a matter of law, suffer irreparable harm at this point; the need for injunctive relief is now moot as to the Savannah River Project. <u>See</u> <u>SI Handling Systems</u>, 753 F.2d at 1264. If it were to turn out that AIT is entitled to some form of relief, damages would be the remedy. <u>Id</u>. <u>See also</u> <u>Campbell Soup</u>, 977 F.2d at 91-92. Even a case for damages, however, should fall to summary judgment, given the Affidavit of Accurate Machine, the non-party that awarded the Savannah River Project contract, and AIT's failure to counter that Affidavit. Mr. Gough, in his Affidavit, ranked AIT third among the three bidders. <u>See</u> Gough Aff., ¶ 11. He ranked MLEA first "based on price, delivery, technical capabilities and acceptable reference checks." <u>Id</u>. And, he ranked MECA second, even though MECA's price was <u>higher</u> than AIT's price. <u>Id</u>. Significantly, Mr. Gough ranked AIT <u>last</u>, concluding that "there seems to be no compelling reason for preference." <u>Id</u>.

---

[3] On July 31, 2002, at Mr. DelGaizo's deposition, he confirmed that the Savannah River Project had, in fact, been completed. <u>See</u> DelGaizo Dep., at 128.

Moreover, in his deposition, Mr. Gough testified that MLEA[4] and MECA were simply better qualified to perform the design-only work:

> Q: Well, take a look at your note 1. Is price the only factor favoring EGS over MECA?
> A: No. No. My – my assessment of the two companies is that EGS is more technically qualified to do the design work than MECA. We're talking about three companies here who are technically qualified. There's no question of that. The question is, which company is the most qualified? And in my opinion, after studying the three companies, EGS was the most technically qualified.
> Q: And what was that based on, that determination?
>     . . . .
> A: EGS's – EGS's design experience for projects of this nature was more extensive than either of the other two bidders'.

Gough Dep., at 182-83; see also Gough Dep. Exh. 7, appended hereto to Exhibit F.

The presence of an engineer at MLEA with relevant experience at the Westinghouse Savannah River Project was a key factor that went into Mr. Gough's decision to rank MLEA first:

> Q: Now, but I thought your testimony was that it really wasn't simply price that went into your evaluation.
> A: That's correct.
> Q: In fact, you said that Mr. Manzon's presence on the team at EGS was an important factor; right?
> A: That is correct.
> Q: A stroke of luck?
> A: Yes.
> Q: So it didn't come down to just price only, did it?
> A: No, it didn't. Again, face-saving on my part.
> Q: I'm sorry. You said –
> A: I think we can all understand when you lose a bid on price, but to say to Mr. Amer, who runs a fine company, that I felt

---

[4] In his deposition testimony, Mr. Gough actually refers to Engineered Gas Systems or "EGS" -- the division of Defendant MLEA, Inc. that bid on the Savannah River Project. MLEA and EGS are referred to interchangeably throughout the deposition of Mr. Gough.

>   that another company was better qualified, I just didn't
>   want to do that.
> Q: You didn't want to hurt his feelings?
> A: Correct.
> Q: And you didn't want to burn any bridges?
> A: Correct.
> Q: Although your recommendation at that time was that for
>   that project, given the personnel, MLEA was better
>   qualified.
> A: Yes.

Gough Dep., at 67-68.

Mr. Manzon had worked on several projects at the Savannah River Site, and for Westinghouse Savannah River Company before being employed by MLEA. See Manzon Dep., at 44-46.

Thus, the Accurate Machine Affidavit and Mr. Gough's deposition testimony show that AIT was *never* in the running to win the contract and that, even if MLEA had never bid on the Savannah River Project, the contract still would not have been awarded to AIT, but would have been awarded to MECA. See Gough Aff., ¶ 11.[5] At his deposition, Mr. Gough stated:

> Q: But if I understand your recommendation, the second
>   choice would have been MECA, even though its price was
>   higher.
> A: Yes. And the primary reason for making that
>   recommendation was that they're next door. I mean if we

---

[5] The evidence discovered in this case also fails to support AIT's allegations that it had an existing contractual relationship with Accurate Machine – an allegation that Mr. Gough, of Accurate Machine, specifically denied in his deposition. Mr. Gough testified:

> Q: Had you, that is, your company, ever done any business before with AIT?
> A: No, we had not.
>         . . . .
> Q: So this was your first experience with AIT?
> A: Yes. Other our telephone conversations and other correspondence.

