## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE MARY A. MCLAUGHLIN** |
|  | : |  |
|  | : | **CASE NO.:  02-CV-2902** |
| **Plaintiff,** | : |  |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf,** | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
| **Defendants.** | : |  |

### ORDER

AND NOW, on this ____ day of _____, 2002, upon consideration of Defendants' Motion to Dismiss Plaintiff's Amended Complaint under Fed. R. Civ. P. 12(b)(6) and Plaintiff's response thereto,

IT IS HEREBY ORDERED that Defendants' foregoing motion is denied.

_____
                                                                                                    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : | **JUDGE MARY A. MCLAUGHLIN** |
| | : | |
| | : | **CASE NO.:  02-CV-2902** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

## I.    INTRODUCTION

On May 15, 2002, Plaintiff, Amer Industrial Technologies, Inc. ("Plaintiff" or "AIT"),

filed a complaint and motion for preliminary and permanent injunction against Defendants,

MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann") (collectively referred to as

"Defendants"), for misappropriation of trade secrets, tortious interference with contractual and

prospective business relations, and civil conspiracy, and for breach of fiduciary duty or duty of

loyalty against Wiedemann only.  In response, on June 18, 2002, Defendants filed a motion to

dismiss.  On that same date, Defendants also filed a memorandum of law in opposition to

Plaintiff's motion for preliminary and permanent injunction.  On July 18, 2002, AIT filed an

amended complaint in which it alleged that, in addition to the allegations previously presented in

Plaintiff's complaint, MLEA tortiously converted proprietary information of AIT's to its

advantage and thereby was unjustly enriched.

Now, by a motion filed August 7, 2002, Defendants seek summary judgment in their favor on AIT's amended complaint.[1] In doing so, Defendants address every issue other than the essential claim of the amended complaint -- that MLEA, through Wiedemann, tortiously converted proprietary information of AIT to MLEA's advantage and thereby unjustly enriched MLEA as a direct result of using information developed by AIT for its proposal and eventual performance on the Savannah River Nuclear Power Plant Project. Defendants' motion addresses itself almost entirely to Plaintiff's motion for preliminary and permanent injunction to preclude the further misuse of information taken by Wiedemann upon his termination of employment from AIT on January 22, 2002. As of the date Defendants filed their motion, Plaintiff's counsel had already indicated that it would give consideration to withdrawal of the injunction request based on certain evidence which emerged from discovery and, to that end, subsequently filed a motion to withdraw its request for preliminary injunction. AIT has not withdrawn its damages claims.

To the extent Defendants' motion addresses issues unrelated to AIT's claims for damages concerning the Savannah River Project, it is moot. Indeed, on August 13, 2002, this Court entered three (3) orders, one granting Plaintiff's withdrawal of its request for preliminary injunction, a second one denying Plaintiff's motion for preliminary injunction as moot, and a third one denying Defendants' original motion to dismiss as moot. All that remains is Defendants' motion concerning Plaintiff's amended complaint.

Prior to Plaintiff's withdrawal of its request for preliminary injunction, the parties engaged in expedited discovery consisting of partial document production, computer inspections,

---

[1]   Although styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Defendants readily admit that, because the motion is supported by affidavits and deposition testimony, the motion should be treated as a motion for summary judgment under Rule 56. Fed.R.Civ.P. 12(b)(6).

and depositions. In total, seven (7) depositions were taken consisting of Kenneth Gough

(Accurate Machine President/CEO) ("Gough"), Ahmad Amer (AIT President) ("Amer"),

Haitham Hamdan (AIT Engineer) ("Hamdan"), Theodore DelGaizo (MLEA President/CEO)

("DelGaizo"), Keith Michael (MLEA VP Sales and Marketing) ("Michael"), George Timberlake

(MLEA SVP Business Development) ("Timberlake"), and Paul Manzon (MLEA VP Special

Projects and Chief Structural Engineer) ("Manzon"). The most critical deposition, that of

Wiedemann, has yet to be taken, as it was scheduled but had to be postponed due to a death in

the family of Plaintiff's counsel. Plaintiff will reschedule that deposition after Defendants have

responded to all outstanding discovery requests.[2]

Notwithstanding Defendants' representations to the contrary, and even without yet

having taken the deposition of the essential figure in the case, Wiedemann, there is more than

sufficient evidence on this record to, not only create a genuine issue of fact but, establish liability

as to AIT's claims concerning Defendants' theft of proprietary information involving the

Savannah River Project.

---

[2]     On August 8, 2002, Plaintiff filed a motion to compel discovery of certain Wiedemann invoices, computer documents retrieved from Wiedemann's personal computer currently used at MLEA, and computer documents retrieved from MLEA's computers by Plaintiff's computer expert which have been withheld by Defendants. The Court has scheduled a telephone conference for August 23, 2002 regarding this motion. In addition to the documents subject to the motion to compel, Plaintiff is awaiting the production of documents in response to Plaintiff's Second Request for Production of Documents. Also, the parties have briefly discussed the potential need for interrogatories and requests for admissions concerning Plaintiff's damages claims. Wiedemann's deposition will be rescheduled in conjunction with this additional discovery.

