**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO.:  02-CV-2902** |
| | : | |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this ____ day of _____, 2003, upon consideration of Defendants' Motion to Motion for Summary Judgment, the accompanying Memorandum of Law, and Plaintiff's response thereto, if any,

IT IS HEREBY ORDERED that Defendants' Motion is GRANTED and Plaintiff's Amended Complaint is dismissed in its entirety with prejudice.

_____
D.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : | JUDGE McLAUGHLIN |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | CASE NO.:  02-CV-2902 |
|  | : |  |
| MLEA, INC. and JOHN K. WIEDEMANN, | : |  |
|  | : |  |
| Defendants. | : |  |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann"), by and through their undersigned counsel, Pepper Hamilton LLP, hereby move for summary judgment.  Defendants incorporate by reference as if fully set forth below, the August 7, 2002 Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint Under Fed.R.Civ.P. 12(6)(b) and, for the reasons stated therein and for the reasons set forth in the accompanying Memorandum of Law attached hereto, request that the Court grant Defendants' Motion.

WHEREFORE Defendants MLEA, Inc. and John K. Wiedemann request that the

Court enter an Order in the form appended hereto.

Respectfully Submitted,


/s/ Robert S. Nix

Philip J. Katauskas, Esquire
Robert S. Nix, Esquire
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103-2799
215.981.4000

Attorneys for Defendants MLEA, Inc. and
John K. Wiedemann

Dated: December 23, 2002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CASE NO.:  02-CV-2902** |
| | : | |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

**I.      INTRODUCTION**

        Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann")

(collectively, "Defendants"), submit this Memorandum of Law in support of their accompanying

Motion for Summary Judgment ("the Motion").  Defendants also incorporate by reference their

August 7, 2002 Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's

Amended Complaint Under Fed.R.Civ.P. 12(b)(6).  For the reasons set forth below, Defendants'

Motion should be granted and the Amended Complaint dismissed in its entirety.

**II.     PROCEDURAL HISTORY**

        On about May 16, 2002, Plaintiff, Amer Industrial Technologies, Inc. ("AIT"),

brought an action against MLEA and Wiedemann seeking preliminary injunctive relief.  AIT

alleged that while employed at AIT, Wiedemann misappropriated confidential and proprietary

information belonging to AIT and subsequently, while employed at MLEA, used it to underbid

AIT and win an engineering design contract with Accurate Machine Products Corporation

("Accurate Machine") for the Savannah River Project.  AIT alleged further that the Defendants

would likely use the AIT information to interfere with AIT's prospective business as well. Preliminary discovery included, in addition to the exchange of documents, AIT's downloading and inspection (by AIT's outside computer expert) of the hard drive of Wiedemann's personal laptop computer as well as four desktop PCs at MLEA. That discovery established that the computers used by Wiedemann contained no confidential or proprietary information belonging to AIT, or anyone else. Accordingly, on June 18, 2002, Defendants filed their Opposition to Plaintiff's Motion for a Preliminary and Permanent Injunction and Defendants' Motion to Dismiss Plaintiff's Complaint under Fed.R.Civ.P. 12(b)(6). Included with Defendants' Opposition and Motion was the Affidavit of Ken Gough, President and General Manager of Accurate Machine. His Affidavit established conclusively that Plaintiff would not have been awarded the Savannah River Project contract, even if MLEA had never bid on it; the contract would have been awarded to a third bidder, MECA, whose bid price was actually higher than AIT's bid price. Thus, Plaintiff was unable to prove causation.

In an attempt to get around this evidence, on July 18, 2002, Plaintiff filed an Amended Complaint, adding a count against MLEA for conversion and unjust enrichment. Plaintiff then alleged that, regardless of who was awarded the contract, MLEA had still unlawfully benefited from AIT's confidential and proprietary information in preparing MLEA's bid for the Savannah River Project contract.

On August 7, 2002, Defendants filed a Motion to Dismiss the Amended Complaint. By then, deposition discovery had revealed that 1) MLEA's work on the Savannah River Project was complete, and 2) there was no basis whatsoever for Plaintiff's claims of tortious interference with prospective contractual relations as to any other projects, including the Kumsung Engineering and CTCI ($N_2$ bottles) and CTCI (fuel tanks) projects alleged in both

Complaints.  With nothing remaining but tort claims for damages as to the Savannah River

Project, on August 9, 2002, Plaintiff formally, by motion, withdrew its request for injunctive

relief.  In that same motion, Plaintiff also abandoned its claims as to the Kumsung and CTCI

projects.

