## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | JUDGE MARY A. MCLAUGHLIN |
|         Plaintiff, | CASE NO.: 02-CV-2902 |
|    v. | |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | |
|         Defendants. | |

### <u>ORDER</u>

AND NOW, on this ____ day of _____, 2003, upon consideration of Defendants' Motion for Summary Judgment and Plaintiff's response thereto and cross Motion for Summary Judgment,

IT IS HEREBY ORDERED that Plaintiff's foregoing motion is GRANTED and Defendants' foregoing motion is DENIED.

_____
                                                     J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : | JUDGE MARY A. MCLAUGHLIN |
| | : | |
| | : | CASE NO.: 02-CV-2902 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Amer Industrial Technologies, Inc. ("Plaintiff" or "AIT"), by and through

counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves this

Court for an order granting summary judgment in its favor on its claims against Defendants

MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann") (collectively referred to

"Defendants") for misappropriation of trade secrets, tortious interference with prospective

business relations, conversion and unjust enrichment, and civil conspiracy, and for breach of

fiduciary duty or duty of loyalty against Defendant Wiedemann only.  No genuine issues of

material fact exist as to these claims against Defendants, and thus Plaintiff is entitled to judgment

as a matter of law.

In support of this Motion, Plaintiff incorporates the Memorandum of Law in Support attached hereto and incorporated by reference herein.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

RICHARD S. MEYER
DONALD D. GAMBURG
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
(215) 569-5699 (fax)

Date:   January 10, 2003

Attorneys for Plaintiff,
AMER INDUSTRIAL TECHNOLOGIES, INC.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : | JUDGE MARY A. MCLAUGHLIN |
| | : | |
| Plaintiff, | : | CASE NO.: 02-CV-2902 |
| | : | |
| v. | : | |
| | : | |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | : | |
| | : | |
| Defendants. | : | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

On May 15, 2002, Plaintiff, Amer Industrial Technologies, Inc. ("Plaintiff" or "AIT"),

filed a complaint and motion for preliminary and permanent injunction against Defendants,

MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann") (collectively referred to as

"Defendants"), for misappropriation of trade secrets, tortious interference with contractual and

prospective business relations, and civil conspiracy, and for breach of fiduciary duty or duty of

loyalty against Wiedemann only. On July 18, 2002, AIT filed an amended complaint in which it

added that MLEA tortiously converted proprietary information of AIT's to its advantage and

thereby was unjustly enriched as a direct result of using information developed by AIT for its

proposal and eventual performance on the Savannah River Nuclear Plant Project ("Savannah

River Project").[1]

Prior to Plaintiff's withdrawal of its request for preliminary injunction, the parties engaged in expedited discovery consisting of partial document production, computer inspections, and depositions. In total, seven (7) depositions were taken consisting of Kenneth Gough (Accurate Machine President/CEO) ("Gough"), Ahmad Amer (AIT President) ("Amer"), Haitham Hamdan (AIT Engineer) ("Hamdan"), Theodore DelGaizo (MLEA President/CEO) ("DelGaizo"), Keith Michael (MLEA VP Sales and Marketing) ("Michael"), George Timberlake (MLEA SVP Business Development) ("Timberlake"), and Paul Manzon (MLEA VP Special Projects and Chief Structural Engineer) ("Manzon"). Subsequently, and most recently, the most critical deposition, that of Wiedemann, was taken.

On December 23, 2002, Defendants filed, for the third time in this case, a dispositive motion, this time for summary judgment.[2] Notwithstanding Defendants' representations to the contrary, there is more than sufficient evidence on this record not only to create a genuine issue of material fact, but also to establish Defendants' liability with regard to AIT's claims of theft of proprietary information and unjust enrichment involving the Savannah River Project. Consequently, AIT not only requests that this Court deny Defendants' motion, but in turn grant summary judgment in its favor on all remaining claims set forth in its amended complaint.

---

[1]    Subsequently, based on certain evidence which emerged from discovery, AIT filed a motion to withdraw its request for preliminary injunction and this Court, on August 13, 2002, entered an order granting same. AIT did not and has not withdrawn its damages claims. On August 21, 2002, in response to Defendants' second motion to dismiss, Plaintiff voluntarily withdrew its cause of action for tortious interference with existing contractual relations.

[2]    On June 18, 2002, Defendants filed a motion to dismiss. On that same date, Defendants also filed a memorandum of law in opposition to Plaintiff's motion for preliminary and permanent injunction. Then, on August 7, 2002, Defendants refiled their motion to dismiss AIT's amended complaint. Defendants' initial motion was dismissed as moot. Defendants' second motion to dismiss was also dismissed by the Court so that the parties could complete discovery, including the deposition of Wiedemann.

## STATEMENT OF THE FACTS

### Wiedemann's Employment With AIT

Wiedemann served as AIT's Program Project Manager from on or about October 20, 2001, his date of hire, until he was discharged from his employment on January 22, 2002. (Wiedemann Tr. at 156-158 and 180-182; Wiedemann Aff. at ¶¶ 1 and 9; Amer Aff. at ¶¶ 3 and 9; Amer Tr. at 77, 80-81, 84, and 250).[3] AIT hired Wiedemann for a three-month probationary period, after which it was within Amer's sole discretion whether to continue Wiedemann's employment and/or make Wiedemann a Vice President. (Wiedemann Tr. at 152-153 and 258-259; Wiedemann Aff. at ¶ 1). Upon his hire, Wiedemann entered into employment agreements with AIT in which he agreed to maintain the confidentiality of and not divulge proprietary information acquired during his employment with AIT. (Wiedemann Tr. at 159-165 and Exhibits 21 and 22; Amer Tr. at 181 and Exhibit 3).[4]

During his employment with AIT, Wiedemann became privy to trade secret information including, but not limited to, proprietary and confidential information regarding pricing, designs,

---

[3]    Citations to John Wiedemann's deposition transcript are set forth as Wiedemann Tr. at __, and are attached as Exhibit A. Citations to Ahmad Amer's deposition transcript are set forth as Amer Tr. at __, and are attached as Exhibit B. Citations to Haitham Hamdan's deposition transcript are set forth as Hamdan Tr. at __, and are attached as Exhibit C. Citations to Kenneth Gough's deposition transcript are set forth as Gough Tr. at __, and are attached as Exhibit D. Citations to Theodore DelGaizo's deposition transcript are set forth as DelGaizo Tr. at __, and are attached as Exhibit E. Citations to Keith Michael's deposition transcript are set forth as Michael Tr. at __, and are attached as Exhibit F. Citations to George Timberlake's deposition transcript are set forth as Timberlake Tr. at __, and are attached as Exhibit G. Citations to Paul Manzon's deposition transcript are set forth as Manzon Tr. at __, and are attached as Exhibit H. Citations to Ahmad Amer's affidavit are set forth as Amer Aff. at ¶__, which is attached as Exhibit I. Citations to John Wiedemann's affidavit are set forth as Wiedemann Aff. at ¶__, and are attached as Exhibit J. Citations to Theodore DelGaizo's affidavit are set forth as DelGaizo Aff. at ¶__, and are attached as Exhibit K. Citations to Kenneth Gough's affidavit are set forth as Gough Aff. at ¶__, and are attached as Exhibit L.

