IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE McLAUGHLIN** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 02-CV-2902 |
| | : | |
| **MLEA, INC. and JOHN K. WIEDEMANN,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann") (collectively, "Defendants"), submit this brief as a reply in support of their December 23, 2002 Motion for Summary Judgment and accompanying Memorandum of Law ("the Motion"), and as a response brief in opposition to Plaintiff's cross motion for summary judgment ("the Cross Motion").  For the reasons set forth below, and for the reasons set forth in the Motion, Defendants' Motion should be granted, and the Plaintiff's Cross Motion should be denied.

**II.   BACKGROUND**

The factual background and procedural history is fully set forth in the Motion and is incorporated herein by reference.  Most recently, however, Defendants filed a Motion for Summary Judgment on December 23, 2002.  Plaintiff filed a response and Cross Motion for Summary Judgment on January 10, 2003.  Defendants file this Reply Brief in support of their motion for summary judgment and response in opposition to Plaintiff's Cross Motion.  The Court has scheduled oral argument for January 30, 2003.

-2-

### III. ARGUMENT

  A. <u>Plaintiff Cannot Prove Causation</u>.

  It is hornbook law that causation is a material element of a claim for damages. <u>See</u> <u>Rohm and Haas Co. v. ADCO Chemical Co.</u>, 689 F.2d 424, 429-30 (3d Cir. 1982) (plaintiff seeking damages for misappropriation of trade secrets must prove causation); <u>Greenberg v. Croydon Plastics Co., Inc.</u>, 378 F. Supp. 806, 811 (E.D. Pa. 1974) (same). In this case, as a matter of law, Plaintiff will never be able to prove causation in its claims for damages because the record is clear that, although AIT may have been a competitive bidder for a Savannah River Project involving both design *and fabrication*, it simply was not as qualified as either MLEA or the runner-up bidder, MECA, for the *design-only* Savannah River Project contract. With respect to the design-only contract, AIT was ranked third -- behind MLEA and MECA -- and would not have won the contract, even if MLEA had never bid on it.

  For Counts I, II, and III of Plaintiff's Amended Complaint to survive a motion for summary judgment, Plaintiff must establish a genuine issue of material fact as to whether AIT would have been awarded the Savannah River Project, but for the alleged wrong-doing of Defendants. Plaintiff cannot do that.[1]

  Ken Gough, President and General Manager of Accurate Machine and the person ultimately *de facto* responsible for deciding which of the three bidders would be the design subcontractor for the Savannah River Project, stated in his company's bid to the customer, Westinghouse Savannah River Company ("Westinghouse"), that, of the three bidding

---

[1] Count I of the Amended Complaint alleges misappropriation of trade secrets, Count II alleges breach of fiduciary duty/duty of loyalty, and Count III alleges tortious interference with contractual relations. That Defendants <u>caused harm to Plaintiff</u> is a material element of each cause of action. <u>See</u> <u>Thompson Coal Co. v. Pike Coal Co.</u>, 412 A.2d 466, 471 (Pa. 1979); <u>Air Products and Chemicals, Inc. v. Johnson</u>, 442 A.2d 1114, 1120 (Pa. Super. Ct. 1982).

companies: "Preferred option is to work with [MLEA], based on price, delivery, technical capabilities and acceptable reference checks. Second choice is to work with MECA, based on delivery, technical capabilities, acceptable references and close proximity to AMPCO [Accurate Machine]. Third choice is AIT, <u>for which there seems to be no compelling reason for preference</u>." <u>See</u> Gough Dep. Exhibit 7, appended to Exhibit A, as attached hereto. (Emphasis added.)[2] In his deposition, Gough made it clear that although AIT might be a preferred choice for a design *and fabrication* contract, it simply did not possess the design capabilities and expertise of either MLEA or MECA when it came to a design-only contract. <u>See</u> Gough Dep. Tr., at 67-68, 140-42, 182-83, attached hereto as Exhibit A. In Gough's estimation, as to the design-only contract, "[MLEA's] design experience for projects of this nature was more extensive than either of the other two bidders." <u>Id</u>. at 182-83. And as between just MECA and AIT, Gough stated: "So would MECA be a better choice for the design-only portion? With no offense to AIT, yes, I believe they would be the better choice. . . MECA's design capabilities were better than AIT's." <u>Id</u>. at 140-42.

