## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMER INDUSTRIAL TECHNOLOGIES, INC.,** | : | **JUDGE MARY A. MCLAUGHLIN** |
| | : | |
| | : | **CASE NO.: 02-CV-2902** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **MLEA, INC.; JOHN K. WIEDEMANN; and** | : | |
| **all others conspiring, acting in concert, or** | : | |
| **otherwise participating with them or acting in** | : | |
| **their aid or behalf,** | : | |
| | : | |
| **Defendants.** | : | |

### PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
### PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

As oral argument is scheduled for January 30, 2003, with one exception, Plaintiff, Amer

Industrial Technologies, Inc. ("Plaintiff" or "AIT"), will reserve all arguments in reply to the

brief filed by Defendants, MLEA, Inc. ("MLEA") and John K. Wiedemann ("Wiedemann")

(collectively referred to as "Defendants"), on January 17, 2003. AIT believes it must, even

before argument, address what it considers a material misrepresentation of the record. That

misrepresentation appears on page 10 of Defendants' Response Brief where Defendants state:

> With respect to Wiedemann's pre-hire consulting work for MLEA,
> Plaintiff tries to suggest Wiedemann and DelGaizo deliberately
> tried to conceal the fact that Wiedemann billed 8-10 hours to the
> Savannah River Project before he was hired full-time by MLEA.
> But Plaintiff cannot dispute that the work was performed *after*
> MLEA had won the contract, not before.

(Emphasis in original).

To the contrary, Plaintiff vigorously disputes that assertion. Defendants' statement

contradicts the undisputed facts in this case as set forth in Plaintiff's original memorandum on

pages 10-12. Defendants, even in the face of unqualified deposition testimony by Defendant

John Wiedemann himself, continue to deny that Wiedemann assisted with and prepared MLEA's

proposal for the Savannah River Project and that MLEA witnesses, in their affidavits and

deposition testimony, attempted to conceal this fact.

## ARGUMENT

Theodore DelGaizo (MLEA President/CEO) and Wiedemann submitted affidavits

concealing the fact of Wiedemann's role. (*See* AIT's initial memorandum at 14-15 and

references to the record contained therein). Then DelGaizo, Keith Michael (MLEA VP Sales

and Marketing), and Paul Manzon (MLEA VP Special Projects and Chief Structural Engineer)

furthered this misrepresentation in their deposition testimony. (*See* AIT's initial memorandum at

15-16 and references to the record contained therein).

However, Wiedemann himself left no doubt that he assisted with and actually prepared

part of MLEA's February 8, 2002 proposal to Accurate Machine for the Savannah River Project,

thereby totally undermining his, DelGaizo's, Michael's, and Manzon's prior sworn statements,

not to mention counsel's misrepresentation quoted hereinabove.

In his deposition, Wiedemann testified as follows:

> Q:    Did you review any documents on behalf of MLEA
> concerning the project prior to award of the bid to MLEA?
>
> A:    Yes.
>
> Q:    What documents did you review?
>
> A:    I think I looked at Keith Michael's final proposal that he
> sent out. Keith had asked me how long it would take to do the
> mechanical work or what disciplines would be involved,
> something to that effect.

*       *       *

2

Q:    Other than reviewing Mr. Michael's proposal, did you review any other documents on behalf of MLEA concerning the project prior to the award?

A:    I saw the specification for the project that was sent to Main Line Engineering.

Q:    Who provided you with those specs for the project?

A:    I think Paul Manzon – either Paul or Keith.

Q:    What was the reason for either Mr. Manzon or Mr. Michael providing the specs to you?

A:    So I could give them a feel of how long it would take me to do my aspect of the design.

                         *         *         *

Q:     How long did it take you to review those specs to make that determination?

A:    Probably eight – no more than eight hours. . . .

(Wiedemann Tr. at 74-75).

    *Wiedemann further testified that, not only did he work on the proposal, he prepared part*

*of the proposal:*[1]

Q:    I've handed to you Exhibit 5 to your deposition [MLEA's proposal to Accurate Machine for the Savannah River Project dated February 8, 2002]. Take your time reviewing Exhibit 5. Let me know when you're done reviewing it. Do you recognize Exhibit 5?

A:    Yes.

Q:    What is Exhibit 5?

A:    This is the proposal for Main Line Engineering to Accurate Machine for the equipment identified in the spec.