Gough Dep., at 18-19.

> had to get together to go over any problems, they're only a few minutes away.
>
> Q: So if EGS or MLEA had not bid on the job or for some reason was disqualified, the work would have gone to MECA.
>
> . . . .
>
> A: I believe that all other factors being equal, we would have suggested that MECA be chosen.
>
> Q: I see. Since you don't award the contract, you can't say the job would have gone to MECA but you would have recommended MECA.
>
> A: That would have been my recommendation, yes.
>
> Q: And it would have happened if, for example, EGS declined to accept the award for some reason.
>
> A: Yes.

Gough Dep., at 54-55.

Moreover, in his deposition, Mr. Gough elaborated on why MECA would have won the design-only contract even if MLEA had never bid on it:

> Q: And for the design-only portion you were recommending MECA because of their proximity in relation to Accurate Machine?
>
> A: That's correct.
>
> Q: Was that the only factor?
>
> A: Now, we –
>
> Q: I'm sorry. Go ahead.
>
> A: Let's see. What's the best way to explain this? There is a difference between designing something that is going to be built in your own shop and designing something that could be built in anyone's shop. AIT and Accurate Machine, for that matter, have specific capabilities, specific strengths, specific weaknesses, specific preferences as to the way we would want to see a job done if it were going to be done in our house. I would fully expect AIT to design this – these vessels for their strengths and weaknesses. On the other hand, a design company, a design engineering company, will be designing so that hopefully any competent shop can do the work without reference to specific weaknesses or strengths and in this way perhaps coming up with an overall better design. So would MECA be a better choice for the design-only portion? With no offense to AIT, yes, I believe they would be the better choice. If the project was going to be design and build, there's no question in my

-13-

> mind that AIT would be an excellent choice. It's an excellent company. But if it were going to break it out and do design only, this is better done by an engineering company. That's their strength. I wouldn't give it to MECA to do the fabrication. They don't have the capability. But when we're looking at relative strengths and weaknesses, then MECA's design capabilities, in my opinion, and without any offense intended to AIT, MECA's design capabilities were better than AIT's.

Gough Dep., at 140-42.

Even after the substantial discovery that has taken place in this case, Plaintiff remains unable to prove causation, because it would not have been awarded the Savannah River Project contract, even if MLEA had never bid. See Gough Aff., ¶ 11 & Gough Dep., at 54-55. Therefore, Plaintiff cannot, as a matter of law, demonstrate a reasonable probability of success on the merits.

AIT has argued in its July 2, 2002 Memorandum of Law that Defendants' summary judgment motion was premature because discovery was incomplete. Yet, at the time, even without discovery, Plaintiff could not demonstrate, by Affidavit, a reasonable probability of success on the merits, or that it would be irreparably harmed by a denial of its motion for injunctive relief. Now, after substantial discovery, Plaintiff still cannot demonstrate a reasonable probability of success on the merits, or that it would be irreparably harmed by a denial of its motion for injunctive relief. Indeed, the evidence shows that Defendants are the ones with the reasonable probability of success on the merits. Moreover, Plaintiff has failed to establish a genuine issue of material fact – particularly as to whether MLEA could cause AIT to lose a bid that it was not going to win -- *even if MLEA had not been involved at all*. Thus, summary judgment is appropriate now. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## IV. CONCLUSION

Because Plaintiff cannot demonstrate a reasonable probability of success on the merits or irreparable harm as to the Savannah River, Kumsung and CTCI projects, summary judgment should be granted as to all claims for injunctive relief. Similarly, Plaintiff cannot show any damages caused by the Defendants as to the Savannah River Project or the Kumsung or CTCI projects, and, therefore, summary judgment is warranted.

Respectfully Submitted,

/s/ Robert S. Nix
PEPPER HAMILTON LLP
Philip J. Katauskas
Robert S. Nix
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Defendants MLEA, Inc. and
John K. Wiedemann

Date:   August 7, 2002

## **CERTIFICATE OF SERVICE**

      I, Robert S. Nix, certify that a true copy of the foregoing Defendants' Motion to Dismiss Plaintiff's Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6), and accompanying Memorandum of Law was served via hand delivery, this 7th day of August, 2002 upon the following Attorney for Plaintiff.

        Donald D. Gamburg, Esquire
        Blank Rome Comisky & McCauley LLP
        One Logan Square
        Philadelphia, PA  19103-6998


        ____/s/ Robert S. Nix_____
        Robert S. Nix