## II.    STATEMENT OF THE FACTS

### A.    WIEDEMANN'S EMPLOYMENT WITH AIT

Wiedemann served as AIT's Program Project Manager from on or about October 20,

2001, his date of hire, until he was discharged from his employment on January 22, 2002.

(Wiedemann Aff. at ¶¶ 1 and 9; Amer Aff. at ¶¶ 3 and 9; Amer Tr. at 77, 80-81, 84, and 250).[3]

Upon his hire, Wiedemann entered into employment agreements with AIT in which he agreed to

maintain the confidentiality of and not divulge proprietary information acquired during his

employment with AIT. (Amer Tr. at 181 and Exhibit 3). During his employment with AIT,

Wiedemann became privy to trade secret information including, but not limited to, proprietary

and confidential information regarding pricing, designs, data, devices, methods, techniques,

drawings, and processes. (Amer Aff. at ¶ 4; Amer Tr. at 125). In particular during his

employment with AIT, Wiedemann supervised preparation of AIT's subcontractor bid proposal

to Accurate Machine Products Corporation ("Accurate Machine") for the design and fabrication

of preheaters, aftercoolers, and process coolers for cleaning contaminated areas at the Savannah

River Nuclear Plant ("Savannah River Project"). (Amer Aff. at ¶ 5; Amer Tr. at 125;

---

[3]    Citations to portions of Ahmad Amer's deposition transcript are set forth as Amer Tr. at __, and are attached as Exhibit A. Citations to portions of Haitham Hamdan's deposition transcript are set forth as Hamdan Tr. at __, and are attached as Exhibit B. Citations to portions of Kenneth Gough's deposition transcript are set forth as Gough Tr. at __, and are attached as Exhibit C. Citations to portions of Theodore DelGaizo's deposition transcript are set forth as DelGaizo Tr. at __, and are attached as Exhibit D. Citations to portions of Keith Michael's deposition transcript are set forth as Michael Tr. at __, and are attached as Exhibit E. Citations to portions of George Timberlake's deposition transcript are set forth as Timberlake Tr. at __, and are attached as Exhibit F. Citations to portions of Paul Manzon's deposition transcript are set forth as Manzon Tr. at __, and are attached as Exhibit G. Citations to Ahmad Amer's affidavit are set forth as Amer Aff. at ¶__, which is attached as Exhibit H. Citations to John Wiedemann's affidavit are set forth as Wiedemann Aff. at ¶__, and are attached as Exhibit I. Citations to Theodrore DelGaizo's affidavit are set forth as DelGaizo Aff. at ¶__, and are attached as Exhibit J. Citations to Kenneth Gough's affidavit are set forth as Gough Aff. at ¶__, and are attached as Exhibit K.

Wiedemann Aff. at ¶ 4).

**B.    AIT'S SAVANNAH RIVER PROJECT PROPOSAL**

On or around October 18, 2001, Accurate Machine originally requested a bid from AIT concerning the Savannah River Project. (Amer Aff. at ¶ 7; Gough Tr. at 102; Hamdan Tr. at 55-58 and Exhibit 2). AIT submitted its original proposal on December 26, 2001, over two (2) months later. (Wiedemann Aff. at ¶ 8; Amer Aff. at ¶ 8; Amer Tr. at 183-184 and Exhibit 8; Gough Tr. at 114). During that two (2) month period, AIT obtained pricing for materials, preliminary designs, calculations, and pricing for the proposal itself. (Amer Tr. at 123-125; Hamdan Tr. at 61-62). Prior to submission of AIT's proposal, Amer reviewed with Wiedemann, in great detail, the requirements of the project and showed Wiedemann how to price and design this type of project, as Wiedemann's recommendations to Amer evidenced a lack of knowledge to be able to do so. (Amer Tr. at 98-101). On January 15, 2002, Accurate Machine submitted its bid to Westinghouse Savannah River Company ("Westinghouse") for the Savannah River Project, and in submitting that bid, "Accurate Machine incorporated a bid submitted to Accurate Machine by Amer Industrial Technologies, Inc. ("AIT")." (Gough Aff. at ¶ 4).

Subsequently, during a telephone conversation, on January 17, 2002, Gough requested that Wiedemann submit a design only proposal from AIT. (Gough Tr. at 130-133). On January 18, 2002, exactly three (3) months to the date Accurate Machine originally requested a bid from AIT, Wiedemann submitted AIT's design only proposal to Gough. (Amer Tr. at 149; Gough Tr. at 43 and Exhibit 5). Wiedemann and Amer determined the pricing for the design only proposal. (Hamdan Tr. at 84; Amer Tr. at 197). Subsequently, AIT reiterated its design only proposal to Accurate Machine on January 25, 2002, and then again on February 20, 2002. (Gough Tr. at 149 and Exhibit 15; Amer Tr. at 194-195, 199-200, and Exhibits 9 and 10; Hamdan Tr. at 72-74 and

Exhibit 4). At or around that time, Accurate Machine advised AIT that only *one* competitor existed, which now turns out was MECA, and that AIT was the lowest bidder. (Amer. Aff. at ¶ 11; Amer Tr. at 132-133 and 214-216). In total, the development of AIT's proposals for the Savannah River Project, based on its 26 years of know-how, cost in excess of $22,000 and required three (3) months to complete. (Amer Aff. at ¶ 13; Amer Tr. at 184-191 and 241-243).