At a status conference on August 23, 2002, the Court determined that, because the

deposition of Wiedemann had not yet been taken, and as Plaintiff still sought to review MLEA's

final designs and calculations for the Savannah River Project ("the Deliverables"), ostensibly to

see if any alleged confidential and proprietary information belonging to AIT had been used to

perform the contract, Defendants' Motion to Dismiss the Amended Complaint would be denied

without prejudice, to be re-filed as a motion for summary judgment, after the completion of

additional discovery.

On October 4, 2002, Defendants produced the Deliverables to Plaintiff's counsel.

On December 17, 2002 the deposition of Wiedemann was taken.  The case is now ripe for

disposition by summary judgment, and Defendants, accordingly, file the instant Motion.


**III.    STATEMENT OF FACTS**

   A.    <u>Introduction</u>

AIT sued MLEA and Wiedemann, because AIT lost to MLEA in a three company

competitive bid process for engineering design work at the Savannah River Project.  AIT

claimed that it lost that work because Wiedemann disclosed AIT's pricing data for that project to

MLEA.  The facts, however, show that (1) Wiedemann never disclosed that data or any other

AIT proprietary information to MLEA, (2) MLEA proposed and submitted its own

independently developed bid proposal for that project, and (3) the company that evaluated the

three bids, Accurate Machine, ranked AIT last among the three bidders, even though the runner-

up, MECA, submitted a bid price that was <u>higher</u> than AIT's price.  AIT also made claims that

Wiedemann might disclose AIT proprietary information to MLEA regarding three other projects:

Kumsung Engineering, CTCI ($N_2$ bottles) and CTCI (fuel tanks).  The Affidavits of Defendants,

however, established that (1) Wiedemann has never disclosed any AIT proprietary information

about those projects to MLEA, and (2) MLEA has no intention of bidding on those three projects

and had never heard of them before being sued by AIT.[1]  Subsequently, Plaintiff filed an

Amended Complaint alleging that MLEA had unlawfully enjoyed the benefits of AIT's

confidential and proprietary information in preparing MLEA's bid on the Savannah River Project

contract.  Despite having deposed what Plaintiff considered to be key MLEA witnesses

(Mr. DelGaizo, the President/CEO, Messrs. Michael and Timberlake (both in Marketing) and

Mr. Manzon, the Savanah River Project Engineer) and having downloaded four MLEA PCs and

Wiedemann's laptop, Plaintiff has never identified what confidential and proprietary information

Defendants allegedly misappropriated and used.

     B.    <u>The Savannah River Project</u>

     Wiedemann was hired by AIT on or about October 20, 2001 for a probationary

three-month period, and worked there until January 22, 2002, when AIT terminated his

employment.  <u>See</u> Wiedemann Dep. Tr., at 38, 258-59, attached hereto as Exhibit A.  <u>See also</u>

Wiedemann Affidavit, attached hereto as Exhibit B, ¶¶ 1 & 9.  Wiedemann was an employee at

will and did not sign, nor was he ever asked to sign, an employment contract or a covenant not to

compete.  Exhibit B, ¶ 2.  One of the projects Wiedemann undertook for AIT was to prepare a

bid to be submitted to Accurate Machine for the design and fabrication of certain equipment at

---

[1]    As further discovery subsequently confirmed what MLEA personnel and Gough had averred in
Affidavits, on August 9, 2002, Plaintiff withdrew all claims for injunctive relief and as to any other prospective
projects besides the Savannah River Project, including the Kumsung Engineering, CTCI ($N_2$ bottles) and CTCI (fuel
tanks) projects.  The case at this point involves only tort claims for damages as to only the Savannah River Project.

the Westinghouse Savannah River Site.  Id. ¶ 4.  In preparing that bid, Wiedemann had

conversations in November 2001 with Paul Manzon of MLEA about the Savannah River Project.

Id. ¶ 6.  Those conversations, however, were about MLEA subcontracting with AIT for design

work for certain components of the Savannah River Project, and on November 20, 2001, MLEA

did submit a bid to AIT for part of the design work for the Savannah River Project.  Id. ¶¶ 6 & 7.