[4]    Inexplicably, Wiedemann's affidavit falsely states that he "had no written employment agreement or contract with AIT." (Wiedemann's Aff. at ¶ 2).

3

data, devices, methods, techniques, drawings, and processes.  (Wiedemann Tr. at 200-201, 207,

210-212, 215-218, 221-224, 226-229, and 231-234 and Exhibits 33, 36, 37, 39, 41, 42, and 44;

Amer Aff. at ¶ 4; Amer Tr. at 125).  In particular during his employment with AIT, Wiedemann

supervised preparation of AIT's subcontractor bid proposal to Accurate Machine Products

Corporation ("Accurate Machine") for the design and fabrication of preheaters, aftercoolers, and

process coolers for cleaning contaminated areas at the Savannah River Project.  (Wiedemann Tr.

at 186-188; Amer Aff. at ¶ 5; Amer Tr. at 125; Wiedemann Aff. at ¶ 4).  This required constant

communication with Gough to ask questions, answer questions, and eventually setup Gough's

visit to AIT.  (Wiedemann Tr. at 187).  In order to perform his responsibilities on the project,

AIT provided Wiedemann with HESECO's request,[5] the request for quote, and the

specifications.  (Wiedemann Tr. at 189-190 and 192-196, and Exhibits 26-28).  Wiedemann

marked up the request for quote and specifications during his review of same.  (Wiedemann Tr.

at 190 and 192-196).

## Wiedemann's Participation In AIT's Savannah River Project Proposal

On or around October 18, 2001, Accurate Machine originally requested a bid from AIT

concerning the Savannah River Project.  (Amer Aff. at ¶ 7; Gough Tr. at 102; Hamdan Tr. at 55-

58 and Exhibit 2).  On December 4, 2002, on AIT's behalf, Wiedemann prepared and sent to

Gough at Accurate Machine the budgetary pricing for the design *and* fabrication of the Savannah

River Project.  (Wiedemann Tr. at 215-216 and Exhibit 36).  The following day, Wiedemann

forwarded a revised budgetary pricing to Accurate Machine to account for a commission to

HESECO.  (Wiedemann Tr. at 216-218 and Exhibit 37).  The pricing itself was developed by

---

[5]     HESECO was one of the companies initially provided by Westinghouse Savannah River
Company to Accurate Machine as a potential company to perform the Savannah River Project.
Accurate Machine contacted HESECO, who in turn contacted AIT.  Had AIT been awarded the
project, AIT agreed to pay HESECO a commission for the referral.

4

Amer, Wiedemann, and Hamdan. (Wiedemann Tr. at 216).

During the two (2) month period following AIT's receipt of the request for bid, AIT

obtained pricing for materials, preliminary designs, calculations, and pricing for the proposal

itself. (Wiedemann Tr. at 200-201, 207, 210-212, 215-218, and 221-223 and Exhibits 33, 36, 37,

and 39; Amer Tr. at 123-125; Hamdan Tr. at 61-62). Wiedemann utilized Microprotal software

to prepare 3D designs for the Savannah River Project. (Wiedemann Tr. at 200-201 and 211-

212).[6] Wiedemann also made use of preliminary designs from an outside design consultant for

AIT, AID. (Wiedemann Tr. at 207 and Exhibit 33). Wiedemann's initial recommendations to

Amer regarding the proposal evidenced a lack of knowledge as to how to develop the proposal.

As a result, prior to submission of AIT's final proposal to Accurate Machine, Wiedemann

acknowledges that Amer reviewed with him, in great detail, the requirements of the project and

showed Wiedemann how to price and design this type of project. (Wiedemann Tr. at 210-211;

Amer Tr. at 98-101).[7]

AIT submitted its original proposal for design and fabrication on December 26, 2001.

(Wiedemann Tr. at Exhibit 39; Wiedemann Aff. at ¶ 8; Amer Aff. at ¶ 8; Amer Tr. at 183-184

and Exhibit 8; Gough Tr. at 114). Wiedemann prepared the proposal, but in the end, for the

---

[6]     When presented with a set of sketches, Wiedemann denied that he was the preparer,
claiming that the 3D sketches were prepared by someone who does not know how to use the
software properly, and that the sketches were "embarrassing." (Wiedemann Tr. at 201-202 and
Exhibit 30). Yet, when presented with the actual proposal sent to Accurate Machine by AIT,
Wiedemann admitted that he prepared the 3D sketches attached to the proposal, 3D sketches
identical to the ones he claimed were "embarrassing." (Wiedemann Tr. at 216-218 and Exhibit
37).

[7]     In reviewing the specifications for the project, Wiedemann initially did not discover that
there was a polish finish requirement. When this oversight was pointed out to Wiedemann,
Wiedemann had to educate himself about surface finishes so as not to look inept to Amer.
(Wiedemann Tr. at 218-220). He did so by requesting generic written materials from Manzon on
December 10, 2001. (*Id.*).

5

reasons discussed in the previous paragraph, Amer determined the price. (Wiedemann Tr. at

221-223). Wiedemann attached his 3D sketches and AID's preliminary designs to the proposal.

(Wiedemann Tr. at 221-223 and Exhibit 39). The pricing set forth in AIT's proposal was derived

from Amer's "experience." (Wiedemann Tr. at 224).

Following the submittal of its design and fabrication proposal, Wiedemann prepared and

forwarded to Accurate Machine AIT's proposed delivery schedule (Wiedemann Tr. at 226-227

and Exhibit 41) and a revised proposal for design and fabrication (Wiedemann Tr. at 227-229

and Exhibit 42). Amer assisted Wiedemann with the delivery schedule and also determined the

pricing for the revised design and fabrication proposal. (Wiedemann Tr. at 226-229). On

January 15, 2002, Accurate Machine submitted its bid to Westinghouse Savannah River

Company ("Westinghouse") for the Savannah River Project, and in submitting that bid,

"Accurate Machine incorporated a bid submitted to Accurate Machine by Amer Industrial

Technologies, Inc. ("AIT")." (Gough Aff. at ¶ 4).

Subsequently, during a telephone conversation on January 17, 2002, Gough requested

that Wiedemann submit a design only proposal from AIT. (Gough Tr. at 130-133). On January

18, 2002, exactly three (3) months to the date Accurate Machine originally requested a bid from

AIT, Wiedemann submitted AIT's design only proposal to Gough. (Wiedemann Tr. at 231-234

and Exhibit 44; Amer Tr. at 149; Gough Tr. at 43 and Exhibit 5). Wiedemann and Amer

determined the pricing for the design only proposal. (Wiedemann Tr. at 231-234; Hamdan Tr. at

84; Amer Tr. at 197). Wiedemann provided his thoughts to Amer concerning the price for the

design, but Amer ultimately determined the price. (Wiedemann Tr. at 231-234). By that time,

Wiedemann had provided Amer with the AID designs and his own 3D designs. (*Id.*). AIT

forwarded its design only proposal to Accurate Machine on January 25, 2002, and then again on

February 20, 2002. (Gough Tr. at 149 and Exhibit 15; Amer Tr. at 194-195, 199-200, and

Exhibits 9 and 10; Hamdan Tr. at 72-74 and Exhibit 4). In total, the development cost of AIT's

proposals for the Savannah River Project exceeded $22,000. (Amer Aff. at ¶ 13; Amer Tr. at

184-191 and 241-243).