Plaintiff's weak attempt to finesse this point does not hold up. Plaintiff suggests that because Ken Gough was only making a *recommendation* to Westinghouse as to which subcontractor Accurate Machine would prefer on the Savannah River Project contract, Defendants' argument is speculative. <u>See</u> Pl.'s Br., at 23. Indeed, it is the exact opposite. There is ample support, both testimonial and documentary, that MECA would have been awarded the design-only job over AIT had MLEA not bid on it. Nor is it speculative. Logic dictates that, absent some reason *not* to follow Accurate Machine's recommendation, Westinghouse would

---

[2] Defendants cite to the Exhibits of their December 23, 2002 Motion for Summary Judgment as being "attached to the Motion," and cite to the Exhibits attached to this Reply and Response Brief, as being "attached hereto."

accept Accurate Machine's recommendation. This is supported by the fact that Westinghouse did accept Gough's recommendation to use MLEA. Thus, the fact-finder may reasonably infer that Westinghouse would have accepted Gough's recommendation to use MECA over AIT had MLEA not bid. Finally, it is Plaintiff's burden to prove causation in the first place. See Greenberg, 378 F. Supp. at 811 (plaintiff in misappropriation of trade secrets case must prove causation). And from the record, there is no way that a reasonable fact-finder could conclude that if MLEA had not bid on the design-only contract, AIT would have been awarded the contract over MECA. AIT is the one engaging in speculation. See Gough Dep. Tr., at 54-55, 67-68, 140-42, 182-83; see also Gough Dep. Exhibit 7, both attached hereto as Exhibit A.

Thus, Defendants did not cause the harm alleged, because AIT would not have won the contract even if MLEA had never bid on it. Counts I, II & III of Plaintiff's Amended Complaint fail as a matter of law.

    B.    Plaintiff Still Has Not Proved Any Trade Secrets Were Misappropriated By Defendants.

In addition to lacking the material element of causation, Plaintiff cannot show that the vague "material in question" constitutes trade secrets under Pennsylvania law – a prerequisite to its claims relating to trade secrets. Thus, Counts I, II & III of Plaintiff's Amended Complaint should be dismissed for this reason as well.

Early in this case, Defendants permitted Plaintiff to inspect the hard drives of their computers in its search for the trade secrets that the Defendants are alleged to have stolen.[3] Plaintiff's computer expert copied those hard drives, ran proprietary software on them and

---

[3] Contrary to Plaintiff's insinuations in the Cross Motion that Defendants had something to hide, or engaged in some sort of cover-up, Defendants have always wanted to clear their name and dispose of this baseless lawsuit. The willingness and promptness with which they agreed to permit such a broad and invasive inspection of their computers, including Mr. Weidemann's personal laptop computer, without resisting, in an effort to clear their names, belies any suggestion that they engaged in a cover-up.

downloaded to hard copy thousands of pages of documents.  Plaintiff also engaged in motion practice by insisting that Defendants produce MLEA's own final designs and calculations for the Savannah River Project ("the Deliverables").[4]  AIT demanded access to the MLEA Deliverables so that its hired outside engineering expert could compare MLEA's Deliverables with AIT's alleged proprietary and confidential information and thus be able to point to MLEA's use of that information in the Deliverables.  Plaintiff hired an expert engineering consultant, had him sign the "Attorney's Eyes Only" confidentiality Stipulation, and on November 7, 2002, informed Defendants that the expert was "scheduled to review MLEA's deliverables next week."

After all of that, however, no expert report or affidavit was forthcoming, and there is not one mention of the engineering expert or his review in the Plaintiff's entire brief.  The reason?  MLEA simply did not ever have access to, use of, or benefit in any way from, anything that was proprietary to AIT.  Thus, the engineering expert could not find <u>anything</u> belonging to