---

[1] Exhibit 5 to Wiedemann's deposition transcript, extensively referred to in these excerpts, is attached hereto. (It, along with the cited transcript pages herein, also appears in Exhibit A to AIT's initial memorandum).

Q:    Is this the Michael letter that you referred to earlier?

A:    That's correct, Keith Michael.

Q:    Did you review this letter prior to it going out?

A:    Yes.

Q:    And earlier you testified that you provided an estimate of the hours for your discipline required for the proposal, correct?

A:    Correct.

                    *       *       *

Q:    *If you'd turn to the last page of Exhibit 5, where there's a chart entitled, price breakdown –*

A:    *Yes.*

Q:    -- which disciplines – there's a column on the left there entitled, discipline, correct?

A:    Correct.

Q:    *Which of those disciplines did you provide an estimated hours for to Mr. Michael?*

A:    *For the mechanical/structural work.  That would be my role.*

                    *       *       *

Q:    *Other than providing the estimated hours for that discipline, did you have any other involvement in the preparation of Exhibit 5?*

A:    *Well, as I mentioned twice earlier, they defined the disciplines that would be required, as well as my hours for the mechanical side.*

Q:    So for the other four disciplines, process electrical, CAD and QA/project management, you identified those other four disciplines for Mr. Michael?

A:    The disciplines you'll need for this project, upon review of the spec you'll need mechanical, structural, you'll need process, you'll need electrical, you'll need CAD, and you'll need QA/project management to get this project done.

4

\*       \*       \*

Q:    Did you have any discussion with Mr. Michael about those other four disciplines?

A:    That he needed to go to the other departments and get their input on it, make sure that they agreed with whatever numbers he comes up with.  I couldn't speak for the other disciplines.

Q:    Did you prepare any of the typewritten aspects of this letter?

A:    I'm looking at the table here, *and the table itself may have been my example table.*

Q:    The table on page 4, at 0004?

A:    Yes, the table where it shows, you have the components on one side, and then the disciplines on the other.

\*       \*       \*

Q:    *Which aspects of this table on the last page of this exhibit did you supply?*

A:    *Formatting, the structure of how it's set up.*

Q:    *So if I understand, you provided the left column, the top column, and the lines?*

A:    *Yes, how much it will – what it will take to get each one of these components designed.*

(Wiedemann Tr. at 81-85) (emphasis added).

Notwithstanding this unambiguous testimony, and after Plaintiff restated the testimony in its own memorandum of law dated January 10, 2003, Defendants persist in representing to the Court that Wiedemann did no work on the Savannah River Project until after Accurate Machine awarded the subcontract to MLEA.  That representation flatly made on page 10 of their brief is simply false.  However one might characterize it, only one logical conclusion can be drawn from Defendants' persistent denial of Wiedemann's participation in preparing MLEA's astoundingly quick (three days) and inexplicably priced proposal ($36,000 under AIT *and* MECA):

5

Defendants have something to hide, and the inescapable inference is that what they are hiding is that Wiedeman gave MLEA enough of AIT's work product on the Savannah River Project, trade secret or not, to enable it to submit in three days a proposal without any meaningful cost of development to MLEA and thereby to underbid AIT and MECA by 30 percent.

**CONCLUSION**

For all of the foregoing reasons and the reasons set forth in Plaintiff's initial memorandum, Plaintiff respectfully requests that this Court enter an order granting Plaintiff's motion for summary judgment in its entirety, and in turn deny Defendants' motion for summary judgment.

Respectfully submitted,

BLANK ROME COMISKY & McCAULEY LLP

RICHARD S. MEYER
DONALD D. GAMBURG
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
(215) 569-5699 (fax)

Date:    January 22, 2003

Attorneys for Plaintiff,
AMER INDUSTRIAL TECHNOLOGIES, INC.