Nonetheless, Accurate Machine advised AIT that AIT's proposal for the Savannah River Project was rejected and that Accurate Machine had decided to award the job to another undisclosed entity because of price only. (Amer Aff. at ¶ 14; Amer Tr. at 132 and 217; Gough Tr. at 65-67 and 201-202). At the time, Accurate Machine refused to disclose the identity of the entity which was awarded the bid. (Amer Aff. at ¶ 15; Amer Tr. at 132; Gough Tr. at 65-67 and 201-202). Subsequently, on April 12, 2002, Accurate Machine advised AIT that the Savannah Project had been awarded to MLEA. (Amer. Aff. at ¶ 16; Gough Tr. at 67).

### C.    WIEDEMANN'S MLEA CONTACTS DURING HIS AIT EMPLOYMENT

In the meantime, for reasons unrelated to this litigation, on January 22, 2002, AIT terminated Wiedemann's employment. (Wiedemann Aff. at ¶ 9; Amer. Aff. at ¶ 9; Amer Tr. at 84). Relying on Wiedemann's employment agreements, AIT expected that Wiedemann would not use or divulge AIT's confidential information. (Amer Tr. at 146 and Exhibit 3). AIT also requested that Wiedemann return all AIT proprietary information. (Amer Tr. at 146-148).

Prior to his termination of employment, Wiedemann frequently telephoned MLEA. (Wiedemann Aff. at ¶ 6; Amer. Aff. at ¶ 17; Amer Tr. at 224-225; Manzon Tr. at 53-56). Notwithstanding Defendants' representations to the contrary, those contacts did not end in December 2001. (Wiedemann Aff. at ¶¶ 6-8). Rather, as AIT's telephone records demonstrate, those contacts continued throughout the month of January, 2002, the month of Wiedemann's

6

termination of employment. (Amer Aff. at ¶ 17; Amer Tr. at 224-225). Further, and contrary to Wiedemann's false representations in his affidavit, these contacts had nothing to do with proposals submitted by MLEA to AIT on November 20, 2001. (Manzon Tr. at 56-63; Wiedemann Aff. at ¶ 10). Indeed, Manzon testified that there was no further communications regarding those proposals. (Manzon Tr. at 53-56).[4]

Manzon also testified that Wiedemann reached out to him at MLEA, in December, 2001, to explore employment options other than with Wiedemann's current employer at the time, AIT. (Manzon Tr. at 67-72). Also, DelGaizo testified that Wiedemann, still exploring his options elsewhere, had an in-person meeting with DelGaizo for one-half hour, in mid-January, 2002, to explore potential employment opportunities with MLEA itself. (DelGaizo Tr. at 36-38). Thus, for the month before his termination of employment, Wiedemann continued to gather AIT's confidential and proprietary information with the apparent plan to go elsewhere.

### D.    "MLEA'S" SAVANNAH RIVER PROJECT PROPOSAL

Shortly after Wiedemann's termination of employment from AIT, MLEA, on January 28, 2002, engaged Wiedemann as a consultant and then later, on March 25, 2002, as an employee. (Wiedemann Aff. at ¶¶ 13, 15, and 16; DelGaizo Aff. at ¶ 6; DelGaizo Tr. at 68 and 70-71). Indeed, MLEA offered full-time employment to Wiedemann *only after* Wiedemann secured the award of the Savannah River Project for MLEA, which occurred on March 4, 2002. (DelGaizo Tr. at 68, 70-71, and 112-113). On January 28, 2002, the same day Wiedemann commenced his

---

[4]    It is also worth noting that one of the proposals submitted by MLEA to AIT involved electrical design work on the Savannah River Project. No one at AIT, other than Wiedemann, knew about this proposal. More interesting, however, is the price contained in that proposal – the extremely low price for the work covered by the proposal evidences MLEA's inexperience with the type of project involved, thus making it even more probable that Wiedemann ultimately shared AIT's design pricing with MLEA. (Amer Tr. at 166-168).

consulting services for MLEA, Wiedemann telephoned Gough to inform Gough that, among

potentially other things, he had been terminated by AIT and to remove his resume from AIT's

proposal package. (Gough Tr. at 150-153). On January 31 or February 1, 2002, Wiedemann

again contacted Gough, this time to advise Gough that, again among potentially other things, "he

might have a lead on another company for the design work, or words to that effect." (Gough

Aff. at ¶ 17; Gough Tr. at 155-157). Gough was interested because "if [Wiedemann] had

obtained employment with a company that had the qualifications that he indicated, then I would

certainly want to hear from them." (Gough Tr. at 160). Then, following his telephone calls to

Gough, Wiedemann told Manzon about the possibility that Accurate Machine would be

interested in receiving MLEA's proposal for the Savannah River Project. (Manzon Tr. at 76).