AIT ultimately submitted a subcontractor bid to Accurate Machine on December 26, 2001 for the

design and fabrication of certain equipment for the Savannah River Project.  Id. ¶ 8.  On

January 15, 2002, Accurate Machine submitted a bid for design and fabrication of the Savannah

River Project to the Westinghouse Savannah River Company ("Westinghouse"), which bid

incorporated the bid submitted to Accurate Machine by AIT.  See Gough Affidavit, attached

hereto as Exhibit C, ¶¶ 3 & 4.

      Shortly thereafter, still in mid-January 2002,Westinghouse told Accurate Machine

that, for budgetary reasons, it had decided to split the Savannah River Project into two separate

phases, design and fabrication -- entailing two separate contracts.  Id. ¶ 5.  Westinghouse then

asked Accurate Machine to submit a bid for the design-only phase of the Project.  Id.

      As a result, Accurate Machine immediately sought new competitive, fixed-price

bid proposals for the design-only phase of the Project.  Id. ¶ 6.  In soliciting the new bids for the

design-only work, Accurate Machine provided each prospective bidder with the same technical

information upon which to base any bid proposals.  Id. ¶ 9.  In response to this solicitation,

Accurate Machine received bids from three companies.  Id. ¶ 7.  On January 18, 2002, Accurate

Machine received a bid from AIT for $127,000.  Id. ¶ 8.  On February 8, 2002, Accurate

Machine received a bid from MLEA for $91,000.  Id.  On February 18, 2002, Accurate Machine

received a bid from MECA for $129,498.  Id.  The three bidders were unaware of each other's

identities, but they knew that the Project was being competitively bid.  Id. ¶ 9.  Wiedemann was

terminated by AIT on January 22, 2002, seven days after Accurate Machine submitted its bid for

the design and fabrication of the Savannah River Project, and four days after AIT had submitted

the second bid to Accurate Machine for the design-only contract.  See Exhibit B, ¶ 9; see Exhibit

C, ¶¶ 3 & 8.

        On March 4, 2002, after evaluating each of the bid proposals, Accurate Machine

awarded the purchase order for the design-only phase of the Savannah River Project to MLEA.

See Exhibit C, ¶ 10.  Accurate Machine awarded the subcontract to MLEA on the combined

basis of MLEA's technical merit and pricing.  Id. ¶ 11.  Of particular value to Accurate Machine

was that one of the key MLEA engineers, Paul Manzon, had previously worked at the Savannah

River Site and was, therefore, familiar with the very stringent operating environment at the plant,

which requires specialized design considerations.  Id.  Accurate Machine ranked MLEA as first

among the three competitive bidders "based on price, delivery, technical capabilities and

acceptable reference checks."  Id.  MECA was ranked second.  Id.  As to AIT, Accurate Machine

concluded that "there seems to be no compelling reason for preference."  Id.  In short, AIT was a

distant third – if that.  AIT had no special "contractual relation" or other business relationship of

any kind with Accurate Machine.  Rather, AIT was simply one project bidder competing for the

Savannah River Project subcontract.  AIT never had any more chance of being awarded the

design-only contract than any other bidder, including MLEA.  In fact, Mr. Amer told

Wiedemann not to spend too much time on the bid proposal to Accurate Machine because

Mr. Amer thought AIT stood less than a 10% chance of winning the job.  See Exhibit B, ¶ 5.

        While employed by AIT, Wiedemann met Gough when he toured the AIT facility

in early January 2002, before the Savannah River Project had been split into design and

fabrication phases.  See Exhibit C, ¶ 12.  At that time, AIT told Gough that Wiedemann would

be responsible for AIT's overall engineering and design work on the Savannah River Project.  Id.

¶ 13; Exhibit B, ¶ 11.  While Wiedemann was employed at AIT, Wiedemann never once

mentioned MLEA to Gough or to Accurate Machine.  See Exhibit B, ¶ 12; Exhibit C, ¶ 15.  After

Wiedemann was terminated by AIT on January 22, 2002, he informed Gough, as a professional

courtesy, that he had been terminated from AIT, and that he would no longer be responsible for

the AIT bid proposal for the Savannah River Project.[2]  See Exhibit B, ¶ 11; Exhibit C, ¶ 16.

After he was terminated by AIT, Wiedemann informed MLEA that Accurate Machine was

seeking bid proposals for the Savannah River Project, but he did not tell MLEA about AIT's

pricing or other proprietary information.  See Exhibit B, ¶¶ 17 & 18; See also DelGaizo

Affidavit, attached hereto as Exhibit D, ¶ 7.