At or around the time of AIT's submission of its design proposal in January and February

2002, Accurate Machine advised AIT that only *one* competitor existed, which now turns out was

MECA, and that AIT was the lowest bidder. (Amer. Aff. at ¶ 11; Amer Tr. at 132-133 and 214-

216). Nonetheless, Accurate Machine advised AIT that AIT's proposal for the Savannah River

Project was rejected and that Accurate Machine had decided to award the job to another

undisclosed entity *because of price only*. (Amer Aff. at ¶ 14; Amer Tr. at 132 and 217; Gough

Tr. at 65-67 and 201-202). At the time, Accurate Machine refused to disclose the identity of the

entity to which it awarded the bid. (Amer Aff. at ¶ 15; Amer Tr. at 132; Gough Tr. at 65-67 and

201-202). Subsequently, on April 12, 2002, Accurate Machine advised AIT that the Savannah

River Project had been awarded to MLEA. (Amer. Aff. at ¶ 16; Gough Tr. at 67).

**Wiedemann's MLEA Contacts During His AIT Employment**

In the meantime, for reasons unrelated to this litigation, on January 22, 2002, AIT

terminated Wiedemann's employment. (Wiedemann Tr. at 180-182; Wiedemann Aff. at ¶ 9;

Amer. Aff. at ¶ 9; Amer Tr. at 84). Relying on Wiedemann's employment agreements, AIT

expected that Wiedemann would not use or divulge AIT's confidential information. (Amer Tr. at

146 and Exhibit 3). Amer also requested that Wiedemann return all AIT proprietary information,

including documents, day planners, and diskettes, which Wiedemann supposedly did.

(Wiedemann Tr. at 183 and 185; Amer Tr. at 146-148).

Prior to his termination of employment, Wiedemann frequently telephoned MLEA.

(Wiedemann Aff. at ¶ 6; Amer. Aff. at ¶ 17; Amer Tr. at 224-225; Manzon Tr. at 53-56).

7

Notwithstanding Defendants' representations to the contrary, those contacts did not end in

December 2001. (Wiedemann Aff. at ¶¶ 6-8). Rather, as AIT's telephone records demonstrate,

those contacts continued throughout the month of January 2002, the month of Wiedemann's

termination of employment. (Wiedemann Tr. at 223-225, 244, and 246-251 and Exhibit 51;

Amer Aff. at ¶ 17; Amer Tr. at 224-225).[8] Likewise, Wiedemann's cellular telephone records set

forth all calls made by Wiedemann to AIT and/or MLEA. (Wiedemann Tr. at 246-251 and

Exhibit 52). Further, and contrary to Wiedemann's false representations in his affidavit, these

contacts had nothing to do with proposals submitted by MLEA to AIT on November 20, 2001.

(Wiedemann Tr. at 239-242 and Exhibits 48 and 49; Manzon Tr. at 56-63; Wiedemann Aff. at ¶

10).[9] Indeed, Manzon testified that there was no further communications regarding those

proposals (Manzon Tr. at 53-56), and Wiedemann himself does not recall whether he had any

such follow-up conversations. (Wiedemann Tr. at 239-242).[10]

Because the probationary status of his employment was set to expire at the end of

January 2002 (Wiedemann Tr. at 37-39), Wiedemann reached out to Manzon at MLEA, in

December 2001, to explore employment options other than with Wiedemann's current employer

---

[8]    AIT's telephone records set forth all calls made from AIT to MLEA. (Wiedemann Tr. at Exhibit 51). During Wiedemann's employment with AIT, Wiedemann was the only AIT employee to call MLEA. (Wiedemann Tr. at 244).

[9]    Even though Wiedemann claims that he provided Manzon parts of the Savannah River Project specifications related to MLEA's proposal only, on November 21, 2001, Wiedemann faxed Manzon attachment 5.12 of the specification, which was not in any way related to MLEA's proposal. (Wiedemann Tr. at 241-244 and Exhibits 49 and 50).

[10]    It is also worth noting that one of the proposals submitted by MLEA to AIT involved electrical design work on the Savannah River Project. No one at AIT, other than Wiedemann, knew about this proposal. More interesting, however, is the price contained in that proposal – the extremely low price for the work covered by the proposal evidences MLEA's inexperience with the type of project involved, thus making it even more probable that Wiedemann ultimately shared AIT's design pricing with MLEA. (Amer Tr. at 166-168).

8

at the time, AIT. (Wiedemann Tr. at 37-39; Manzon Tr. at 67-72). Manzon informed Wiedemann about an opportunity at Nine Mile Point Nuclear Power Station for which Wiedemann would be a consultant to MLEA, and in response Wiedemann sent Manzon his resume. (Wiedemann Tr. at 41-42 and 47-48 and Exhibit 3). Also, Wiedemann, still exploring his options elsewhere, had an in-person meeting with DelGaizo for one-half hour, in mid-January, 2002, to explore potential employment opportunities with MLEA itself. (Wiedemann Tr. at 49-50; DelGaizo Tr. at 36-38). Thus, for a month before the termination of his employment at AIT, Wiedemann continued to receive confidential and proprietary information with an apparent intention to leave AIT's employ.

**Wiedemann's Preparation of "MLEA's" Savannah River Project Proposal**

On January 28, 2002, MLEA engaged Wiedemann as a consultant and then, on March 18, 2002, hired him as an employee with the title Principal Engineer. (Wiedemann Tr. at 22-23 and 25-26; Wiedemann Aff. at ¶¶ 13, 15, and 16; DelGaizo Aff. at ¶ 6; DelGaizo Tr. at 68 and 70-71). MLEA offered full-time employment to Wiedemann *only after* Wiedemann secured the award of the Savannah River Project for MLEA, which occurred on March 4, 2002. (Wiedemann Tr. at 95-96; DelGaizo Tr. at 68, 70-71, and 112-113).

On January 28, 2002, the same day Wiedemann commenced his consulting services for MLEA, Wiedemann telephoned Gough to inform him, among other things, that he had been terminated by AIT and to remove his resume from AIT's proposal package. (Wiedemann Tr. at 67-68; Gough Tr. at 150-153). On January 31 or February 1, 2002, Wiedemann again contacted Gough, this time to advise Gough that "he might have a lead on another company for the design work, or words to that effect." (Gough Aff. at ¶ 17; Gough Tr. at 155-157; Wiedemann Tr. at 67-68). Gough was interested because "if [Wiedemann] had obtained employment with a company that had the qualifications that he indicated, then I would certainly want to hear from

9

them." (Gough Tr. at 160).

Following his telephone calls to Gough, Wiedemann informed Manzon that Accurate Machine would be interested in receiving MLEA's proposal for the Savannah River Project. (Manzon Tr. at 76; Wiedemann Tr. at 62-63). Manzon directed Wiedemann to talk to Timberlake from Business Development, which Wiedemann did. (Manzon Tr. at 76; Timberlake Tr. at 45). Wiedemann informed Timberlake that he should contact Gough at Accurate Machine, and provided Gough's contact information. (Wiedemann Tr. at 64-66). Following this conversation with Wiedemann, Timberlake telephoned Gough, identified himself as from MLEA, and notified Gough that Wiedemann had suggested that MLEA contact Accurate Machine concerning the Savannah River Project. (Gough Tr. at 160-161; Timberlake Tr. at 47-49). As such, based on this series of events, it is clear that Wiedemann established himself with Accurate Machine as a competent and knowledgeable individual based on his association with AIT and AIT's experience in the industry, and then used his elevated status with Accurate Machine on behalf of MLEA to present it as a viable bidder for the project.