---

[4] Defendants resisted the production of the MLEA Savannah River Project Deliverables because they were proprietary to the customer, Westinghouse (a contractor of the U.S. Department of Energy), and the customer did not want a potential bidder on the fabrication component to have the advantage of seeing the designs before other potential bidders for the fabrication work.  This apprehension was warranted.  AIT President, Ahmad Amer, had previously shown an inclination to engage in unethical and illegal conduct during the bidding process for other Westinghouse work.  See Hansrote v. AIT, 586 F. Supp. 113, 115 (W.D. Pa. 1984), aff'd., 770 F.2d 1070 (3d Cir. 1985).  In Hansrote, a jury returned a verdict in favor of a former employee of AIT who claimed he'd been wrongfully terminated.  The employee claimed that Mr. Amer had conditioned his employment with AIT on his improperly influencing his then employer, Westinghouse, to award a bid to AIT.  In denying AIT's motion for JNOV, the court found that there was sufficient evidence from which a jury could find that "Amer terminated its employment relationship with [employee] because [employee] refused to participate in AIT's unlawful and unethical conduct."  Id. at 115.  The Hansrote opinion is attached hereto as Exhibit B.  Moreover, Mr. Amer is apparently still engaging in unethical conduct in connection with the preparation of AIT bids and proposals.   His former secretary, E. Joyce Haan, testified that Mr. Amer recently directed her to falsify the resume of a quality-control specialist who had been employed by AIT for only a few months.  Amer's apparent motive was to make it appear that the specialist had been employed by AIT for two years – in order to include the resume in a bid for which the prospective customer required the people who would work on its contract to have been employed by the bidder for two or more years.  Haan Dep. Tr., at 85-87, 120-21, attached hereto as Exhibit C.  Thus, in this case, Defendants and third parties were justified in insisting on some form of protective stipulation.  However, once the Court granted a form of protective order requiring Plaintiff to agree to an "attorneys' eyes only" confidentiality stipulation, by which Amer or AIT would not have access to the Deliverables, Defendants produced the Deliverables for inspection and review by Plaintiff's outside engineering consultant.

AIT in any of MLEA's work product.[5] Nor has Plaintiff's computer expert provided any evidence that anything proprietary to AIT was found on Defendants' computers. Plaintiff has not met its burden of establishing the existence of a trade secret under Pennsylvania law.

The *existence* and *identification* of a trade secret is a *prerequisite* to AIT's claims.[6] Without first identifying the alleged trade secrets, Plaintiff cannot prove an essential element of its claims. See SI Handling Systems v. Heisley, 753 F.2d 1244, 1255 (3d Cir. 1985) (under Pennsylvania law, plaintiff must show that information at issue constitutes trade secret). Between the time it brought this suit in May 2002, and January 10, 2003, when it responded to the Defendants' Motion, AIT had yet to prove just what "proprietary and confidential information" Mr. Wiedemann supposedly spirited away.

Apparently the best that Plaintiff can do to present what it considers to be the "trade secrets" that it alleges Wiedemann took and gave to MLEA, is mentioned in passing on page 20 of the Cross Motion. For it is there that, *for the very first time in this litigation*, Plaintiff has identified anything that it considers to be AIT's misappropriated trade secrets: 1) "the preliminary designs by AID"; 2) "the 3D designs by Wiedemann"; and 3) "AIT's proposal." See Pl.'s Br. at 20. Argument by counsel is not evidence, and AIT has not provided this Court or Defendants with any evidence that the "preliminary designs by AID" or the "3D Designs" are trade secrets under Pennsylvania law.

---

[5] Moreover, this exercise was doomed from the start as Plaintiff never even identified any supposed proprietary information that it claims was taken in the first place, much less met its burden of establishing that, even if there were any information, it constituted a trade secret. In other words, there was never anything against which this engineering expert could compare MLEA's Deliverables.

[6] Recognizing the shortcoming in its case, Plaintiff filed an Amended Complaint in response to Defendants' first Motion to Dismiss. The Amended Complaint added a count for unjust enrichment and conversion of Plaintiff's proprietary information in order to attempt to circumvent the fact that it could never establish the existence of a trade secret and because it would be unable to prove that MLEA had caused AIT any harm.

Plaintiff suggests that its proposals, and the bid price contained therein, is a trade secret. Although it may be confidential business information, it is not a trade secret under Pennsylvania law. Air Products, 442 A.2d at 1120 (under Pennsylvania law, a trade secret differs from other proprietary business information in that it does not include information as to single or ephemeral events in the conduct of the business, as, for example, *the amount or other terms of a secret bid for a contract*, rather, a trade secret is a formula, process or device for continuous use in the operation of the business). And as to AIT's design-only bid price for the Savannah River project, Mr. Wiedemann flatly denied under oath that he ever disclosed that bid price, because doing so would be "unethical." See Wiedemann Dep. Tr., at 278, attached hereto as Exhibit D.