112300.00400/21112538v1

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Plaintiff's Reply Brief in Support of Plaintiff's

Cross Motion for Summary Judgment was filed electronically this 22nd day of January, 2003, and

that service shall be sent via the Electronic Case Filing system upon the following attorney for

Defendants:

> Philip J. Katauskas, Esquire
> Pepper Hamilton LLP
> 3000 Two Logan Square
> 18th and Arch Streets
> Philadelphia, PA 19103-2799
> E-Mail:  katauskasp@pepperlaw.com

_____
Attorney for Plaintiff

112300.00400/21112538v1

**EXHIBIT A**

# MLEA    *Engineered Gas Systems*

February 8, 2002

Ms. Yvonne Zdonowicz,
Purchasing Manager
Accurate Machine Products Corporation
P.O Box 998
Johnson City, TN 37605-0998

FAX: 423-928-1063

RE: **Your Inquiry 122C-001, dated Feb 5, 2001**
    Our EGS Proposal ES-2002-10

Dear Ms. Zdonowicz:

We thank you for the bid package for design of process equipment per Westinghouse Savannah River Co. Specification M-SPP – H-00353. Engineered Gas Systems is an industry leader in engineering and design of industrial gas equipment.  Our in-house expertise can provide the required design, documentation and fabrication drawings for this project.  Our experience includes welding and polishing requirements for tritium gas. Our designs are fabricated by regional shop(s) working with our engineers and designers. We would welcome the opportunity to supply this process equipment based on our design for Accurate Machine Products in the future.

## SCOPE OF SUPPLY

This proposal includes engineering, documentation and drawings for the following process items per the requirements of Westinghouse Procurement Specification M-SPP-H-00353, Tritium Extraction Facility Catalytic Reactors and Heat Exchangers, Rev.1:
1) Catalytic Reactor Preheaters design
2) Catalytic Reactor Aftercoolers design
3) Process Coolers design

The total design process will be allocated to each engineering discipline and support department as required. This proposal is based on lead direction and technical contributions from our mechanical/structural group and participation from process design, electrical and CAD groups. Our resources for this project will be allocated to ensure that schedule and quality are maintained.  Our experience with the Savannah River project will assist in the understanding and execution of the review process and hold points mentioned in the specification.


EXHIBIT
John
Wiedemann-5
JW 127 02

MLEA 0002

# MLEA Engineered Gas Systems

Deliverables shall include :

1. 2000 ASME Section VIII, Div. 1 design calculations for Lethal service, including dynamic analysis for each pressure vessel listed above;
2. TEMA "R" calculations as required for each heat exchanger design;
3. Thermal and hydraulic calculations as required for each vessel;
4. Electrical sizing calculations as required for the Preheater design;
5. Structural calculations as required for vessel supports;
6. Fabrication drawings for each vessel in AutoCad 2000 format.

## PRICING

The following pricing is offered per the above scope:

| Equipment | Engineering, ASME/TEMA Design Calculations and Fabrication Drawings Total |
|---|---|
| Catalytic Reactor Preheaters | THIRTY THREE THOUSAND DOLLARS ------ $33,000. |
| Catalytic Reactor Aftercoolers | TWENTY NINE THOUSAND DOLLARS ------- $29,000. |
| Process Coolers | TWENTY NINE THOUSAND DOLLARS ------- $29,000. |
| Total Price: | NINETY ONE THOUSAND DOLLARS----------$91,000. |

## DELIVERY

1. Preliminary design and calculations available for review:      4-6 weeks ARO
2. Final Calculations incorporating review comments:      2-3 weeks after reciept.

## ATTACHMENTS

Per your request, please find attached the following transmittals:

1) Main Line Engineering Inc. QA Procedures, applicable to both divisions, Main Line Engineering and Engineered Gas Systems
2) Company history
3) Qualifications of Primary Engineers
4) References for similar projects

We look forward to this and future opportunities with Accurate Machine Products.

Keith Michael

VP –Sales & Marketing

MLEA 0003

211 Welsh Pool Road • Suite 120 • Exton, PA  19341 • (610) 594-9310 • Fax (610) 594-9311 • www.mlea.com

 **Engineered Gas Systems**

### Price Breakdown

| Discipline | Mechanical /Structural | Process | Electrical | CAD | QA/Project Management |
|---|---|---|---|---|---|
| Catalytic Reactor Preheaters | $16k | $7k | $4k | $4k | $2k |
| Catalytic Reactor Aftercoolers | $16k | $7k | | $4k | $2k |
| Process Coolers | $16k | $7k | | $4k | $2k |
| Total Discpline Price: | $48k | $21 | $4 | $12 | $6 |
| Total Price per Unit: | $33 | $29 | | $29 | |
| Total Project Price: | $91 | | | | |

MLEA 0004

211 Welsh Pool Road • Suite 120 • Exton, PA  19341 • (610) 594-9310 • Fax (610) 594-9311 • www.mlea.com