Manzon directed Wiedemann to talk to Timberlake, which Wiedemann did. (Manzon Tr. at 76;

Timberlake Tr. at 45). Following this conversation with Wiedemann, Timberlake telephoned

Gough, identified himself as from MLEA, and notified Gough that Wiedemann had suggested

that MLEA contact Accurate Machine concerning the Savannah River Project. (Gough Tr. at

160-161; Timberlake Tr. at 47-49). As such, based on this series of events, it is clear that

Wiedemann established himself with Accurate Machine as a competent and knowledgeable

individual based on his association with AIT and AIT's experience in the industry, and then used

his elevated status with Accurate Machine to present MLEA as a viable option for the project.

On February 5, 2002, Accurate Machine actually requested a bid from MLEA. (Gough

Tr. at 172-173 and Exhibit 21). Miraculously, *three (3) days* after Accurate Machine requested

the bid from MLEA, MLEA submitted, on February 8, 2002, a *complete* proposal to Accurate

Machine. (Gough Tr. at 37, 175, and Exhibit 4; Gough Aff. at ¶ 8; DelGaizo Aff. at ¶ 8).

MLEA submitted the lowest priced proposal to Accurate Machine for the Savannah

Project. MLEA created in three (3) days a response to the request for proposal, a response that

took AIT a couple of months to prepare, and mysteriously managed to underbid not only AIT,

but also the third bidder, MECA, by at least $36,000. (Gough Tr. at 175-176). Indeed, MLEA

submitted a bid for $91,000, more than $36,000 less than its competitors, AIT ($127, 000) and

MECA ($129,498). (Gough Tr. at 143 and 175; Gough Aff. at ¶ 8; Amer Aff. at ¶ 12). That

means either that MLEA is so expert that it cannot only prepare a proposal in a fraction of the

time taken by its competitors, but can submit a price on the order of 30% less than both of them.

AIT submits that the more plausible conclusion and the one indicated by the doctrine of

inevitable disclosure is that MLEA took advantage of information which Wiedemann brought

with him from AIT. (Amer Tr. at 123-124).

**E.    WIEDEMANN'S PERFORMANCE ON "MLEA'S" SAVANNAH RIVER
         PROJECT AND THE COVER-UP OF SAME**

Although MLEA's affidavits completely conceal it, MLEA's documents and the

deposition testimony so far demonstrate that Wiedemann has had substantial involvement in the

Savannah River Project on behalf of MLEA:

- *Invoices for Consulting Services*: MLEA improperly withheld invoices
  rendered by Wiedemann to it for February and March, 2002 for consulting
  services he performed. MLEA finally produced these invoices after
  Plaintiff filed a motion to compel same. Wiedemann's invoice to MLEA,
  dated March 15, 2002, conclusively establishes that Wiedemann
  performed mechanical engineering design services concerning tritium heat
  exchanger design by developing "models per 1998 ASME Sec. VIII Div
  1." (*See* Invoice, attached as Exhibit L). That work was performed, or
  was at least invoiced, within the first two (2) weeks after Accurate
  Machine awarded the project to MLEA. (*Id.*).

  Notwithstanding this clear evidence, DelGaizo, during his deposition,
  flatly denied such consulting services by Wiedemann:

  > Q:    Did you ever pay [Wiedemann] as a contract engineer for
  >       anything associated with the Savannah River Project?

A:      No, I'm fairly positive of that.

(DelGaizo Tr. at 70-73).[5]

- *Kick-Off Meeting*: On March 13, 2002, while Wiedemann was still a consultant to MLEA, Wiedemann attended the "kick-off meeting" for the Savannah River Project attended by Gough of Accurate Machine and other MLEA personnel. (Manzon Tr. at Exhibit 14; Gough Tr. at 193-196). In his affidavit, DelGaizo concealed Wiedemann's involvement:

> 5.    I hired John K. Wiedemann as a permanent employee of MLEA on March 25, 2002.
>
> 6.    After January 22, 2002 and prior to MLEA hiring Wiedemann as permanent employee, MLEA utilized his services as a contract engineer on projects *unrelated to the Savannah River Project*.

(DelGaizo Aff. at ¶¶ 5 and 6) (emphasis added). Likewise, Wiedemann's affidavit ignores his involvement. (Wiedemann Aff. at ¶¶ 13 and 15). Manzon himself, the person who prepared MLEA's minutes of the meeting, allegedly could not remember Wiedemann's attendance. (Manzon Tr. at 114-115 and 117-118).