      C.     Wiedemann's Post-Termination Employment

      Between January 28, 2002 and February 22, 2002, Wiedemann performed some

contractual consulting work for MLEA.  See Exhibit B, ¶ 13; see also Exhibit D, ¶ 6.  The

majority of this consulting work concerned the BOC Edwards Ammonia Project in Taiwan and

was unrelated to the Savannah River Project or to AIT.  See Exhibit B, ¶ 13.[3]  When Accurate

Machine awarded the design-only Savannah River Project contract to MLEA on March 4, 2002,

Wiedemann was out of the country on vacation.  See Exhibit B, ¶ 14; Exhibit C, ¶ 10.  When

Wiedemann returned from vacation, he again performed some contract consulting work for

MLEA between March 11, 2002 and March 22, 2002.  See Exhibit B, ¶ 15.  Again, most of this

---

    [2]     Mr. Wiedemann testified that, as a professional engineer, he did not want his CV associated with AIT's bid for a "lethal service" project when he was no longer employed by AIT.   Exhibit A, at 277-78.

    [3]     At his deposition, Mr. Wiedemann clarified his Affidavit, explaining that before being employed by MLEA, he spent between eight and ten hours on the Savannah River Project reviewing the specification and estimating his time for the design work, which eight to ten hours he did not consider to be consulting work.  Exhibit A, at 32-33, 264.

consulting work had nothing to do with the Savannah River Project or with AIT.  Id.  Rather, his

work concerned the BOC NF$_3$ Project in South Africa.  Id.  On March 18, 2002, Wiedemann was

hired by MLEA as a full-time employee.  See Exhibit A, at 25.  Prior to being hired full-time by

MLEA, Wiedemann did bill some hours of work to the Savannah River Project.[4]  He also

performed design work on the project after he became a full-time employee of MLEA.  By the

end of the July 2002, MLEA had completed all of the work on the Savannah River Project

contract.  See DelGaizo Dep. Tr., at 128, attached hereto as Exhibit E.

      D.    Conclusion

        There is no evidence that Wiedemann misappropriated or disclosed any AIT trade

secrets to MLEA, and he breached no fiduciary or other duty of loyalty to AIT.  See Exhibit B,

¶¶ 17 & 18; Exhibit D, ¶¶ 7 & 8.  MLEA has not tortiously interfered with any existing or

potential contractual relation of AIT.  See Exhibit D, ¶¶ 7 & 8.  Wiedemann and MLEA have

never tortiously conspired to intentionally harm AIT, and AIT has suffered no actionable harm.

See Exhibit B, ¶¶ 17 & 18.  Other than the Savannah River Project (the contract which was

awarded in March 2002), AIT has not alleged – nor can it – that there are any other projects for

which MLEA and AIT have subsequently competed.  See Exhibit B, ¶ 17; Exhibit D, ¶¶ 3 & 4.

Indeed, in withdrawing its Motion for Injunctive Relief, Plaintiff abandoned its claims with

respect to projects other than the Savannah River Project, including the Kumsung Engineering,

CTCI (N$_2$ bottles) and CTCI (fuel tanks) projects.

        AIT cannot meet its burden of surviving Defendant's motion for summary

judgment as to its tort claims regarding the Savannah River Project and, accordingly, MLEA and

Wiedemann now move to have AIT's suit dismissed in its entirety.

---

[4]      Mr. Wiedemann's Affidavit was off by one week on his date of hire by MLEA.  It was March 18th, not March 25, 2002.  See also footnote 3, supra.

IV.    **ARGUMENT**

    A.    <u>Plaintiff Cannot Meet Its Burden Of Opposing Defendants' Motion</u>.

        Federal Rule of Civil Procedure 56 provides that a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, *the non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial.* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (emphasis supplied). Now that liability discovery is complete, the totality of the evidence produced in this case proves that Plaintiff cannot ever meet that burden.

        Discovery is now complete and it is time for Plaintiff to show its cards. All depositions requested by AIT have been taken, Defendants' computer hard drives have been inspected by AIT, numerous documents have been exchanged, and the final Savannah River Project designs and calculations of MLEA have been reviewed by Plaintiff's outside engineering expert. Notwithstanding all of this discovery, there is still no evidence to support the claims in Plaintiff's Amended Complaint.

        Indeed, Plaintiff has admitted that there is no evidence that Wiedemann or MLEA interfered with any prospective contractual relations. Moreover, the evidence establishes that there is no genuine issue of material fact as to whether the Defendants either: 1) caused AIT to lose the bid for the Savannah River Project; or 2) had the benefit of any AIT proprietary information to perform the Savannah River Project contract.