On February 5, 2002, Accurate Machine actually requested a bid from MLEA. (Gough Tr. at 172-173 and Exhibit 21). Miraculously, *three (3) days* after Accurate Machine requested the bid from MLEA, MLEA submitted, on February 8, 2002, a *complete* proposal to Accurate Machine. (Gough Tr. at 37, 175, and Exhibit 4; Gough Aff. at ¶ 8; DelGaizo Aff. at ¶ 8). Although affidavits and deposition testimony of MLEA's witnesses affirmatively denied Wiedemann's role, Wiedemann's invoices for consulting services and his own deposition testimony demonstrate that Wiedemann played an integral part in MLEA's preparation of its proposal to Accurate Machine for the Savannah River Project.

Indeed, Wiedemann's invoice to MLEA, dated March 15, 2002, shows that Wiedemann

10

performed 50 hours of consulting services for MLEA, of which 12 to 14 hours was for reviewing

the Savannah River Project specifications and MLEA's proposal for same, as well as attending

the kickoff meeting for the Savannah River Project. (Wiedemann Tr. at 30, 32-34, 51, and

Exhibit 2). Wiedemann reviewed the entire Savannah River Project specifications to assist

MLEA in determining the disciplines required for the project and the number of hours required

to complete Wiedemann's specific discipline, mechanical engineering. (Wiedemann Tr. at 73-

75). Wiedemann estimates that it took him 8 hours to complete this review for MLEA. (*Id.*). In

reviewing the specifications, Wiedemann made handwritten notations. (Wiedemann Tr. at 78-80

and Exhibit 4). These notations are almost identical to the notations made by Wiedemann in

AIT's specification package. (Wiedemann Tr. at Exhibits 4 and 28).

Wiedemann also reviewed Michael's proposal to Accurate Machine. (Wiedemann Tr. at

73-74). In fact, Wiedemann prepared the actual table included in the proposal which sets forth

the different disciplines required for the project and, with respect to the mechanical/structural

work discipline, Wiedemann provided the estimate of hours required. (Wiedemann Tr. at 81-85

and Exhibit 5). Wiedemann discussed with Manzon who would be needed for the project.

(Wiedemann Tr. at 85-86). After MLEA submitted its initial proposal, MLEA received a change

in the specifications from Accurate Machine. (Wiedemann Tr. at 89-90 and 92). MLEA had

Wiedemann review the specification change to determine whether it impacted his prior

estimates. (*Id.*). This review took Wiedemann an additional 1-2 hours. (*Id.*).

Wiedemann invoiced MLEA for his consulting services on the Savannah River Project.

(Wiedemann Tr. at 26).[11] Wiedemann invoiced MLEA for his attendance at the kickoff meeting

---

[11]    Defendants improperly withheld invoices rendered by Wiedemann to MLEA for
February and March, 2002 for consulting services he performed. (Wiedemann Tr. at 27-29).
Defendants finally produced these invoices after Plaintiff filed a motion to compel production.

on March 13, 2002, his review of the specifications and specifications change, and the proposal itself. (Wiedemann Tr. at 30, 32, 34, 51, and 127-129). In total, the March 15, 2002 invoice contains between 12 to 14 hours for the Savannah River Project, of which 8 to 10 hours were for specification review and proposal assistance. (*Id.*).

With Wiedemann's assistance and most likely AIT's pricing in hand, MLEA submitted the lowest priced proposal to Accurate Machine for the Savannah River Project. MLEA created in three (3) days a response to the request for proposal, a response that took AIT months to prepare, and mysteriously managed to underbid not only AIT, but also the third bidder, MECA, by at least $36,000. (Gough Tr. at 175-176). Indeed, MLEA submitted a bid for $91,000, more than $36,000 less than its competitors, AIT ($127, 000) and MECA ($129,498). (Gough Tr. at 143 and 175; Gough Aff. at ¶ 8; Amer Aff. at ¶ 12). That means either that MLEA is so expert that it could not only prepare a proposal in a fraction of the time taken by its competitors, but could submit a price on the order of 30% less than both of them. AIT submits that the more plausible conclusion and the one indicated by Defendants' fraud on this Court, as well as the doctrine of inevitable disclosure, is that MLEA took advantage of information which Wiedemann brought with him from AIT, including AIT's pricing. (Amer Tr. at 123-124).

**Wiedemann's Execution of "MLEA's" Savannah River Project**

Although Defendants' affidavits concealed Wiedemann's role, Wiedemann had substantial involvement in the execution of the Savannah River Project:

> • *Kick-Off Meeting*: On March 13, 2002, while Wiedemann was still a consultant to MLEA, Wiedemann, at Manzon's request, attended the "kick-off meeting" for the Savannah River Project attended by Gough of Accurate Machine and other MLEA personnel. (Wiedemann Tr. at 123-

---

Wiedemann did not gather and produce his invoices to MLEA in response to Plaintiff's document requests, even though Wiedemann readily admits that such invoices were responsive to AIT's Request for Production No. 5. (Wiedemann Tr. at 255 –257 and Exhibit 54).

124; Manzon Tr. at Exhibit 14; Gough Tr. at 193-196). Wiedemann
invoiced MLEA for 4 hours for his attendance at this meeting.
(Wiedemann Tr. at 127-129 and Exhibit 2). Wiedemann attended the
kickoff meeting for approximately 4 hours out of the 6 hour meeting
(everything except for the marketing meetings). (Wiedemann Tr. at 127).
Not only did Wiedemann attend the meeting, Wiedemann assisted Manzon
in the preparation of the "kickoff meeting talking points." (Wiedemann
Tr. at 132-133 and Exhibit 14).

Gough testified that the kick-off meeting lasted all day (9:00 a.m. to 3:00
p.m.), Wiedemann both attended and accompanied Gough the entire time,
and only two other MLEA individuals, Manzon and Michael, attended as
much of the meetings as Wiedemann. (Gough Tr. at 193-196).

- *Principal Engineer on the Project*: The kick-off meeting minutes further
  show that MLEA assigned Wiedemann as the only "Engineer" on the
  project (Manzon Tr. at Exhibit 14), even though it employs, depending on
  who you ask, 3 to 12 other engineers qualified for the project (none of
  whom came from AIT!). (DelGaizo Tr. at 81; Timberlake Tr. at 56-57;
  Michael Tr. at 29; Manzon Tr. at 77-78). For no discernable reason other
  than Wiedemann's knowledge of the details of AIT's Savannah River
  Project information, MLEA hired Wiedemann and made him an engineer
  on the implementation of the Savannah River Project which was awarded
  to MLEA. Indeed, Wiedemann himself testified that MLEA's use of him
  on the project enabled MLEA to do the project "faster, better, cheaper."
  (Wiedemann Tr. at 124-125).