Thus, Counts I, II & III should be dismissed, because after having been given every opportunity to do so, Plaintiff still has not proved the existence of a trade secret under Pennsylvania law.

C. Defendants Did Not Use, or Benefit From Any AIT Proprietary Information to Win or Perform the Savannah River Project Contract.

Plaintiff argues that, even if such information does not constitute a trade secret under Pennsylvania law, MLEA allegedly converted and benefited from AIT's pricing and bidding information on the project. The record does not support that contention. Thus, AIT cannot prevail on Count V, as a matter of law, because Defendants used only their own independent professional training, experience and judgment to bid on and perform the Savannah River Project – and did not need, use, or benefit from, any AIT confidential and proprietary information (whether a "trade secret," or not). Plaintiff's specious argument about an alleged "cover-up" of Wiedemann's involvement creating an inference of wrong-doing is nothing more than speculation and innuendo. See Greenberg, 378 F. Supp. at 812 & 815 (such inferences can

be overcome by a showing by defendants that they achieved the desired result through their own independent effort).

>    1.    Defendants Used Only Their Own Independent Professional Training, Experience and Judgment to Bid On and Perform the Savannah River Project, and Did Not Use Or Benefit From Plaintiff's, Or Anybody Else's Proprietary Information.

In this case, Wiedemann and Manzon are the MLEA engineers whose aptitude, skill and mental abilities designed and oversaw the design of the Deliverables for the Savannah River Project. Wiedemann had over 20 years experience designing and working with pressure vessels before he was hired by AIT.[7] See Wiedemann Dep. Tr., at 9-22, attached hereto as Exhibit D. Manzon has over 30 years experience, including prior experience working for Westinghouse Savannah River Company.[8] See Manzon Dep. Tr., at 22-24, attached to the Motion as Exhibit G. Each has done many design projects like the Savannah River Project. It is, therefore, baseless for Plaintiff to contend that Defendants would even need confidential and proprietary information from AIT in order to bid on the Savannah River Project contract.[9] See

---

[7]    Wiedemann, having never entered into any form of non-compete agreement with AIT, was free to compete with AIT. Spring Steels, Inc. v. Molloy, 162 A.2d 370, 376 (Pa. 1960). As long as he did not use any proprietary information belonging to AIT – which he did not -- he was free to work on the Savannah River Project. See id. at 374 (after termination of his agency, in absence of restrictive agreement, agent can properly compete with his principal as to matters for which he had been employed).

[8]    Indeed, for Plaintiff to suggest, as it does in its Brief that Wiedemann "elevated" himself by associating himself with AIT in order to appear more appealing to Accurate Machine is simply wrong. If anything, the record bears out the opposite. Of the people Ken Gough of Accurate Machine met at AIT, he was most impressed with Wiedemann's capabilities. Gough Dep. Tr., at 17-18, 159-60, attached hereto as Exhibit A. When AIT fired Wiedemann, Gough was stunned because he considered Wiedemann to be an "integral part of the team that had won our approval." Id. at 69-70. By contrast, even without Wiedemann on board, MLEA was much more qualified than AIT to do the design-only work for the Savannah River Project by virtue of Paul Manzon's experience – and most particularly, his prior Westinghouse Savannah River Project experience -- a premium asset in the eyes of Accurate Machine and its customer, Westinghouse. See id. at 38-39, 67-68, 185-87, see also Gough Aff., ¶ 11, attached to the Motion as Exhibit C. See also footnote 9, infra.

[9]    Plaintiff speculates that MLEA could not possibly have prepared a design-only bid in such a short time without having availed itself of AIT's pricing and bid information. Plaintiff is incorrect. As MLEA President and CEO, Ted DelGaizo, testified, for an experienced engineering design company, preparing a design-only bid is simply a matter of reviewing the job specifications and estimating the number of man hours it will take to render

(continued...)

Pittsburgh Cut Wire Co. v. Sufrin, 38 A.2d 33, 35 (Pa. 1944) (citing Williston on Contracts, § 1646, p. 4627); Spring Steels, 162 A.2d at 373 (employee had right to use his own advantage, experience, knowledge, memory and skill, which he gained while there employed). Mr. Manzon and Mr. Weidemann combined had <u>over</u> 50 years of engineering design experience to bring to bear on the Savannah River project. It makes no sense to argue that they got --- or indeed needed --- anything at all from AIT to bid on and perform the Savannah River project.