Notwithstanding MLEA's apparent cover-up, and willingness to do so under oath, Gough testified that the kick-off meeting lasted all day (9:00 a.m. to 3:00 p.m.), Wiedemann both attended and accompanied Gough the entire time, and only two other MLEA individuals, Manzon and Michael, attended as much of the meetings as Wiedemann. (Gough Tr. at 193-196).

- *Main Engineer*: The kick-off meeting minutes further show that MLEA assigned Wiedemann as the only "Engineer" on the project (Manzon Tr. at Exhibit 14), even though it employs, depending on who you ask, 3 to 12 other engineers qualified for the project (none of whom came from AIT!). (DelGaizo Tr. at 81; Timberlake Tr. at 56-57; Michael Tr. at 29; Manzon Tr. at 77-78). For no discernable reason other than Wiedemann's knowledge of the details of AIT's Savannah River Project information, MLEA hired Wiedemann and made him an engineer on the implementation of the Savannah River Project which was awarded to MLEA.

---

[5]     Later during his deposition, DelGaizo reversed fields only after the untruthfulness of his statements, both in his affidavit and in his earlier deposition testimony, was clear. (DelGaizo Tr. at 117-118).

- *Laptop Documents*: AIT has also, pursuant to this Court's Order of May 31, 2002, performed computer searches of Wiedemann's personal laptop and MLEA's desktops used by Wiedemann and Manzon. Curiously, when counsel for MLEA produced the box of documents from Wiedemann's laptop pursuant to the agreed-upon discovery procedure, *after* screening the box for privileged documents, the only two relevant Savannah River Project documents remaining on Wiedemann's laptop were missing from the box and had to be secured directly from AIT's computer expert. (*See* Laptop Documents, attached as Exhibit M).

  From his date of hire until just before his termination of employment, Wiedemann used his personal laptop computer for all of his AIT business. (Amer Tr. at 83-85). All of the Savannah River Project documents, including designs and calculations, were on Wiedemann's laptop, but apparently are no longer. (Amer Tr. at 124-127 and 137-138). That those designs and other Savannah River Project documents no longer reside on the laptop shows only that Wiedemann deleted them and made such use of his laptop in the past few months as to totally overwrite the hard drive, making it impossible even to uncover the deletions. The fact that the laptop still had on its hard drive preliminary drafts of the proposal shows not only that Wiedemann used the laptop to work on the Savannah River Project while he was at AIT, but also raises significant question as to where the rest of that work went.

- *Draft Designs*: Documents, retrieved from MLEA's computers used by Wiedemann and Manzon, identify Wiedemann as the preparer of numerous designs for the Savannah River Project. (*See* example cover page of such computer documents, attached as Exhibit N).

- *Time Records*: Defendants still have yet to respond to Plaintiff's Second Request for Production of Documents, which responses are due on August 22, 2002. Defendants' responses should include, among other things, documents illustrating the actual hours and tasks performed by each MLEA employee, including Wiedemann, on the Savannah River Project. (DelGaizo Tr. at 101-103). Manhour estimates, retrieved from Manzon's personal computer, already show that Wiedemann (identified as "JKW") was estimated to perform almost all of the engineering work on the Savannah River Project. (Manzon Tr. at Exhibit 6).

- *Actual Designs*: Defendants have improperly withheld actual designs submitted by MLEA to Accurate Machine. Plaintiff seeks the production of those designs to compare to its own in-house documents to determine, if possible, the extent to which MLEA used AIT's proprietary and confidential information. A motion to compel the production of these documents is currently pending with the Court.

For the reasons stated below, Defendants' motion for summary judgment should be

11

denied as genuine issues of material fact already exist, and Plaintiff has yet to even take Wiedemann's deposition.

## III.   LAW AND ARGUMENT

Defendants' Motion to Dismiss must be denied as moot with regard to the request for preliminary injunction and utterly without merit as to Plaintiff's claims for damages.

### A.   DEFENDANTS' MOTION HAS BEEN RENDERED MOOT INSOFAR AS IT RELATES TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION BY PLAINTIFF'S WITHDRAWAL OF THAT REQUEST

On August 9, 2002, for the reasons set forth therein, Plaintiff filed a motion to withdraw its request for preliminary injunction. It did so, as explained in the foregoing motion, because as to the Savannah River Project, the damage has already been done, and it appears from deposition testimony that MLEA has no intention of competing for any of the other projects with respect to which Wiedemann had proprietary information learned while at AIT. On August 13, 2002, this Court entered an order granting Plaintiff's withdrawal of its injunction request. Should further discovery show otherwise, AIT obviously reserves the right to reinstate its request for preliminary injunction.

### B.   AS TO AIT'S CLAIM FOR DAMAGES, EVEN WITHOUT HAVING YET TAKEN WIEDEMANN'S DEPOSITION, THE RECORD EVIDENCE THUS FAR ACCUMULATED IN DISCOVERY GENERATES AN OVERWHELMING INFERENCE THAT MLEA USED WIEDEMANN'S KNOWLEDGE OF AIT'S PROPRIETARY INFORMATION IN FORMULATING, OBTAINING, AND IMPLEMENTING THE SAVANNAH RIVER PROJECT FOR ACCURATE MACHINE

#### 1.   Trade Secrets

Under Pennsylvania law, an employer has a common law right to protect its legitimate interests in trade secrets and proprietary information from misappropriation by third parties. *See Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965).