-12-

B.    Plaintiff Voluntarily Abandoned All Claims
       Regarding Prospective Contractual Relations.

Count IV of the Amended Complaint alleges tortious interference with prospective business relations and seeks injunctive relief to prevent the Defendants from interfering with AIT's present or future efforts to win the Kumsung Engineering and CTCI ($N_2$ bottles) and CTCI (fuel tanks) projects.

Discovery, however, revealed that no one at MLEA, other than Wiedemann, had ever even heard of the Kumsung, CTCI ($N_2$ bottles) and CTCI (fuel tanks) projects. Nor did MLEA ever intend to bid on them or otherwise interfere with Plaintiff's prospects for obtaining any of them. See Exhibit B ¶ 17; Exhibit D ¶¶ 3, 4 and 7; Exhibit E, at 69-70. Accordingly, on August 9, 2002, Plaintiff formally withdrew its request for a preliminary injunction against MLEA and Wiedemann. As to the Savannah River project, MLEA had already completed the work, thereby mooting any injunctive relief. But as to the Kumsung and CTCI ($N_2$ bottles) and CTCI (fuel tanks) projects, Plaintiff stated:

> Plaintiff has also concluded that, according to MLEA's witnesses' depositions, Defendants have not attempted to solicit AIT's prospective projects involving Kumsung Engineering and CTCI ($N_2$ bottles) and CTCI (fuel tanks). Plaintiff no longer has a reasonable belief that Defendants have acted unlawfully with respect to projects other than the Savannah River Project and thus Plaintiff seeks to withdraw its motion for preliminary injunction at this time.

Pl.'s Br., Aug. 9, 2002, at 3.

Accordingly, Count IV of the Amended Complaint should be dismissed in its entirety, and Count VI of the Amended Complaint should also be dismissed to the extent that it alleges a civil conspiracy as to the unlawful use of AIT's proprietary trade secrets to obtain jobs

other than the Savannah River Project, including the Kumsung, CTCI ($N_2$ bottles) or CTCI (fuel tanks) contracts.

    C.      The Defendants Did Not Cause AIT to Lose
               the Bid for the Savannah River Project.

        Counts I, II & III of Plaintiff's Amended Complaint address only the Savannah River Project and allege misappropriation of trade secrets against the Defendants, breach of fiduciary duty/duty of loyalty against Wiedemann, and tortious interference with contractual relations against the Defendants, respectively. Causation is an essential element of each of those alleged torts. Thus, for Plaintiff to survive a motion for summary judgment, there must exist a genuine issue of material fact as to whether, but for MLEA and Wiedemann's alleged wrongful acts to underbid AIT and win the Savannah River design-only contract, AIT would have been awarded the Savannah River Project contract. Plaintiff cannot meet this burden, because it would not have been awarded the Savannah River contract even if MLEA had not bid on it.

        Counts I, II, and III of the Amended Complaint should fall to summary judgment, based on the Affidavit of Mr. Gough of Accurate Machine, Gough's Deposition testimony, and AIT's failure to counter that evidence. Mr. Gough, in his Affidavit, ranked AIT third among the three bidders. See Exhibit C, ¶ 11. He ranked MLEA first "based on price, delivery, technical capabilities and acceptable reference checks." Id. And, he ranked MECA second, even though MECA's price was higher than AIT's price. Id. Significantly, Mr. Gough ranked AIT last, concluding that "there seems to be no compelling reason for preference." Id.

        Moreover, in his deposition, Mr. Gough testified that MLEA[5] and MECA were simply better qualified to perform the design-only work:

---

        [5]      In his deposition testimony, Mr. Gough actually refers to Engineered Gas Systems or "EGS" -- the division of Defendant MLEA, Inc. that bid on the Savannah River Project. MLEA and EGS are referred to interchangeably throughout the deposition of Mr. Gough.

Q:      Well, take a look at your note 1.  Is price the only factor
        favoring EGS over MECA?
A:      No.  No.  My – my assessment of the two companies is that
        EGS is more technically qualified to do the design work
        than MECA.  We're talking about three companies here
        who are technically qualified.  There's no question of that.
        The question is, which company is the most  qualified?
        And in my opinion, after studying the three companies,
        EGS was the most technically qualified.
Q:      And what was that based on, that determination?