- *Time Records*: During the duration of the Savannah River Project,
  Wiedemann worked primarily on that project. (Wiedemann Tr. at 104-
  105). As an employee of MLEA, Wiedemann submits timesheets every
  15th and 30th of the month in which he accurately reflects the number of
  hours worked on each project. (Wiedemann Tr. at 144-147). According
  to Wiedemann's timesheets for the period March 18, 2002 through the
  completion of the Savannah River Project on July 5, 2002, 603 out of
  716 hours worked by Wiedemann were on the Savannah River Project, or
  84 percent. (Wiedemann Tr. at Exhibit 19).

  Further, the time records for all work performed by MLEA's employees
  on the project establish that it took MLEA 1550.50 hours to complete the
  project, of which Wiedemann worked 603 hours, or 40 percent. (*See* Time
  Records attached as Exhibit M).[12]

---

[12]    MLEA's estimate of hours for the project was 866 hours, which is 45 percent short of the
actual number of hours worked. (*See* Hour Estimates attached as Exhibit N). The fact that
MLEA's estimate of the number of hours for the project was so far off lends further evidence

- *Actual Designs*: Wiedemann, on behalf of MLEA, prepared the mechanical design calculations, reviewed the electrical designs, and verified the hand counts on the software for the Savannah River Project. (Wiedemann Tr. at 103-104). Wiedemann prepared 9 out of 12 of the final design calculations for the Savannah River Project, consisting of all of the mechanical designs. (Wiedemann Tr. at 107-112). In addition, Wiedemann assisted with the final drawings. (Wiedemann Tr. at 120-123).

For the reasons stated below, Plaintiff's motion for summary judgment should be granted with respect to all of the remaining claims set forth in the amended complaint, and in turn Defendants' motion for summary judgment should be denied.

## ARGUMENT

I. **THE RECORD EVIDENCE JUSTIFIES AND MANDATES A FINDING THAT DEFENDANTS MISAPPROPRIATED AIT'S PROPRIETARY INFORMATION IN FORMULATING, OBTAINING, AND IMPLEMENTING THE SAVANNAH RIVER PROJECT AND THEREBY COMPELS SUMMARY JUDGMENT IN AIT'S FAVOR**

A. **DEFENDANTS' CONCERTED EFFORT TO CONCEAL WIEDEMANN'S ROLE IN THE SAVANNAH RIVER PROJECT COMPELS AN INFERENCE THAT WIEDEMANN CONVEYED TO MLEA AIT'S WORK PRODUCT, WHICH MLEA THEN USED TO ITS BENEFIT**

Wiedemann's invoices for consulting services, as well as Wiedemann's deposition testimony itself, acknowledged that he undertook a material and central role in the preparation of MLEA's Savannah River Project proposal. Notwithstanding this clear evidence, as set forth above, of Wiedemann's material participation in MLEA's formulation of the proposal for the Savannah River Project, Wiedemann and MLEA engaged in an active and concerted manner to conceal such participation:

- Wiedemann's affidavit, attached to Defendants' motion to dismiss filed with this Court on June 18, 2002, states:

---

that Wiedemann shared AIT's pricing, and that MLEA did not determine its own pricing from scratch.

14

"From about January 28, to February 22, 2002 I was self-employed and did some consulting work for MLEA involving the Edwards Ammonia Project in Taiwan. *None of that work had anything to do with AIT or the Savannah River Project.*" (Wiedemann Aff. at ¶ 13) (emphasis added);

"[F]rom March 11 to March 22, 2002, I did additional consulting work for MLEA, this time involving BOC NF3 Project in South Africa, *which had nothing to do with AIT or the Savannah River Project.*" (Wiedemann Aff. at ¶ 15) (emphasis added); and

"My conversations with MLEA about the Savannah River Project, after AIT terminated me, *were only that there might be an opportunity to bid on design work for Accurate Machine.*" (Wiedemann Aff. at ¶ 18) (emphasis added).

All of the foregoing is materially false.

● MLEA's President, DelGaizo, in his affidavit which was also filed with this Court on June 18, 2002, states: "After January 22, 2002 and prior to MLEA hiring Wiedemann as permanent employee, *MLEA utilized his services as a contract engineer on projects unrelated to the Savannah River Project.*" (DelGaizo Aff. at ¶ 6) (emphasis added). That is false.

● Defendants' witnesses, during their depositions, continued to deny Wiedemann's participation in the preparation of MLEA's proposal. MLEA's President, DelGaizo, flatly denied Wiedemann's role:

> Q:   Did you ever pay [Wiedemann] as a contract engineer for anything associated with the Savannah River Project?
>
> A:   No, I'm fairly positive of that.

(DelGaizo Tr. at 70-73).[13]

Likewise, MLEA's Vice President of Sales and Marketing, Keith Michael, denied the fact that Wiedemann directly prepared part of MLEA's proposal:

> Q:   Did Mr. Wiedemann assist in putting together the proposal [for the Savannah River Project]?

---

[13]   Later during his deposition, DelGaizo reversed fields only after the untruthfulness of his statements, both in his affidavit and in his earlier deposition testimony, was clear. (DelGaizo Tr. at 117-118).

> A:    No, he didn't assist me directly. . . . I believe John worked
>        for Paul, so in that regard Paul may have delegated some of
>        that work to John, is my understanding.

(Michael Tr. at 30-31). Wiedemann's testimony clearly shows that he
worked directly on the preparation of the proposal.

MLEA's Vice President of Special Projects, Manzon, reiterated MLEA's
denials of Wiedemann's role:

> Q:    Did you ever discuss the Savannah project with Mr.
>        Wiedemann when he was a consultant to MLEA?

> A:    We did not have a Savannah project when Mr. Wiedemann
>        was a consultant to MLEA.

> Q:    Did you ever discuss the solicitation of that project [with
>        Mr. Wiedemann when he was a consultant to MLEA]?

> A:    Mr. Wiedemann said to me there was a possibility that the
>        Savannah River project would be going out for bid for
>        design only. My response was, the appropriate people to
>        talk to in Main Line are Keith Michael and George
>        Timberlake.

> Q:    Did you have any other discussions with Mr. Wiedemann
>        while he was a consultant still about the solicitation of that
>        project?

> A:    None at all.

(Manzon Tr. at 52-53). This testimony is all clearly false.

MLEA's documents and the deposition testimony also demonstrate that Wiedemann had

substantial involvement in the execution of the Savannah River Project. However, as with his

role with the proposal, MLEA's affidavits conceal and/or ignore Wiedemann's role. Indeed,

DelGaizo and Wiedemann's affidavits concealed Wiedemann's involvement in the kick-off

meeting. (DelGaizo Aff. at ¶ 6; Wiedemann Aff. at ¶¶ 13 and 15). Manzon himself, the person

who prepared MLEA's minutes of the meeting, allegedly could not remember Wiedemann's

attendance. (Manzon Tr. at 114-115 and 117-118). No where in the affidavits of DelGaizo or

16

Wiedemann do Defendants reveal that Wiedemann was the principal engineer on the project, spent almost all of his own work time on the project, or that the majority of work performed by MLEA on the project was performed by Wiedemann.