>   2.  Plaintiff's Alleged "Cover-Up" Is Nothing More Than Unsupported Speculation and Innuendo.

Plaintiff, having emerged from discovery without any evidence to support its claims, now tries desperately to hold together the remains of its case with nothing more than unsupported speculation and innuendo. Plaintiff claims that Defendants engaged in some elaborate cover-up to hide Wiedemann's alleged misappropriation of AIT trade secrets. Plaintiff's reliance on immaterial discrepancies (all of which were clarified by witnesses during depositions) as evidence of some grand "cover up" by Defendants is baseless.

For instance, Plaintiff contends that Wiedemann is hiding something because he initially got his official hire date by MLEA wrong by one week. He initially thought his hire date was March 25, 2002, when it turned out to be March 18, 2002. But how that is relevant at all, is not explained by the Plaintiff. He either gave AIT confidential information to MLEA, or

---

(continued...)

design calculations and drawings – only a few hours worth of work. See DelGaizo Dep. Tr., at 74, 83, 110, and 125, attached hereto as Exhibit E  Indeed, when informed by Accurate Machine that the original design and fabrication contract had been changed to one for design-only, AIT was able to turn its own design-only bid around in only one day. See Pl.'s Br., at 6. See also Hamdan Dep. Tr., at 73, 75-76, attached hereto as Exhibit F. Moreover, AIT's specialty is fabrication, not design. Id. at 63, 65. By contrast, MLEA's specialty is design work. See Gough Dep. Tr., at 53-54, 177-78, 182-83, attached hereto as Exhibit A. For AIT to suggest that MLEA needed to see AIT design-only bid and pricing information in order to quickly prepare a design-only bid of its own is disingenuous.

he didn't, regardless of his start date – and here all evidence of record supports a finding that he disclosed nothing of AIT's to MLEA.

With respect to Wiedemann's pre-hire consulting work for MLEA, Plaintiff tries to suggest Wiedemann and DelGaizo deliberately tried to conceal the fact that Wiedemann billed 8-10 hours to the Savannah River Project before he was hired full-time by MLEA. But Plaintiff cannot dispute that the work was performed <u>after</u> MLEA had won the contract, not before. Since Mr. Amer admitted that Wiedemann was free to compete against AIT, (see Amer Dep. Tr., at 181, attached hereto as Exhibit G), and because there is no evidence that Wiedemann gave AIT information to MLEA, it is irrelevant whether Wiedemann billed a few hours to the Savannah River Project before he was actually hired as a full-time employee.[10] Mr. Weidemann was free to compete as a consultant or as an MLEA employee.

The most egregious example of Plaintiff's desperation is the allegation that the "only two relevant documents" retrieved from Wiedemann's personal laptop computer during the inspection were deliberately withheld in an attempt to hide something from Plaintiff. See Pl.'s Br., at 17 & 19. In truth, and as confirmed by the Plaintiff's own computer expert, the two subject documents were apparently inadvertently withheld from both Defendants and Plaintiff *by Plaintiff's own expert*. When the error was discovered by counsel for the parties, the

---

[10] Moreover, Plaintiff insinuates, without any evidence whatsoever, that Wiedemann deleted AIT confidential information from his personal laptop computer prior to discovery. The only evidence of record establishes that Wiedemann did no such thing. "Q: What was the reason that Exhibit 57 was still on your laptop at the time it was inspected? A: I didn't delete anything from my laptop." See Wiedemann Dep. Tr., at 276-77, attached hereto as Exhibit D. Moreover, Stanley Yavoroski, Plaintiff's computer expert, offered no report or affidavit suggesting that anything had been deleted from Wiedemann's laptop. See also Claire Furia Smith, Cyber Sleuths Bring Back Deleted Files, Philadelphia Inquirer, May 27, 2002 (reporting that "cyber sleuths" such as Yavoroski can easily retrieve deleted e-mails and data which are never really deleted, but stored until written over – which can take many months or even years).