In order to prove a cause of action for misappropriation of trade secrets, AIT must prove: (1) the information constitutes a trade secret; (2) the information is of value to AIT and important in the conduct of its business; (3) by reason of discovery and ownership, AIT had the right to use of the secret; and (4) the secret was communicated to Wiedemann while he was employed by AIT in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself to the prejudice of AIT. *See, Prudential Ins. Co. of Am. v. Stella*, 994 F.Supp. 318, 323 (E.D.Pa. 1998); *Tyson Metal Products, Inc. v. McCann*, 376 Pa. Super. 119, 122, 546 A.2d 119, 121 (1988); *Felmlee v. Lockett*, 466 Pa. 1, 8, 351 A.2d 271, 277 (1976).

Trade secret protection clearly encompasses business information that is not generally known in the industry. Indeed, in *Air Prods. & Chems. v. Johnson*, 296 Pa. Super. 405, 419, 442 A.2d 1114, 1121-22 (1982), the Court held that business knowledge that could enable a competitor to thwart the plaintiff's plans or to compete without the burden of testing and market analysis born by the plaintiff is protectable as a trade secret. To that end, evidence that the plaintiff has expended a large sum of money and a great deal of effort in developing the information supports a trade secret status. *Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. 1997); *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa. Super. 2000).

The second element of a trade secret claim is the requirement that the information is of value to the employer and important in the conduct of its business. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. AIT has established that its proposal was invaluable to the success of its business. Indeed, AIT, in addition to its 26 years of experience and the costs associated with the acquiring of such know-how, invested in direct salary expenses and other administrative costs

more than $22,000 into preparing its proposal and three (3) months of effort and expense. The confidentiality of this proposal is crucial to AIT's continued success and ability to compete in the marketplace.

The third element of a trade secret claim is that, by reason of discovery or ownership, the employer has the right to the use and enjoyment of the trade secret. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. There is no question that AIT has the right to use and enjoy its trade secrets, which resulted from an investment of many months of hard work and several thousand dollars.

The final element of a trade secret claim is that the trade secret be communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable to disclose it to others, or to make use of it himself, to the detriment of the employer. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. In this regard, it is well established that an employee, upon termination of employment, has a duty to refrain from disclosing or using any confidential information acquired in the course of his/her employment. *See Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960). Wiedemann was employed by AIT until January 22, 2002 as a high-level employee responsible for a number of proposals. By necessity, Wiedemann had daily access to AIT's proposals and requests for bids.

The record evidence is overwhelming that Defendants misappropriated AIT's trade secrets concerning its proposal for the Savannah River Project. It is inconceivable that MLEA could have prepared a response to Accurate Machine's proposal which it received on February 5, 2002 by February 8, 2002 without having some kind of "head start." Moreover, it is inconceivable that MLEA is so much smarter than MECA and AIT that it could bid this project for $91,000 when the other two competitors bid at least $127,000. The most plausible explanation for the difference in price is that MLEA did not incur the developmental costs

14

incurred by the other two competitors, *i.e.*, it could project a comparable profit as AIT and

MECA, even at a lower price, because it had saved the cost of developing the proposal and/or

information to perform the actual design work by obtaining much of the information from

Wiedemann. Thus, while there is not yet any direct evidence that Wiedemann conveyed such

proposal information to MLEA, the mountain of circumstantial evidence cannot be ignored.

Further, Wiedemann's role in the performance of MLEA's actual design work on the

Savannah River Project also conclusively establishes Defendants' misappropriation of trade

secrets. It has been held that an employer is liable for misappropriation of a trade secret as a

consequence of hiring a competitor's employee and placing the employee in a position resulting

in the inevitable disclosure or use of the trade secret. *Pepsico, Inc. v. Redmond*, 54 F.3d 1262,

1269 (7th Cir. 1995), *RKI, Inc., d/b/a Roll-Kraft v. Glimes*, 200 F.Supp. 2d 916, 922 (N.D.Ill.

2002); *Air Products, supra*, 442 A.2d at 1123-1124. In *RKI, Inc., supra*, the Court points out

that:

> "Because direct evidence of misappropriation of trade secrets is
> typically not available, a plaintiff can rely on circumstantial
> evidence to prove misappropriation… In this case, *Roll-Kraft*
> constructed a web of circumstantial evidence from which this
> Court drew inferences, convinced it was more probable than not
> what *Roll-Kraft* alleged happened did in fact take place."

200 F.Supp. at 923. Every word of that quotation applies to this case, even at this stage, before

Wiedemann has been deposed.