                . . . .
A:      EGS's – EGS's design experience for projects of this
        nature was more extensive than either of the other two
        bidders'.

Gough Dep. Tr., at 182-83; see also Gough Dep. Tr. Exh. 7, both appended hereto to Exhibit F.

        The presence of an engineer at MLEA with prior hands-on experience at the

Westinghouse Savannah River Project was a key factor in Mr. Gough's decision to rank MLEA

first:

Q:      Now, but I thought your testimony was that it really wasn't
        simply price that went into your evaluation.
A:      That's correct.
Q:      In fact, you said that Mr. Manzon's presence on the team at
        EGS was an important factor; right?
A:      That is correct.
Q:      A stroke of luck?
A:      Yes.
Q:      So it didn't come down to just price only, did it?

A:      No, it didn't.  Again, face-saving on my part.

Q:      I'm sorry.  You said –
A:      I think we can all understand when you lose a bid on price,
        but to say to Mr. Amer, who runs a fine company, that I felt
        that another company was better qualified, I just didn't
        want to do that.
Q:      You didn't want to hurt his feelings?
A:      Correct.
Q:      And you didn't want to burn any bridges?
A:      Correct.

> Q:    Although your recommendation at that time was that for
>        that project, given the personnel, MLEA was better
>        qualified.
> A:    Yes.

Exhibit F, at 67-68.

Mr. Manzon had worked on several projects at the Savannah River Site, and for

Westinghouse Savannah River Company before being employed by MLEA.  See Manzon Dep.,

at 44-46, attached hereto as Exhibit G.

Thus, the Accurate Machine Affidavit and Mr. Gough's deposition testimony

show that AIT was *never* in the running to win the contract and that, even if MLEA had never

bid on the Savannah River Project, the contract still would not have been awarded to AIT, but

would have been awarded to MECA.  See Exhibit C, ¶ 11.[6]  At his deposition, Mr. Gough stated:

> Q:    But if I understand your recommendation, the second
>        choice would have been MECA, even though its price was
>        higher.
> A:    Yes.  And the primary reason for making that
>        recommendation was that they're next door.  I mean if we
>        had to get together to go over any problems, they're only a
>        few minutes away.
> Q:    So if EGS or MLEA had not bid on the job or for some
>        reason was disqualified, the work would have gone to
>        MECA.
>                . . . .
> A:    I believe that all other factors being equal, we would have
>        suggested that MECA be chosen.

---

[6]    The evidence discovered in this case also fails to support AIT's allegations that it had an existing
contractual relationship with Accurate Machine – an allegation that Mr. Gough, of Accurate Machine, specifically
denied in his deposition.   Mr. Gough testified:

Q:    Had you, that is, your company, ever done any business before with AIT?

A:    No, we had not.

Q:    So this was your first experience with AIT?

A:    Yes.  Other than our telephone conversations and other correspondence.

Exhibit F, at 18-19.  See also Amer Dep. Tr. at 181-83, attached hereto as Exhibit H.

> Q:    I see.  Since you don't award the contract, you can't say the
>        job would have gone to MECA but you would have
>        recommended MECA.
> A:    That would have been my recommendation, yes.
> Q:    And it would have happened if, for example, EGS declined
>        to accept the award for some reason.
> A:    Yes.

Exhibit F, at 54-55.

Moreover, in his deposition, Mr. Gough elaborated on why MECA would have

won the design-only contract even if MLEA had never bid on it:

> Q:    And for the design-only portion you were recommending
>        MECA because of their proximity in relation to Accurate
>        Machine?
> A:    That's correct.
> Q:    Was that the only factor?
> A:    Now, we –
> Q:    I'm sorry.  Go ahead.
> A:    Let's see.  What's the best way to explain this?  There is a
>        difference between designing something that is going to be
>        built in your own shop and designing something that could
>        be built in anyone's shop.  AIT and Accurate Machine, for
>        that matter, have specific capabilities, specific strengths,
>        specific weaknesses, specific preferences as to the way we
>        would want to see a job done if it were going to be done in
>        our house.  I would fully expect AIT to design this – these
>        vessels for their strengths and weaknesses.  On the other
>        hand, a design company, a design engineering company,
>        will be designing so that hopefully any competent shop can
>        do the work without reference to specific weaknesses or
>        strengths and in this way perhaps coming up with an
>        overall better design.  <u>So would MECA be a better choice
>        for the design-only portion?  With no offense to AIT, yes, I
>        believe they would be the better choice.</u>  If the project was
>        going to be design and build, there's no question in my
>        mind that AIT would be an excellent choice.  It's an
>        excellent company.  But if it were going to break it out and
>        do design only, this is better done by an engineering
>        company.  That's their strength.  I wouldn't give it to
>        MECA to do the fabrication.  They don't have the
>        capability.  <u>But when we're looking at relative strengths
>        and weaknesses, then MECA's  design capabilities, in my
>        opinion, and without any offense intended to AIT, MECA's
>        design capabilities were better than AIT's.</u>

Exhibit F, at 140-42 (emphasis added).