Further, AIT, pursuant to this Court's Order of May 31, 2002, performed computer searches of Wiedemann's personal laptop and MLEA's desktops used by Wiedemann and Manzon. Curiously, when counsel for MLEA produced the box of documents from Wiedemann's laptop pursuant to the agreed-upon discovery procedure, *after* screening the box for privileged documents, the only two relevant Savannah River Project documents remaining on Wiedemann's laptop were missing from the box and had to be secured directly from AIT's computer expert. (*See* Laptop Documents, attached as Exhibit O).

From his date of hire until just before his termination of employment, Wiedemann used his personal laptop computer for all of his AIT business. (Amer Tr. at 83-85). All of the Savannah River Project documents, including designs and calculations, were on Wiedemann's laptop, but apparently are no longer. (Wiedemann Tr. at 276-277; Amer Tr. at 124-127 and 137-138). That those designs and other Savannah River Project documents no longer reside on the laptop shows only that Wiedemann deleted them and made such use of his laptop in the past few months as to totally overwrite the hard drive, making it impossible even to uncover the deletions. (Wiedemann Tr. at 268-269). The fact that the laptop still had on its hard drive preliminary drafts of the proposal shows not only that Wiedemann used the laptop to work on the Savannah River Project while he was at AIT, but also raises significant question as to where the rest of that work went.

Defendants' cover-up of Wiedemann's involvement in the preparation of MLEA's proposal for and performance of the Savannah River Project provides sufficient evidence for this

17

Court to draw the inference that Wiedemann shared with MLEA the know-how about the

Savannah River Project acquired during his employment with AIT.  It is well-established that

such an inference based on circumstantial evidence may be drawn in misappropriation of trade

secret cases:

> Plaintiffs in trade secret cases, who must prove by a fair
> preponderance of the evidence disclosure to third parties and use of
> the trade secret by the third parties, are confronted with an
> extraordinarily difficult task.  Misappropriation and misuse can
> rarely be proved by convincing direct evidence.  In most cases
> plaintiffs must construct a web of perhaps ambiguous
> circumstantial evidence from which the trier of fact may draw
> inferences which convince him that it is more probable than not
> that what plaintiffs allege happened did in fact take place.  Against
> this often delicate construct of circumstantial evidence there
> frequently must be balanced defendants and defendants' witnesses
> who directly deny everything.

*Greenberg v. Croydon Plastics Co., Inc.*, 378 F.Supp. 806, 814 (E.D.Pa.), order vacated on other

grounds, 184 U.S.P.Q. 27 (E.D.Pa. 1974).  This principle, originally set forth in *Greenberg*, has

been consistently adhered to in this Circuit.  *See, Rohm and Haas Co. v. Adco Chemical Co.*, 689

F.2d 424, 430-431 (3d Cir. 1982); *Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, 1995 U.S. Dist.

LEXIS 13495, *29 (E.D.Pa. 1995) (copy attached as Exhibit P).

Although Defendants consistently deny any wrongful conduct, Defendants' subsequent

cover-up of such conduct constitutes an admission by conduct.  As stated in Wigmore on

Evidence:

> It has always been understood – the inference, indeed, is one of the
> simplest in human experience – that a party's *falsehood* or *other*
> *fraud* in the preparation and presentation of his cause, his
> fabrication or suppression of evidence by bribery or spoliation, and
> all similar conduct is receivable against him as an indication of his
> consciousness that his case is a weak or unfounded one; and from
> that consciousness may be inferred the fact itself of the cause's
> lack of truth and merit.

2 Wigmore, Evidence § 278 (Chadbourn rev. 1979).  This principle is similarly stated in

McCormick on Evidence:

> [W]rongdoing by the party in connection with its case amounting
> to an obstruction of justice is . . . commonly regarded as an
> admission by conduct.  By resorting to wrongful devices, the party
> is said to provide a basis for believing that he or she thinks the case
> is weak and not to be won by fair means . . . .  Accordingly, the
> following are considered under this general category of admissions
> by conduct:  a party's false statement about the matter in litigation
> . . . .

2 McCormick on Evidence, § 265 (Strong 1999).

Consequently, based on the cover-up evidence discussed above alone, AIT has

established Defendants' wrongdoing.  There is no other logical explanation for: (i) Wiedemann

and DelGaizo to falsify their affidavits; (ii) DelGaizo, Manzon, and Michael to perjure

themselves in their depositions; or (iii) Defendants to improperly withhold the only relevant

documents recovered by AIT's computer expert from Wiedemann's laptop computer.

Defendants engaged in this conduct with one goal in mind -- to cover-up Wiedemann's

participation in the preparation and execution of MLEA's proposal for the Savannah River

Project, thereby covering up Wiedemann's sharing of AIT's work product, most likely including

AIT's pricing, on the Savannah River Project.

### B.    AIT'S WORK PRODUCT ON THE SAVANNAH RIVER PROJECT CONSTITUTES PROTECTED TRADE SECRETS

Under Pennsylvania law, an employer has a common law right to protect its legitimate

interests in trade secrets and proprietary information from misappropriation by third parties.  *See*

*Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965).

In order to prove a cause of action for misappropriation of trade secrets, AIT must prove: (1) the

information constitutes a trade secret; (2) the information is of value to AIT and important in the

19

conduct of its business; (3) by reason of discovery and ownership, AIT had the right to use of the

secret; and (4) the secret was communicated to Wiedemann while he was employed by AIT in a

position of trust and confidence, under such circumstances as to make it inequitable and unjust

for him to disclose it to others, or to make use of it himself to the prejudice of AIT. *See,*

*Prudential Ins. Co. of Am. v. Stella*, 994 F.Supp. 318, 323 (E.D.Pa. 1998); *Tyson Metal Products,*

*Inc. v. McCann*, 376 Pa. Super. 119, 122, 546 A.2d 119, 121 (1988); *Felmlee v. Lockett*, 466 Pa.

1, 8, 351 A.2d 271, 277 (1976).

Trade secret protection clearly encompasses business information that is not generally

known in the industry. Indeed, in *Air Prods. & Chems. v. Johnson*, 296 Pa. Super. 405, 419, 442

A.2d 1114, 1121-22 (1982), the Court held that business knowledge that could enable a

competitor to thwart the plaintiff's plans or to compete without the burden of testing and market

analysis born by the plaintiff is protectable as a trade secret. To that end, evidence that the

plaintiff has expended a large sum of money and a great deal of effort in developing the

information supports a trade secret status. *Christopher M's Hand Poured Fudge, Inc. v. Hennon*,

699 A.2d 1272, 1275 (Pa. Super. 1997); *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa.

Super. 2000). Under these standards, AIT's Savannah River Project information, including, but

not limited to, the preliminary designs by AID, the 3D designs by Wiedemann, and AIT's

proposals themselves, constitute protectable trade secrets.

The second element of a trade secret claim is the requirement that the information is of

value to the employer and important in the conduct of its business. *See Felmlee*, 466 Pa. at 8,

351 A.2d at 277. AIT has established that its proposal was invaluable to the success of its

business. Indeed, AIT, in addition to its 26 years of experience and the costs associated with the

acquiring of such know-how, invested in direct salary expenses and other administrative costs

20

more than $22,000 into preparing its preliminary design and proposal and three (3) months of

effort and expense. The confidentiality of this proposal was crucial to AIT's continued success

and ability to compete in the marketplace for the Savannah River Project.