Plaintiff's computer expert quickly provided the documents to counsel for Plaintiff and Defendants at the same time by electronic fax.[11]

Plaintiff's reliance on case law that suggests that circumstantial evidence can be used to prove a misappropriation of trade secrets is inapplicable here. First, the doctrine is applicable only to established legal trade secrets, an element of this case that Plaintiff is unable to prove. See Greenberg, 378 F. Supp. at 812-14. Second, to obtain the relief it seeks here, it must still prove causation, again, an element Plaintiff cannot prove as a matter of law. Moreover, Plaintiff's speculative inferences do not overcome the direct evidence offered by Defendants. Wiedemann testified that he did not ever disclose any of AIT's bid or pricing information to MLEA. Wiedemann Dep. Tr., at 278, attached hereto as Exhibit D. DelGaizo testified that MLEA did not use anything but its own experience in preparing a bid price for the design-only contract. See DelGaizo Dep. Tr. at 74, 83, 110 and 125, attached hereto as Exhibit E; see also DelGaizo Aff., ¶ 8, attached to the Motion as Exhibit D. The large difference in bid prices, contrary to what Plaintiff argues, suggests, as supported by DelGaizo's testimony, that MLEA and AIT each employed completely independent processes in preparing their respective bids. See id.; see also Greenberg, 378 F. Supp. at 812 & 815 (inference based on circumstantial

---

[11] The most disturbing part of Plaintiff's grasping at "circumstantial evidence" of Defendants' alleged wrong-doing is that this non-issue caused by Plaintiff's expert's own inattentiveness was resolved among counsel over six months ago. For Plaintiff to bring it up now as part of its argument is not only evidence of Plaintiff's desperation, but a rather disappointing reflection on Plaintiff's counsel as well. See e-mail correspondence between counsel, July 11 and August 8, 2002, attached hereto as Exhibit H. Moreover, the two documents, attached to the Cross-Motion at Exhibit O, contain no trade secrets or other confidential information belonging to AIT and would be of absolutely no use, or any benefit, to anyone. They consist simply of an outline or template for the preparation of a bid proposal, and contain nothing more than very generic background and qualifications statements similar to what appears on the AIT website. See http://www.amerindustrial.com. Plaintiff's efforts to draw an inference of a "cover-up" by Defendants -- using a mistake by Plaintiff's own computer expert with respect to completely irrelevant documents – is sad.

evidence can be overcome by a showing by defendants that they arrived at bid price independently).

Count V of Plaintiff's amended complaint should be dismissed because Plaintiff's pure speculation regarding completely immaterial facts cannot create a genuine issue of material fact as to whether Defendants did anything other than what they testified they had done in this case, and in numerous other design-only jobs: simply estimated the number of man hours that it should take to complete the calculations and drawings based on the job specifications.

D. Count VI of Plaintiff's Amended Complaint Cannot Stand Alone, and Thus Should Be Dismissed.

As set forth in the Motion, a claim for civil conspiracy does not survive without an underlying predicate wrong-doing. See Thompson Coal, 412 A.2d at 472. Accordingly, if this Court grants Defendants' Motion as to Counts I, II, III & V, then it should also grant Defendants' Motion as to Count VI as well.[12]

---

[12] As set forth in footnote 1 of Plaintiff's Cross-Motion, Plaintiff has voluntarily withdrawn its claims as to Count IV of the amended complaint, relating to tortious interference with prospective contractual relations (incorrectly identified as "existing" contractual relations in Plaintiff's Cross Motion. See Pl.'s Br., at 2.

## IV. CONCLUSION

Plaintiff has not, and cannot, demonstrate a genuine issue of material fact as to whether the Defendants caused the damages alleged in Counts I, II & III of the Amended Complaint. Nor can Plaintiff demonstrate the existence of any trade secret under Pennsylvania law that is relevant to the allegations of the Amended Complaint. Finally, Plaintiff's speculation cannot meet its burden of opposing summary judgment as to its allegations that Defendants used and were unjustly enriched by AIT's proprietary information to underbid and win the Savannah River Project contract. For the foregoing reasons, and for the reasons set forth in Defendants' Motion for Summary Judgment, Defendants' Motion should be granted as to all Counts of the Amended Complaint.

Respectfully submitted,

PEPPER HAMILTON LLP
Philip J. Katauskas
Robert S. Nix
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Defendants MLEA, Inc. and
John K. Wiedemann

Date:  January 17, 2003

## **CERTIFICATE OF SERVICE**

        I, Robert S. Nix, certify that a true copy of the foregoing Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment and Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment was served via hand delivery, this 17th day of January, 2003 upon the following Attorney for Plaintiff:

        Donald D. Gamburg, Esquire
        Blank Rome Comisky & McCauley LLP
        One Logan Square
        Philadelphia, PA  19103-6998


        _____
        Robert S. Nix