Indeed, the evidence that Wiedemann worked on the Savannah River Project, and

Defendants' cover-up of this fact, leads to the logical conclusion that Defendants themselves

know that such involvement by Wiedemann is wrongful. It is inconceivable that summary

judgment can be granted to Defendants at this stage, before Wiedemann has been deposed,

especially where the evidence already shows Wiedemann had access to all of AIT's proprietary

information on the Savannah River Project, that it was in his possession, that her performed consulting services for MLEA concerning the Savannah River Project, that he participated in the kick-off meting for implementation of the project by MLEA after it secured the job, and that he was a main engineer on the job.

Defendants incorrectly argue that Plaintiff cannot recover on its claim for damages for misappropriation of trade secrets based on Gough's testimony that he recommended AIT third out of three companies who submitted bids for the design only portion of the Savannah River Project. First and foremost, there is absolutely no record evidence that Westinghouse would have awarded the project to MECA had the bidding process consisted of MECA and AIT only. Indeed, the record evidence establishes that, prior to Wiedemann's termination of employment, Accurate Machine had in fact relied upon AIT's proposal, not MECA's, in making its own proposal to Westinghouse. Furthermore, Gough himself stated that Accurate Machine made *recommendations* only, it was not the decision-maker: "[P]lease understand that I was not making the final decision here, I was only making a recommendation . . . ." (Gough Dep. at 53). In fact, in the very same testimony cited by Defendants, Gough reiterated, and Defendants' counsel acknowledged, this limited capacity:

> Q:   So if EGS or MLEA had not bid on the job or for some reason was disqualified, the work would have gone to MECA.
>
> A:   I believe that all other factors being equal, we would have *suggested* that Meca be chosen.
>
> Q:   I see. *Since you don't award the contract, you can't say the job would have gone to MECA but you would have recommended MECA.*
>
> A:   That would have been my *recommendation*, yes.

16

(Gough Dep. at 54). Consequently, absent the sworn testimony from the actual decisionmaker at Westinghouse, Defendants' argument that, absent MLEA, MECA would have been awarded the project is entirely speculative and lacks any support in the record.

Moreover, even assuming that AIT would have lost the Savannah River Project regardless of MLEA's participation in the bidding process, AIT is still entitled to recover damages for MLEA's misappropriation of its trade secrets. Under such circumstances, even if it is true, as Defendants argue, that AIT has not lost anything, "the appropriate measure of damages . . . is not what the [p]laintiff lost, but rather the benefits, profits or advantage gained by [d]efendant in the use of the trade secret." *Reinforced molding Corp. v. General Electric Co.*, 592 F.Supp. 1083, 1088 (W.D.Pa. 1984); *SI Handling Systems, Inc. v. Heisley*, 658 F.Supp. 362, 371 (E.D.Pa. 1986). In the instant case, MLEA's and Wiedemann's "benefit, profit, or advantage" is (i) the award of the Savannah River Project to MLEA in the amount of $91,000; (ii) subsequent project awards by Accurate Machine to MLEA due to the now established all-important contact with Accurate Machine in an industry where contacts mean everything and comprise almost all of MLEA's marketing efforts (Timberlake Tr. at 10-11); and (iii) Wiedemann's obtainment of full-time salaried employment at $92,500 (DelGaizo Tr. at Exhibit 2). Accordingly, Defendants' motion concerning the misappropriation of trade secrets should be denied.

### 2.    Breach of Fiduciary Duty or Duty of Loyalty

It is well established that "an agent owes a duty of loyalty to his/her principal, and in all matters affecting the subject of his agency, he/she must act with the utmost good faith in the furtherance and advancement of the interests of his/her principal." *Sylvester v. Beck*, 406 Pa. 607, 610, 178 A.2d 755, 757 (1962). An agent is a fiduciary with respect to matters within the scope of his/her agency and is required to act solely for the benefit of his/her principal. *See*

17

*Onorato v. Wissahickon Park, Inc.*, 430 Pa. 416, 423, 244 A.2d 22, 26 (1968). The courts recognize that an employee's fiduciary duty or duty of loyalty to the employer *extends beyond the life of the employment relationship. See Air Products and Chemicals, Inc. v. Johnson*, 296 Pa. Super. 405, 415-16, 442 A.2d 1114, 1119 (1982).

This duty of loyalty and non-disclosure arises from the confidential relationship which, of necessity, exists between an employer and an employee and exists independently of any contractual agreement not to disclose confidential information. *See Felmlee*, 466 Pa. at 8; 351 A.2d at 273 ("a pledge of secrecy is impliedly extracted from the employee, a pledge which carries with him even beyond the ties of his employment relationship").

The confidential nature of the employer-employee relationship that existed between AIT and Wiedemann imposed a duty upon Wiedemann not to use or disclose his former employer's trade secrets. Moreover, as a high level employee, Wiedemann was solely entrusted with the responsibility of supervising the Savannah River Project proposal. The confidential nature of Wiedemann's employment with AIT was reduced to written agreement between Wiedemann and AIT, thus contractually binding Wiedemann to maintain the confidentiality of the information he acquired during his employment, including the information about the Savannah River Project. Wiedemann blatantly disregarded and neglected his duties when he conspired to harm and injure AIT by dissuading Accurate Machine from continuing to use AIT, pushing Accurate Machine towards using MLEA for the Savannah Project, and then using his know-how acquired during his employment with AIT to assist with the proposal and/or perform actual work for MLEA on the same project. Accordingly, Defendants' request for summary judgment concerning Plaintiff's breach of fiduciary duty or duty of loyalty claim against Wiedemann should be denied.