Even after the completion of discovery in this case, Plaintiff remains unable to prove causation, because it would not have been awarded the Savannah River Project contract, even if MLEA had never bid. See Exhibit C, ¶ 11 & Exhibit F, at 54-55. Therefore, Plaintiff cannot, as a matter of law, demonstrate causation because nothing the Defendants did caused AIT to lose the Savannah River Project bid. Plaintiff has failed to establish a genuine issue of material fact – particularly as to whether MLEA could cause AIT to lose a bid that it was not going to win -- *even if MLEA had not been involved at all*. Thus, summary judgment is now appropriate as to Counts I, II, and III of the Amended Complaint. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

D.      Defendants Did Not Use any AIT Proprietary
        Information to Win the Savannah River Project Contract.

Plaintiff filed its Amended Complaint in response to the Defendants' first motion to dismiss. In an attempt to save what was essentially a dead case, it added Count V alleging conversion and unjust enrichment against MLEA. Even with the new Count, however, AIT cannot prevail, as a matter of law, because: 1) Defendants used only their own independent professional training, experience and judgment to bid on the Savannah River Project – and did not use any AIT confidential and proprietary information; and 2) Plaintiff has never even identified what information was allegedly taken, much less met its burden of proving that it constituted a trade secret.

1.      Defendants Used Only Their Own Independent Professional Training,
        Experience and Judgment to bid on and Perform the Savannah River
        Project.

A person's aptitude, skill, dexterity, manual and mental ability, and such other subjective knowledge obtained while in the course of employment, are not the property of the

employer and the right to use and expand these powers remains employee's property unless

curtailed through some restrictive covenant entered into with the employer.  See Pittsburgh Cut

Wire Co. v. Sufrin, 38 A.2d 33, 35 (Pa. 1944) (citing Williston on Contracts, § 1646, p. 4627);

Spring Steels, Inc. v. Molloy, 162 A.2d at 373 (Pa. 1960)(employee had right to use his own

advantage, experience, knowledge, memory and skill, which he gained while there employed).

Wiedemann and Manzon are the MLEA engineers whose aptitude, skill and mental abilities

designed and oversaw the design of the Deliverables for the Savannah River Project.

Wiedemann had over 20 years experience designing and working with pressure vessels before he

was hired by AIT.  See Exhibit A, at 9-22.  Manzon has over 30 years experience, including prior

experience working for Westinghouse Savannah River Company.  See Exhibit G, at 22-24.  Each

has done many design projects like the Savannah River Project.   It is, therefore, baseless for

Plaintiff to contend that Defendants would need confidential and proprietary information from

AIT in order to bid on the Savannah River Project contract.

      Defendants employed only their own skills and experiences to prepare the bid for

the Savannah River Project.  Defendants did not misappropriate AIT's or anyone else's trade

secrets.  In his Affidavit, Wiedemann avers that he "never told anyone at MLEA about the price

or other proprietary information in AIT's bid proposal to Accurate Machine for the Savannah

River Project or any AIT business whatsoever."  See Exhibit B, ¶ 17.  He confirmed that at his

deposition.  Exhibit A, at 278.

     2.    Plaintiff Has Never Identified What Alleged Confidential and
           Proprietary Information It Thinks Wiedemann Took.

      Plaintiff has yet to identify the specific trade secrets or confidential or proprietary

information of AIT that Wiedemann and MLEA allegedly used to bid on the Savannah River

Project.  Instead, AIT has said, essentially, "show us Defendants' work product, and we'll look at

it and tell you what we think was made using our proprietary information." The law of trade secrets, however, does not operate that way. The *existence* of, and *identification* of, a trade secret is a *prerequisite* to AIT's claims. Without first identifying the alleged trade secrets, Plaintiff cannot prove the elements of its claims. See SI Handling Systems v. Heisley, 753 F.2d 1244, 1255 (3d Cir. 1985) (under Pennsylvania law, Plaintiff must show that the information at issue constitutes a trade secret). However, since first learning (on April 2, 2002; see ¶ 18 of the first Complaint) that MLEA won the Savannah River Project contract, AIT has yet to specify just what "proprietary and confidential information" Mr. Wiedemann supposedly spirited away.