The third element of a trade secret claim is that, by reason of discovery or ownership, the

employer has the right to the use and enjoyment of the trade secret. *See Felmlee*, 466 Pa. at 8,

351 A.2d at 277. There is no question that AIT has the exclusive right to use and enjoy its trade

secrets, in this case the proposal for the Savannah River Project and the information acquired to

develop same, which resulted from an investment of overhead, including intellectual inventory

imparted to Wiedemann, in excess of $22,000 in direct labor and other expense.

The final element of a trade secret claim is that the trade secret be communicated to the

defendant while employed in a position of trust and confidence under such circumstances as to

make it inequitable to disclose it to others, or to make use of it himself, to the detriment of the

employer. *See Felmlee*, 466 Pa. at 8, 351 A.2d at 277. In this regard, it is well established that

an employee, upon termination of employment, has a duty to refrain from disclosing or using any

confidential information acquired in the course of his/her employment. *See Wexler v.

Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960). Wiedemann was employed by AIT until January

22, 2002 as a high-level employee responsible for a number of proposals. By necessity,

Wiedemann had daily access to AIT's proposals and requests for bids.

The record evidence is overwhelming that Defendants misappropriated AIT's trade

secrets concerning its proposal for the Savannah River Project. It is inconceivable that MLEA

could have prepared a response to Accurate Machine's request for proposal which it received on

February 5, 2002 by February 8, 2002 without having some kind of "head start." Moreover, it is

inconceivable that MLEA is so much smarter than MECA and AIT that it could bid this project

21

for $91,000 when the other two competitors each bid at least $127,000. The most plausible

explanation for the difference in price between MLEA and the other two companies is that

MLEA did not incur the developmental costs incurred by the other two competitors, *i.e.*, it could

project a comparable profit as AIT and MECA, even at a lower price, because it had saved the

cost of developing the proposal and/or information to perform the actual design work by

obtaining much of the information from Wiedemann. AIT has established that Wiedemann

played an integral part in the formulation of MLEA's proposal for the Savannah River Project.

Thus, while Defendants deny that Wiedemann conveyed AIT's actual proposal pricing to

MLEA, the mountain of circumstantial evidence cannot be ignored.

     Further, Wiedemann's role in the performance of MLEA's actual design work on the

Savannah River Project also conclusively establishes Defendants' misappropriation of trade

secrets. It has been held that an employer is liable for misappropriation of a trade secret as a

consequence of hiring a competitor's employee and placing the employee in a position resulting

in the inevitable disclosure or use of the trade secret. *Pepsico, Inc. v. Redmond*, 54 F.3d 1262,

1269 (7th Cir. 1995), *RKI, Inc., d/b/a Roll-Kraft v. Glimes*, 200 F.Supp. 2d 916, 922 (N.D.Ill.

2002); *Air Products*, *supra*, 442 A.2d at 1123-1124. In *RKI, Inc.*, *supra*, the Court points out

that:

> "Because direct evidence of misappropriation of trade secrets is
> typically not available, a plaintiff can rely on circumstantial
> evidence to prove misappropriation... In this case, *Roll-Kraft*
> constructed a web of circumstantial evidence from which this
> Court drew inferences, convinced it was more probable than not
> what *Roll-Kraft* alleged happened did in fact take place."

200 F.Supp. at 923. Every word of that quotation applies to this case.

     Indeed, the evidence that Wiedemann assisted with the proposal for and worked on the

Savannah River Project on behalf of MLEA, and Defendants' cover-up of this fact, leads to the

22

logical conclusion that Defendants themselves know that such involvement by Wiedemann was wrongful. The evidence shows Wiedemann had access to all of AIT's proprietary information on the Savannah River Project, that it was in his possession, that he performed consulting services for MLEA concerning the Savannah River Project, that he assisted with MLEA's proposal, that he participated in the kick-off meeting for implementation of the project by MLEA after it secured the job, and that he was the main engineer on the job.

Defendants incorrectly argue that Plaintiff cannot recover on its claim for damages for misappropriation of trade secrets based on Gough's testimony that he recommended AIT third out of three companies who submitted bids for the design only portion of the Savannah River Project. First and foremost, there is absolutely no record evidence that Westinghouse would have awarded the project to MECA had the bidding process consisted of MECA and AIT only. Indeed, the record evidence establishes that, prior to Wiedemann's termination of employment, Accurate Machine had in fact relied upon AIT's proposal, not MECA's, in making its own proposal to Westinghouse. Furthermore, Gough himself stated that Accurate Machine made *recommendations* only, it was not the decision-maker: "[P]lease understand that I was not making the final decision here, I was only making a recommendation . . . ." (Gough Tr. at 53). In fact, in the very same testimony cited by Defendants, Gough reiterated, and Defendants' counsel acknowledged, this limited capacity:

> Q:   So if EGS or MLEA had not bid on the job or for some reason was disqualified, the work would have gone to MECA.
>
> A:   I believe that all other factors being equal, we would have *suggested* that Meca be chosen.
>
> Q:   I see. *Since you don't award the contract, you can't say the job would have gone to MECA but you would have recommended MECA.*

23

A:    That would have been my *recommendation*, yes.

(Gough Tr. at 54). Consequently, absent the sworn testimony from the actual decisionmaker at

Westinghouse, Defendants' argument that, absent MLEA, MECA would have been awarded the

project is entirely speculative and lacks any support in the record.

Moreover, even assuming that AIT would have lost the Savannah River Project

regardless of MLEA's participation in the bidding process, AIT is still entitled to recover

damages for Defendants' misappropriation of its trade secrets. Under such circumstances, even

if it is true, as Defendants argue, that AIT has not lost anything, "the appropriate measure of

damages . . . is not what the [p]laintiff lost, but rather the benefits, profits or advantage gained by

[d]efendant in the use of the trade secret." *Reinforced Molding Corp. v. General Electric Co.*,

592 F.Supp. 1083, 1088 (W.D.Pa. 1984); *SI Handling Systems, Inc. v. Heisley*, 658 F.Supp. 362,

371 (E.D.Pa. 1986). In the instant case, MLEA's and Wiedemann's "benefit, profit, or

advantage" is (i) the award of the Savannah River Project to MLEA in the amount of $91,000;

(ii) subsequent project awards by Accurate Machine to MLEA due to the now established all-

important contact with Accurate Machine in an industry where contacts mean everything and

comprise almost all of MLEA's marketing efforts (Timberlake Tr. at 10-11); and (iii)

Wiedemann's obtainment of full-time salaried employment at $92,500 (DelGaizo Tr. at Exhibit

2). Accordingly, AIT's motion for summary judgment concerning Defendants' misappropriation

of trade secrets should be granted.