### 3.    Tortious Interference with Prospective Business Relations

To state a cause of action for tortious interference with prospective business relations, a

plaintiff must establish:

1.    the existence of a prospective business relation;

2.    the purpose or intent to harm the plaintiff by preventing the relation from occurring;

3.    the absence of privilege or justification on the part of the defendant; and

4.    the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1980); *Glenn v.*

*Point Park College*, 441 Pa. 474, 479-480, 272 A.2d 895, 898 (1971).  The cornerstone of this

tort is whether there exists a reasonable probability that a plaintiff will contract with a third

party.  *See Glenn*, 441 Pa. at 480, 272 A.2d at 898.

In the instant matter, it was reasonably probable that AIT would have a contractual

relationship with Accurate Machine for the Savannah River Project.  Indeed, prior to

Wiedemann's termination of employment from AIT and MLEA's subsequent bid substantially

undercutting AIT, AIT was the lowest bidder for the Savannah River Project.  Defendants

unlawfully interfered with this prospective relationship, thus damaging AIT.  As already

discussed above, Defendants' assertion that AIT would not have been awarded the project, even

if Defendants had not engaged in their unlawful conduct, lacks any support.  Accordingly,

genuine issues of material fact exist as to Plaintiff's claim for intentional interference with

prospective contractual relations, and thus Defendants' motion for summary judgment should be

denied. [6]

---

[6]    Plaintiff voluntarily withdraws its cause of action for tortious interference with existing contractual relations.  Plaintiff reserves the right to pursue this claim should the remaining discovery in this matter uncover evidence substantiating such a claim.

### 4.    Conversion and Unjust Enrichment

Defendants' motion completely ignores Plaintiff's claim for conversion and unjust enrichment. Conversion is "the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995); *Welded Tube Co. of America v. Phoenix Steel Corp.*, 512 F.2d 342, 345 (3d Cir. 1975). Plaintiff has sufficiently plead a cause of action for conversion of its design, developmental, and other work concerning the Savannah River Project. Thus, because Plaintiff has sufficiently plead a cause of action and Defendants have failed to plead otherwise, Plaintiff is entitled to judgment in its favor on its conversion and unjust enrichment claim.

### 5.    Civil Conspiracy

Pennsylvania law recognizes a cause of action for civil conspiracy where two or more persons combine to do an unlawful act. *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999). More specifically, an action for damages exists for a conspiracy to misappropriate trade secrets or destroy the business of another. *Somat Corp. v. Combs*, 40 Pa. D. & C.2d 107 (1966); *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 953 F.Supp. 617 (E.D.Pa. 1997). To state a cause of action for conspiracy, a plaintiff must establish: (i) a combination of two or more persons acting with a common purpose to do an unlawful act, or to do a lawful act by unlawful means or for an unlawful purpose; (ii) an overt act done in pursuance of the common purpose; and (iii) actual legal damage. *McGuire v. Shubert*, 722 A.2d 1087 (Pa. Super. 1998). In the instant matter, Wiedemann and MLEA unlawfully conspired to misappropriate AIT's proprietary and confidential trade secret information concerning the Savannah River Project. AIT clearly has suffered from this conspiracy. Consequently, Defendants' request for summary judgment should be denied.

20

IV.    **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that Plaintiff's motion to dismiss Plaintiff's amended complaint under Fed. R. Civ. P. 12(b)(6) be denied in its entirety.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

RICHARD S. MEYER
DONALD D. GAMBURG
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
(215) 569-5699 (fax)

Date:    August 21, 2002

Attorneys for Plaintiff,
AMER INDUSTRIAL TECHNOLOGIES, INC.

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing Plaintiff's Memorandum of Law in Opposition

to Defendants' Motion to Dismiss Plaintiff's Amended Complaint under Fed. R. Civ. P. 12(b)(b)

and proposed Order was served via hand delivery, this 21st day of August, 2002 upon the

following Attorney for Defendants:

> Philip J. Katauskas, Esquire
> Pepper Hamilton LLP
> 3000 Two Logan Square
> 18th and Arch Streets
> Philadelphia, PA 19103-2799

_____
Attorney for Plaintiff

---

**AMER INDUSTRIAL TECHNOLOGIES, INC.,**

                    **Plaintiff,**

     **v.**

**MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf,**

                    **Defendants.**

**JUDGE MARY A. MCLAUGHLIN**

**CASE NO.:  02-CV-2902**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

# **EXHIBITS**

# **HARD COPY OF EXHIBITS A THROUGH N FILED WITH THE CLERK OF COURT**