AIT claims Wiedemann had access to AIT's "preliminary designs" for the Savannah River Project. If such preliminary designs existed, AIT would have been obligated to produce them in response to Defendants' Document Request No. 13[7], and none were produced. Nevertheless, pursuant to the Court's September 23, 2002 Order resolving Plaintiff's Motion to Compel, on October 4, 2002, Defendants produced to Plaintiff's counsel the Deliverables, i.e., MLEA's own proprietary design and calculation work for the Savannah River Project (under an "attorneys eyes only" protective stipulation), so that Plaintiff's outside engineering expert could review them. Moreover, Defendants provided Plaintiff with access to Wiedemann's personal laptop computer as well as access to the four MLEA desktop PCs used by Wiedemann and Manzon. Plaintiff and its expert were unable to identify any of AIT's alleged confidential and proprietary information in the Deliverables, or find any of its information on any of Defendants' computers.[8]

---

[7]    Defendants' Document Request No. 13 states, "all documents that support, refute or relate in any way to AIT's allegations that MLEA submitted a lower-priced proposal to Accurate Machine for the Savannah Project based exclusively on proprietary and confidential information developed by Wiedemann for AIT."

[8]    Plaintiff has offered no evidence that Wiedemann took, or MLEA used, any AIT confidential and proprietary information. It's sole argument is along the lines of, "MLEA got the job, therefore, Wiedemann *had to*

Count V of the Amended Complaint should be dismissed because there is no genuine issue of fact as to whether Wiedemann took any AIT confidential or proprietary with him when he left AIT, and significantly, AIT has never even identified any such information – much less met its burden of showing that such information constitutes a trade secret under Pennsylvania law.

Count VI, alleging a civil conspiracy, should also be dismissed upon the dismissal of the other Counts of the Amended Complaint because, it is predicated on the underlying unlawful acts alleged in the other Counts and, therefore, cannot survive.

## V.    CONCLUSION

Having abandoned its claims as to the Kumsung Engineering and CTCI ($N_2$ bottles) and CTCI (fuel tanks) projects, and having withdrawn its request for all injunctive relief, Plaintiff has pared this matter down to just a case for damages as to only the  Savannah River Project.  As set forth above, Plaintiff has not, and cannot, demonstrate a genuine issue of material fact as to its allegations that Defendants used AIT's proprietary information to underbid and win the Savannah River Project contract because it would never have won the design contract anyway, whether or not MLEA had bid on it.  Nor is there a genuine issue of material fact as to whether MLEA used AIT's proprietary information to prepare MLEA's bid on the Savannah River Project contract because the MLEA engineers were highly qualified and experienced professionals who used their own experience and expertise in preparing MLEA's bid. Proprietary or confidential information was not required for the Savannah River Project designs, which were specified to meet industry codes and standards.  Furthermore, even after having

---

*have* taken and given them AIT's information."  In his Deposition, Mr. Amer repeatedly admits that he had no evidence of Wiedemann's alleged wrongdoing.  See Exhibit H, at 123-128, 131-132, 136-141.

reviewed the actual MLEA final designs and calculations, and the five relevant computer hard

drives of MLEA and Wiedemann, Plaintiff has not identified any AIT confidential and

proprietary information that Wiedemann misappropriated.  For the foregoing reasons, summary

judgment should be granted as to all Counts of the Amended Complaint.

Respectfully submitted,


/s/ Robert S. Nix
PEPPER HAMILTON LLP
Philip J. Katauskas
Robert S. Nix
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Defendants MLEA, Inc. and
John K. Wiedemann

Date:   December 23, 2002

CERTIFICATE OF SERVICE

I, Robert S. Nix, certify that a true copy of the foregoing Defendants' Motion for

Summary Judgment and accompanying Memorandum of Law in support thereof was served via

hand delivery, this 23rd day of December, 2002 upon the following Attorney for Plaintiff:


Donald D. Gamburg, Esquire
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA  19103-6998


_____/s/ Robert S. Nix_____
Robert S. Nix