24

**C.    IN ANY EVENT, AIT'S WORK PRODUCT ON THE SAVANNAH RIVER PROJECT WAS ITS PROPERTY WHICH MLEA USED WITHOUT COMPENSATING AIT**

Based on the same record evidence supporting AIT's misappropriation of trade secrets claim, AIT has established that Defendants unlawfully converted AIT's Savannah River Project information and thus were unjustly enriched.  Conversion is "the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995); *Welded Tube Co. of America v. Phoenix Steel Corp.*, 512 F.2d 342, 345 (3d Cir. 1975).  Plaintiff has sufficiently established a cause of action for conversion of its pricing, design, developmental, and other work concerning the Savannah River Project.  For illustration purposes, if this Court were to view the Savannah River Project from the time of the request for bid until the project's completion as a five-step process, then MLEA was able to start at step three or four of that process.  Indeed, Wiedemann, with all of his know-how acquired with AIT about the project, was able to pick up where he left off with AIT, but instead for the benefit of MLEA.  This is a classical conversion of intellectual property.  Thus, even if this Court were to conclude that AIT's work product on the Savannah River Project does not rise to the level of a trade secret, Plaintiff is entitled to judgment in its favor on its conversion and unjust enrichment claim.

**II.    THE RECORD EVIDENCE ESTABLISHES THAT WIEDEMANN BREACHED HIS FIDUCIARY DUTY OR DUTY OF LOYALTY TO AIT BY SHARING AIT'S SAVANNAH RIVER PROJECT INFORMATION WITH MLEA**

It is well established that "an agent owes a duty of loyalty to his/her principal, and in all matters affecting the subject of his agency, he/she must act with the utmost good faith in the furtherance and advancement of the interests of his/her principal." *Sylvester v. Beck*, 406 Pa.

607, 610, 178 A.2d 755, 757 (1962). An agent is a fiduciary with respect to matters within the scope of his/her agency and is required to act solely for the benefit of his/her principal. *See Onorato v. Wissahickon Park, Inc.*, 430 Pa. 416, 423, 244 A.2d 22, 26 (1968). The courts recognize that an employee's fiduciary duty or duty of loyalty to the employer *extends beyond the life of the employment relationship. See Air Products, supra*, 296 Pa. Super. at 415-16, 442 A.2d at 1119.

This duty of loyalty and non-disclosure arises from the confidential relationship which, of necessity, exists between an employer and an employee and exists independently of any contractual agreement not to disclose confidential information. *See Felmlee*, 466 Pa. at 8; 351 A.2d at 273 ("a pledge of secrecy is impliedly extracted from the employee, a pledge which carries with him even beyond the ties of his employment relationship").

The confidential nature of the employer-employee relationship that existed between AIT and Wiedemann imposed a duty upon Wiedemann not to use or disclose his former employer's trade secrets. Moreover, as a high level employee, Wiedemann was solely entrusted with the responsibility of supervising the Savannah River Project proposal. The confidential nature of Wiedemann's employment with AIT was reduced to written agreement between Wiedemann and AIT, thus contractually binding Wiedemann to maintain the confidentiality of the information he acquired during his employment, including the information about the Savannah River Project. Wiedemann blatantly disregarded and neglected his duties when he conspired to harm and injure AIT by dissuading Accurate Machine from continuing to use AIT, pushing Accurate Machine towards using MLEA for the Savannah Project, and then using his know-how acquired during his employment with AIT to assist with the proposal and perform actual work for MLEA on the

26

same project.[14]  Accordingly, AIT is entitled to summary judgment on its breach of fiduciary

duty or duty of loyalty claim against Wiedemann.

**III.   THE RECORD EVIDENCE ESTABLISHES THAT DEFENDANTS
TORTIOUSLY INTERFERED WITH AIT'S PROSPECTIVE BUSINESS
RELATION WITH ACCURATE MACHINE**

To state a cause of action for tortious interference with prospective business relations, a

plaintiff must establish:

      1.    the existence of a prospective business relation;

      2.    the purpose or intent to harm the plaintiff by preventing the relation from occurring;

      3.    the absence of privilege or justification on the part of the defendant; and

      4.    the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1980); *Glenn v.*

*Point Park College*, 441 Pa. 474, 479-480, 272 A.2d 895, 898 (1971).  The cornerstone of this

tort is whether there exists a reasonable probability that a plaintiff will contract with a third

party.  *See Glenn*, 441 Pa. at 480, 272 A.2d at 898.

In the instant matter, it was reasonably probable that AIT would have a contractual

relationship with Accurate Machine for the Savannah River Project.  Indeed, prior to

Wiedemann's termination of employment from AIT and MLEA's subsequent bid substantially

undercutting AIT, AIT was the lowest bidder for the Savannah River Project.  Defendants

unlawfully interfered with this prospective relationship, thus damaging AIT.  As already

discussed above, Defendants' assertion that AIT would not have been awarded the project, even

if Defendants had not engaged in their unlawful conduct, lacks any support.  Accordingly,

---

[14]    Wiedemann's contacts, while he was still employed by AIT, with Manzon and DelGaizo about employment opportunities are highly suspicious and lend further support to Wiedemann's breach of his duty to AIT.

Plaintiff is entitled to summary judgment on its claim for intentional interference with prospective contractual relations.

IV.    **THE RECORD EVIDENCE ESTABLISHES THAT DEFENDANTS CONSPIRED TO STEAL AIT'S SAVANNAH RIVER PROJECT INFORMATION**

Pennsylvania law recognizes a cause of action for civil conspiracy where two or more persons combine to do an unlawful act. *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999). More specifically, an action for damages exists for a conspiracy to misappropriate trade secrets or destroy the business of another. *Somat Corp. v. Combs*, 40 Pa. D. & C.2d 107 (1966); *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 953 F.Supp. 617 (E.D.Pa. 1997). To state a cause of action for conspiracy, a plaintiff must establish: (i) a combination of two or more persons acting with a common purpose to do an unlawful act, or to do a lawful act by unlawful means or for an unlawful purpose; (ii) an overt act done in pursuance of the common purpose; and (iii) actual legal damage. *McGuire v. Shubert*, 722 A.2d 1087 (Pa. Super. 1998). In the instant matter, Wiedemann and MLEA unlawfully conspired to misappropriate AIT's proprietary and confidential trade secret information concerning the Savannah River Project. AIT clearly has suffered from this conspiracy. Consequently, AIT's request for summary judgment should be granted.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court enter an order granting Plaintiff's motion for summary judgment in its entirety, and in turn deny Defendants' motion for summary judgment.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

RICHARD S. MEYER
DONALD D. GAMBURG
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
(215) 569-5699 (fax)

Date:   January 10, 2003

Attorneys for Plaintiff,
AMER INDUSTRIAL TECHNOLOGIES, INC.

29

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Plaintiff's Motion for Summary Judgment,

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment

and in Support of Plaintiff's Cross Motion for Summary Judgment, and proposed Order was

served via hand delivery, this 10th day of January, 2003 upon the following Attorney for

Defendants:

> Philip J. Katauskas, Esquire
> Pepper Hamilton LLP
> 3000 Two Logan Square
> 18th and Arch Streets
> Philadelphia, PA 19103-2799

Attorney for Plaintiff

30

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMER INDUSTRIAL TECHNOLOGIES, INC., | : | JUDGE MARY A. MCLAUGHLIN |
| | : | |
| | : | CASE NO.: 02-CV-2902 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MLEA, INC.; JOHN K. WIEDEMANN; and all others conspiring, acting in concert, or otherwise participating with them or acting in their aid or behalf, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT


EXHIBITS


HARD COPY OF EXHIBITS A THROUGH P
FILED WITH THE CLERK OF COURT